**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

---

The Northern Trust Company,

                Plaintiff,

vs.

Dharod Family, LLC, Dharod Family Trust,
and Harshad Dharod,

                Defendants.

Civil Action No. _____

---

**COMPLAINT**

---

The Plaintiff, The Northern Trust Company ("**Plaintiff**" or "**Lender**"), by its undersigned attorneys, for its complaint against Defendants, states and alleges the following:

**INTRODUCTION**

Plaintiff is the holder of a promissory note, in the original principal amount of $20 million (the "**Note**"), that was executed by Senior Classic Leasing, LLC, DFG Restaurants, Incorporated, Harshad & Nasir Corporation, Sun Gir Incorporated, Second Star Holdings LLC, and Third Start Investments LLC (collectively, the "**Borrowers**"), which owned and operated 59 Carl's Jr. restaurants throughout northern and central California. On April 2, 2026, the Borrowers each separately filed bankruptcy petitions in the United States Bankruptcy Court for the Central District of California, Santa Ana Division. The bankruptcy cases are being jointly administered under case number 8:26-bk-11056-SC. Borrowers' payment and performance obligations to Plaintiff under the Note are unconditionally guaranteed by each of the Defendants, jointly and severally.

Borrowers are in default under the Note. Accordingly, Plaintiff seeks a money judgment against the Defendants, jointly and severally, pursuant to the terms of their guaranties as described herein.

## PARTIES

1. Lender is, and at all times relevant to this matter was, an Illinois banking corporation with a banking office located at 50 South LaSalle Street, Chicago, Illinois 60603.

2. Defendant Dharod Family, LLC (the "**Company**") is a Nevada limited liability company with a principal place of business located at 1 Center Pointe Drive, Suite 400, La Palma, California 90623, which can be served through its registered agent National Corporate Research Ltd., 202 South Minnesota Street, Carson City, Nevada 89703. Its members are: Defendant Hashad D. Dharod, a resident of the state of California; Chetna H. Dharod, a resident of the state of California; and Dharod Family Corporation, a corporation formed under the laws of the state of California.

3. Defendant Dharod Family Trust (the "**Trust**") is a revocable trust organized under the laws of the State of California, with a principal place of business locate at 1 Centerpointe Drive, Suite 490, La Palma, California 90623. Defendant Harshad Dharod is the settlor and trustee of the Trust under the Trust Agreement dated October 26, 1995.

4. Harshad Dharod ("**Dharod**") is a resident of the State of California residing at 38 Shoreridge, Newport Coast, CA 92657.

## JURISDICTION AND VENUE

5. Defendants each contractually agreed that all lawsuits arising under their Guaranties, defined herein, shall be subject to litigation in courts having situs within or jurisdiction over Cook County, Illinois; thus, Defendants each consented to personal jurisdiction in this court.

6.     Defendants have further consented to the jurisdiction of this court expressly in their Guaranties and waived any right to transfer or change venue.

7.     This court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because there is complete diversity between the Plaintiff and each Defendant herein and because the amount in controversy exceeds $75,000.00.

8.     Venue is proper in the Northern District of Illinois under 28 U.S.C. § 1391(b) because the subject Loan was made in Illinois, and the parties contracted for venue in Illinois courts.

**FACTS**

9.     Lender and Borrowers entered into that certain Term Loan Agreement dated as of September 5, 2025 (the "**Loan Agreement**"), pursuant to which Lender agreed to make a term loan to Borrowers in the original principal amount of $20,000,000.00 (the "**Loan**"), a true and correct copy of which is attached hereto as **Exhibit A**.

10.     The Loan is evidenced by that certain promissory note executed by Borrowers and delivered to Lender, dated as of September 5, 2025, as subsequently amended, extended, and/or modified (collectively, the "**Note**"), in the original principal amount of $20,000,000.00, a true and correct copy of which is attached hereto as **Exhibit B**.

11.     Defendants each executed a Guaranty dated September 5, 2025 (collectively, the "**Guaranties**"), pursuant to which each Defendant absolutely and unconditionally guaranteed Borrowers' prompt payment and performance of obligations under the Note. True and correct copies of the Guaranties are attached hereto as **Exhibits C, D, and E**.

12.     Pursuant to the Guaranties, Defendants further guaranteed and promised to pay Lender, on demand, any obligations, debts, damages, losses, costs, expenses fines, penalties,

3

charges, fees, judgments, awards, court costs, and legal or other expenses, including attorneys' fees and costs, which Lender may incur as a direct or indirect consequence of, *inter alia*, the filing by Borrowers or Defendants of a voluntary petition under the Bankruptcy Code.

13. Borrowers are in default under the Loan Agreement and Note by failing to make timely payments under the Note.

14. As a result of the Borrowers' defaults, as of May 15, 2026, the Borrowers owed Lender the sum of $18,465,312.95, as follows:

| Principal | $18,333,333.32 |
|---|---|
| Interest | $156,884.32 |
| Total | $18,390,217.58 |

plus Lender's legal fees and costs, and plus interest, default interest, late fees, and Lender's protective advances, if any, incurred from and after May 15, 2026 (collectively, the "**Indebtedness**").

15. Guarantors have failed to cure Borrowers' defaults, in breach of their obligations under the Guaranties.

### COUNT 1
### Breach of Contact

16. Lender realleges and incorporates the allegations contained in the preceding paragraphs of this Complaint as if set forth fully herein.

17. Borrowers are in default under the Note.

18. The Guaranties obligate Guarantors to cure Borrowers' defaults under the Note.

19. Guarantors have failed to cure Borrowers' defaults under the Note, in breach of their Guaranties.

20. As a result of the Guarantors' breach of their obligations under the Guaranties, Lender is entitled to a money judgment against Guarantors, jointly and severally, for the total amount of the Indebtedness

**WHEREFORE**, Lender The Northern Trust Company respectfully requests entry of an order and judgment, as follows:

1. Entry of a money judgment against Defendants, jointly and severally, in the amount of $18,390,217.58, representing principal, interest, and late fees due under the Note and through May 15, 2026, plus Lender's legal fees and costs, and plus interest, default interest, late fees, and Plaintiff's protective advances, if any, incurred from and after May 15, 2026;

2. Finding that Plaintiff is entitled to an award of attorneys' fees, costs, and disbursements in this matter; and

3. Ordering such other and further relief as the Court deems equitable and just.

Dated: May 22, 2026

Respectfully submitted,

**WINTHROP & WEINSTINE, P.A.**

By: */s/ Thomas H. Boyd*
Thomas H. Boyd (IL ARDC 6196410)
William J. Schumacher (MN #397267)
Cynthia L. Hegarty (IL ARDC 6237282)
225 South Sixth Street, Suite 3500
Minneapolis, MN 55402
Telephone: (612) 604-6400
Facsimile: (612) 604-6800
tboyd@winthrop.com
wschumacher@winthrop.com
chegarty@winthrop.com

*Attorneys for Plaintiff The Northern Trust Company*

5

# EXHIBIT A

<div align="right">Northern Trust/FCC<br>Term Loan Agreement</div>

## TERM LOAN AGREEMENT
Dated as of September 5, 2025

This Agreement (as modified from time to time, this "Agreement") is between:

(a)    **SENIOR CLASSIC LEASING, LLC**, a limited liability company organized under the law of the State of California ("Senior"), **DFG RESTAURANTS, INCORPORATED**, a corporation organized under the law of the State of California ("DFG"), **HARSHAD & NASIR CORPORATION**, a corporation organized under the law of the State of California ("H&N"), **SUN GIR INCORPORATED**, a corporation organized under the law of the State of California ("Sun"), **SECOND STAR HOLDINGS LLC**, a limited liability company organized under the law of the State of Nevada ("Second Star"), and **THIRD STAR INVESTMENTS LLC**, a limited liability company organized under the law of the State of California ("Third Star," and together with Senior, DFG, H&N, Sun and Second Star, individually, collectively and jointly and severally "Borrower" or "Borrowers"), with an address at 1 Centerpointe Drive, #400, La Palma, California 90623; and

(b)    **THE NORTHERN TRUST COMPANY**, an Illinois banking corporation ("Lender"), with an office at 50 S. LaSalle Street, Chicago, Illinois 60603.

If Borrower constitutes more than one person or entity, "Borrower" refers to each of them individually and some or all of them collectively, and their obligations hereunder shall be joint and several. If any party comprising "Borrower" is a trustee(s), "Trust Agreement" means the governing trust agreement and/or instruments governing the trust, as modified from time to time, and all related documents and instruments, and "Borrower" also refers to the trustee(s) in its capacity as such and the trust individually and collectively.

For value received, the receipt and adequacy of which are hereby acknowledged by Lender and Borrower, the parties agree as follows:

1.    **DEFINITIONS.**

(a)    As used in this Agreement the following terms shall have the indicated meanings:

"Adjusted EBITDA" means, for any period of determination, (a) the net income (or loss) of each Borrower and its Subsidiaries (on a combined basis), as determined in accordance with GAAP, plus (b) the sum of (i) Interest Charges, (ii) federal, state, local and foreign income taxes, (iii) depreciation and amortization expense, (iv) non-cash losses and non-cash charges (excluding any non-cash charges that constitute an accrual of or a reserve for future cash charges or are reasonably likely to result in a cash outlay in a future period), (v) one-time extraordinary expenses, (vi) new restaurant pre-opening expenses and (vii) closed restaurant expenses, minus (c) general and administrative expenses.

"Adjusted EBITDAR" means, for any period of determination, the sum of (a) Adjusted EBITDA, plus (b) Lease Rentals.

"Affiliate" means any entity (other than a Subsidiary) which, directly or indirectly is in control of, is controlled by, or is under common control with the Borrower. For purposes of this definition, "control" means the power, directly or indirectly through one or more intermediaries, to direct or cause the direction of the management of such entity whether through the exercise of voting power, by contract or otherwise.

<div align="center">1</div>

"Anti-Terrorism Law" means any law relating to terrorism or money-laundering, including Executive Order No. 13224 and the USA Patriot Act.

"Banking Day" means a day on which Lender is generally open for banking business at its main office in Chicago, Illinois.

"Capital Expenditures" for any period means the aggregate amount of all expenditures (whether paid in cash or accrued as a liability) by Borrower during that period for the acquisition or leasing (pursuant to a capital lease) of fixed or capital assets, in each case which should be capitalized on the balance sheet of the Borrower in accordance with GAAP.

"Collateral Assignment" means that certain Collateral Assignment of Leases of even date herewith by the Borrowers in favor of the Lender, as amended, restated or replaced from time to time.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. §1 et seq.), as amended from time to time, and any successor statute.

"Compliance Certificate" has the meaning given to such term in Section 8(b)(v) hereof.

"Constituent Documents" means the articles or certificate of incorporation, by-laws, partnership agreement, certificate of limited partnership, limited liability company operating agreement, limited liability company articles of organization or certificate of formation, trust agreement, certificate of formation, and all other documents and instruments pertaining to the formation and ongoing existence of any person or entity which is not a natural person.

"Credit Support Party" means Guarantors, and any other person, or any persons severally, other than Borrower, who now or hereafter guarantees payment or collection of all or any part of the Loan or provides any collateral for the Loan.

"Daily Simple SOFR" has the meaning given to such term in Section 3(a) hereof.

"Daily Simple SOFR-Based Rate" has the meaning given to such term in Section 3(a) hereof.

"Daily Simple SOFR Rate Note Floor" has the meaning given to such term in Section 3(a) hereof.

"Distribution" means, in respect of any person: (a) dividends or other distributions or payments on capital stock or other Equity Interest of such person (except distributions in such stock or other Equity Interest); and (b) the redemption or acquisition of such stock or other Equity Interests or of warrants, rights or other options to purchase such stock or other Equity Interests (except when solely in exchange for such stock or other Equity Interests) unless made, contemporaneously, from the net proceeds of a sale of such stock or other Equity Interests.

"Dollar" and "$" means lawful money of the United States of America, unless otherwise specified.

"Equity Interests" means, with respect to any person, all of the shares of capital stock of (or other ownership or profit interests in) such person, all of the warrants, options or other rights for the purchase or acquisition from such person of shares of capital stock of (or other ownership or profit interests in) such person, and all of the other ownership or profit interests in such person (including partnership, member or trust interests therein).

2

"Event of Default" has the meaning given to such term in Section 9 hereof.

"Executive Order No. 13224" means Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001.

"Financing Statement" means, individually and collectively, each UCC-1 financing statement covering each Borrower, as debtor, and Lender, as secured party.

"Fixed Charges" means, for each period of determination and for each Borrower, the sum of (a) Interest Charges, (b) Lease Rentals, (c) for purposes of measuring the Post Distribution Fixed Charge Coverage Ratio only, Distributions, (d) mandatory principal payments, and (e) taxes.

"Franchise Agreement" means, collectively, all franchise agreements, development agreements, license agreements or related agreements by and between each Borrower, as franchisee, and the Franchisor, as franchisor, granting each Borrower a franchise or license to own or operate a Carl's Jr. branded restaurant.

"Franchisor" means Carl's Jr. Restaurants LLC.

"Funded Debt" means, for any period of determination, all indebtedness of a person which by its terms or by the terms of any instrument or agreement relating thereto matures, or which is otherwise payable or unpaid, one year or more from, or is directly or indirectly renewable or extendible at the option of the obligor in respect thereof to a date one year or more (including, without limitation, the outstanding amount under a revolving credit or similar agreement obligating the lender or lenders to extend credit to any such obligor over a period of one year or more) from, the date of the creation thereof, but shall exclude indebtedness which is (i) subordinated to the Liabilities on terms acceptable to Lender or (ii) otherwise permitted hereunder.

"GAAP" means generally accepted accounting principles as in effect from time to time in the United States of America, consistently applied.

"Guaranties" or "Guaranty" means, individually and collectively, those certain Guaranties executed by the Guarantors in favor of the Lender, as amended, restated or replaced from time to time.

"Guarantors" or "Guarantor" means, individually, collectively and jointly and severally, the Personal Guarantor, the LLC Guarantor and the Trust Guarantor.

"Index Floor" means a per annum rate of interest equal to zero percent (0%).

"Interest Charges" means, for any period of determination, the sum (without duplication) of all interest accruing during such period in respect of indebtedness of the Borrower and their Subsidiaries (eliminating all offsetting debits and credits between each Borrower and its Subsidiaries and all other items required to be eliminated in the course of preparation of the consolidated financial statement of the Borrower and their Subsidiaries in accordance with GAAP).

"Lease" means each operating lease of real property, or both real property and personal property, for a Unit Location.

1758371410.docx-9/4/2025 1:25 PM
©The Northern Trust Company 2016

Northern Trust/FCC
Term Loan Agreement

"Lease-Adjusted Leverage Ratio" means, for any period of determination, the sum of Lease-Adjusted Rentals divided by Adjusted EBITDAR for Borrower.

"Lease Rentals" means, for any period of determination, the sum of rental and other obligations required to be paid by each Borrower or any Subsidiary as tenant under any Lease, excluding the amount required to be paid by the tenant (whether or not designated as rent or additional rent) on account of maintenance and repairs, insurance, taxes, assessments, water rates and similar charges; provided that if at the date of determination any such rental or other obligation (or portion thereof) are contingent or not otherwise fixed and determinable under the applicable Lease, the amount of such obligation (i) shall be equal to the amount of such obligation for a period of twelve (12) consecutive months immediately preceding the date of determination or, if the applicable Lease was not in effect during such preceding 12-month period, (ii) shall be assumed to be an amount estimated in good faith by the Senior Financial Officer of each Borrower.

"Lease-Adjusted Rentals" means, for any period of determination, each Borrower's Funded Debt plus the sum of Lease Rentals, multiplied by a factor of eight (8).

"Lender Affiliate" means Northern Trust Corporation or any direct or indirect subsidiary of Northern Trust Corporation (other than Lender itself).

"Liabilities" means any and all obligations of Borrower to Lender hereunder or in connection herewith, now existing or hereafter arising, including: principal and interest on the Loan(s); commitment, late or other fees (if applicable); and prepayment breakage fees (if applicable). Unless otherwise provided herein or in a Related Document, each of the Liabilities shall be due and payable upon Lender's request.

"LLC Guarantor" means Dharod Family, LLC, a Nevada limited liability company.

"Loan" has the meaning given to such term in Section 2(a) hereof.

"Margin stock" has the same meaning herein as in Federal Reserve Board Regulation U, or any successor regulation, as and if modified from time to time. The verbs "purchase" and "carry" when used with respect to margin stock shall have the same meaning as in such Regulation or successor and applicable authorities thereunder.

"ND Agreement" means each Non-Disturbance Agreement of even date herewith by and among the Borrowers, the Lender and Propco Lender, as amended, restated or replaced from time to time.

"Note" means that certain Term Note of even date herewith in the original principal amount of $20,000,000 executed by the Borrower and payable to the order of the Lender, as amended, restated or replaced from time to time.

"Permitted Closure" means the closure of a restaurant in the Borrower's reasonable business judgment so long as (a) no Event of Default has occurred and is then continuing or results from such closure, (b) the restaurant has negative Adjusted EBITDA for the last measurement period, and (c) the Borrower has provided to the Lender at least thirty (30) days prior written notice of the potential closure of any such restaurant. For the purpose of the foregoing, to the extent otherwise permitted hereunder, neither moving a restaurant from one location to another or the temporary closure of a restaurant during a renovation or a re-equipping shall constitute a closure.

4

"Person" means any individual, corporation, company, limited liability company, voluntary association, partnership, trust, estate, unincorporated organization, other entity, or government (or any agency, instrumentality, or political subdivision thereof).

"Personal Guarantor" means Harshad Dharod, an individual.

"Post-Distribution Fixed Charge Coverage Ratio" means, for any period of determination, the ratio of (a) Adjusted EBITDAR within the current fiscal year to (b) Fixed Charges within the current fiscal year.

"Pre-Distribution Fixed Charge Coverage Ratio" means, for any period of determination, the ratio of (a) Adjusted EBITDAR within the current fiscal year to (b) Fixed Charges (excluding Distributions) within the current fiscal year.

"Prohibited Person" means: (i) a person that is listed in the Annex to, or is otherwise subject to the provisions of, Executive Order No. 13224; (ii) a person owned or controlled by, or acting for or on behalf of, any person that is listed in the Annex to, or is otherwise subject to the provisions of, Executive Order No. 13224; (iii) a person with whom Lender is prohibited from dealing or otherwise engaging in any transaction by any Anti-Terrorism Law; (iv) a person who commits, threatens or conspires to commit or supports "terrorism" as defined in Executive Order No. 13224; (v) a person that is named as a "specially designated national and blocked person" on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control at its official website or at any replacement website or at any other official publication of such list; and (vi) a person who is affiliated with a person described in clauses (i) – (v) above.

"Propco Lender" means BMO Bank N.A., a national banking association.

"Related Document(s)" means this Agreement, the Note, the Security Documents, the Tri-Party Agreement, the ND Agreements, the Guaranties, any Swap Agreement, and any other agreement, guaranty, document or instrument previously, now or hereafter delivered to Lender in connection with this Agreement.

"Related Party(ies)" means any Credit Support Party, any Subsidiary, and, in addition: (i) as to any Borrower or Credit Support Party which is a natural person, trusts for the benefit of Borrower; and (ii) as to any Borrower or Credit Support Party which is not a natural person, to the extent applicable, any general or limited partner, controlling shareholder, joint venturer, member or manager, of Borrower or such Credit Support Party.

"Scheduled Maturity Date" has the meaning given to such term in Section 2(b) hereof.

"Security Agreement" means that certain Security Agreement of even date herewith executed by Borrower, as debtor, in favor of Lender, as amended, restated or replaced from time to time.

"Security Documents" means, collectively, the Security Agreement, each Financing Statement, the Collateral Assignment and each other document securing the obligations of each Borrower to Lender.

"SOFR" means a rate per annum equal to the secured overnight financing rate as administered by the SOFR Administrator.

1758371410.docx-9/4/2025 1:25 PM
©The Northern Trust Company 2016

"SOFR Administrator" means the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate).

"SOFR Administrator's Website" means the website of the Federal Reserve Bank of New York, currently at http://www.newyorkfed.org, or any successor source for the secured overnight financing rate identified as such by the SOFR Administrator from time to time.

"SOFR Margin" means two and one-quarter percent (2.25%) per annum.

"Subsidiary" means any corporation, partnership, limited liability company, joint venture, trust, or other legal entity of which Borrower owns directly or indirectly 50% or more of the outstanding voting stock or interest, or of which Borrower has effective control, by contract or otherwise.

"Swap Agreement" means any agreement, document or instrument executed or delivered by Borrower or any Credit Support Party pertaining to any Swap Obligation.

"Swap Obligation" means, with respect to Borrower or any Credit Support Party, any obligation to pay or perform under any agreement, contract, or transaction that constitutes a "swap" within the meaning of section 1(a)(47) of the Commodity Exchange Act, as amended from time to time, if entered into with Lender or any Lender Affiliate.

"Tri-Party Agreement" means that certain Tri-Party Agreement of even date herewith by and among the Borrowers, the Lender and the Franchisor, as amended, restated or replaced from time to time.

"Trust Guarantor" means Dharod Family Trust, a revocable trust.

"Unit Locations" means the leased property locations described on Schedule 7(m), in all cases leased to and operated by a Borrower, as tenant, in connection with a Franchise Agreement.

"Unmatured Event of Default" means any event or condition that would become an Event of Default with notice or the passage of time or both.

"USA Patriot Act" means the "Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001" (Public Law 107-56, signed into law on October 26, 2001), as amended from time to time.

"U.S. Government Securities Business Day" means any day except for (i) a Saturday, (ii) a Sunday or (iii) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

(b)        As used in this Agreement, unless otherwise specified: the term "including" means "including without limitation;" the term "days" means "calendar days"; and terms such as "herein," "hereof" and words of similar import refer to this Agreement as a whole.  Unless otherwise defined herein or the context requires otherwise, all terms (including those not capitalized) that are defined in the Uniform Commercial Code of Illinois shall have the same meanings herein as in such Code, as such Code may be amended from time to time (the "UCC"); however, no amendment to the UCC after the date hereof shall limit any rights of Lender hereunder or in connection herewith. Unless the context requires otherwise, wherever used herein the singular shall include the plural and vice versa, and the use of one gender shall also denote the others.  Captions herein are for convenience of reference only and shall

6

not define or limit any of the terms or provisions hereof; references herein to sections or provisions without reference to the document in which they are contained are references to this Agreement.

2.    **LOAN.**

(a)    Subject to the terms and conditions of this Agreement, Lender agrees to make a term loan (together with portions thereof from time to time outstanding hereunder, the "Loan") to Borrower in the principal amount of $20,000,000, on the date of this Agreement. The Loan shall be repaid, and may be prepaid, in accordance with the terms hereof but cannot be reborrowed.

(b)    The Loan shall be evidenced by the Note. The Loan principal shall be payable in eighty-four (84) substantially equal consecutive monthly principal installments in an amount equal to $238,095.24, payable on the first (1st) day of each month, beginning with October 1, 2025, provided that in any event all such principal shall be paid on or before September 5, 2032 (the "Scheduled Maturity Date"). Interest shall be payable as set forth in Section 3(e) hereof.

(c)    **Notwithstanding any other provision hereof to the contrary, if the interest rate options hereunder include any pursuant to which a principal payment on the Loan is due on a date other than the last day of an applicable interest period (as and if defined herein), Borrower shall pay a prepayment breakage fee on the amount of such Loan payment determined as if such Loan principal payment were a prepayment made on a date other than the last day of such interest period. For the avoidance of doubt, this subsection (c) shall prevail over the Section 3 hereof to the extent of any conflict or inconsistency.**

3.    **INTEREST; PAYMENTS & PREPAYMENTS.**

(a)    Borrower agrees to pay interest on the unpaid principal amount from time to time outstanding hereunder at the rate per year equal to the sum of (i) the "Daily Simple SOFR-Based Rate," defined as the greater of: (A) two and one-quarter percent (2.25%) (the "Daily Simple SOFR Rate Note Floor"), or (B) Daily Simple SOFR, plus (ii) the SOFR Margin.

For purposes hereof, "Daily Simple SOFR" means, for any day (a "SOFR Rate Day"), a rate per annum equal to the greater of (a) SOFR for the day (such day, a "SOFR Determination Day") that is five (5) U.S. Government Securities Business Days prior to (i) if such SOFR Rate Day is a U.S. Government Securities Business Day, such SOFR Rate Day or (ii) if such SOFR Rate Day is not a U.S. Government Securities Business Day, the U.S. Government Securities Business Day immediately preceding such SOFR Rate Day and (b) the Index Floor. If by 5:00 P.M., New York City time, on the second (2nd) U.S. Government Securities Business Day immediately following any SOFR Determination Day, the SOFR in respect of such SOFR Determination Day has not been published on the SOFR Administrator's Website then the SOFR for such SOFR Determination Day will be the SOFR as published in respect of the first preceding U.S. Government Securities Business Day for which such SOFR was published on the SOFR Administrator's Website; provided that any SOFR determined pursuant to this sentence shall be utilized for purposes of calculating Daily Simple SOFR for no more than three (3) consecutive SOFR Rate Days. Any change in Daily Simple SOFR due to a change in SOFR shall be effective from and including the effective date of such change in SOFR without notice to Borrower.

(b)    Borrower may from time to time prepay any principal bearing interest at the Daily Simple SOFR-Based Rate in whole or in part without breakage fee, penalty or premium; provided, however, that if a Swap Agreement with a Daily Simple SOFR-Based Rate is in effect between Lender and

7

1758371410.docx-9/4/2025 1:25 PM
©The Northern Trust Company 2016

Borrower in connection with the Loan made pursuant to the Note, any applicable swap breakage fees, penalties, premiums and costs will apply.

(c)     Notwithstanding the foregoing, if an Event of Default has occurred and is continuing, Borrower agrees to pay interest on the Loan at a rate per year equal to two percent (2%) in addition to the rate otherwise applicable hereunder.  Notwithstanding the foregoing or any other provision hereof or of any Related Document, in no event shall the interest rate hereunder  (i) be less than one percent (1%) per year at any time or (ii) exceed the maximum interest rate allowed under applicable law.

(d)     Interest shall be computed for the actual number of days elapsed on the basis of a year consisting of 360 days and days elapsed, including the date the Loan is made and excluding the date the Loan or any portion thereof is paid or prepaid.  **Calculating interest on the basis of a year other than a calendar year may result in a higher effective interest rate than any numeric rate stated in or determined pursuant hereto.**

(e)     Borrower agrees to pay accrued interest monthly on the first (1st) day of each month, beginning October 1, 2025, with all accrued but unpaid interest being due and payable in full with the final principal payment due hereunder. After maturity, whether by acceleration or otherwise, interest shall be payable on demand.

(f)     [Intentionally Deleted].

(g)     The maintenance of principal at the Daily Simple SOFR-Based Rate shall be subject to the following additional terms and conditions:

(i)     If Lender notifies Borrower that (A) reasonable means do not exist for Lender to determine the Daily Simple SOFR-Based Rate as determined by Lender in its sole discretion or (B) there is a public statement or publication of information by or on behalf of the SOFR Administrator, the regulatory supervisor for the SOFR Administrator, the Board of Governors of the Federal Reserve System, the Federal Reserve Bank of New York, an insolvency official with jurisdiction over the SOFR Administrator or a court or an entity with similar insolvency or resolution authority over the SOFR Administrator, announcing that (1) the SOFR Administrator has ceased to provide SOFR permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide SOFR or (2) SOFR is no longer representative (including pursuant to an earlier statement or announcement that SOFR will no longer be representative as of a specified future date), then the principal subject or to be subject to the Daily Simple SOFR-Based Rate shall immediately accrue or shall continue to accrue interest at the Prime-Based Rate and Borrower will be deemed to have converted any election for a requested borrowing into an election to borrow funds at the Prime-Based Rate.

(ii)     If any treaty, statute, regulation, interpretation thereof, or any directive, guideline, or otherwise by a central bank or fiscal authority (whether or not having the force of law) shall prohibit or restrict the making or maintenance of a Loan based on the Daily Simple SOFR-Based Rate, or the determination or charging of interest rates based upon the Daily Simple SOFR-Based Rate, then, on and as of the date the prohibition or restriction becomes effective, the principal subject to that prohibition or restriction shall immediately accrue or shall continue to accrue interest at the Prime-Based Rate.

1758371410.docx-9/4/2025 1:25 PM
©The Northern Trust Company 2016

(iii)     All payments of principal and interest shall be made net of any taxes, costs, fees, losses and expenses incurred or charged by Lender resulting from having principal outstanding hereunder at the Daily Simple SOFR-Based Rate, including:

(A)     Taxes (or the withholding of amounts for taxes) of any nature whatsoever including income, excise, and interest equalization taxes (other than income taxes imposed by the United States or any State thereof on the income of Lender), as well as all levies, imposts, duties, or fees whether now in existence or resulting from a change in, or promulgation of, any treaty, statute, regulation, interpretation thereof, or any directive, guideline, or otherwise, by a central bank or fiscal authority (whether or not having the force of law) or a change in the basis of, or time of payment of, such taxes and other amounts resulting therefrom;

(B)     Any reserve or special deposit requirements against assets or liabilities of, or deposits with or for the account of, Lender with respect to principal outstanding at the Daily Simple SOFR-Based Rate (including those imposed under Regulation D of the Federal Reserve Board) or resulting from a change in, or the promulgation of, such requirements by treaty, statute, regulation, interpretation thereof, or any directive, guideline, or otherwise by a central bank or fiscal authority (whether or not having the force of law); and

(C)     Any other costs resulting from compliance with treaties, statutes, regulations, interpretations, or any directives or guidelines, or otherwise by a central bank or fiscal authority (whether or not having the force of law).

If Lender incurs or charges any such taxes, costs, fees, losses and expenses, Borrower, upon demand in writing specifying the amounts thereof, shall promptly pay them; save for manifest error Lender's specification shall be presumptively deemed correct. Lender's method of determining any amount payable to Lender under this section shall be substantially similar to the method used by Lender in implementing similar provisions for similarly situated borrowers and extensions of credit.

(h)     Lender is hereby authorized by Borrower at any time and from time to time at Lender's sole option to attach a schedule (grid) to the Note and to endorse thereon notations with respect to the Loan specifying the date and principal amount thereof, the applicable interest rates, the date and amount of each payment of principal and interest made by Borrower with respect to the Loan, and other relevant details. Lender's endorsements as well as its records relating to the Loan shall be rebuttably presumptive evidence of the outstanding principal, interest and other relevant details, absent manifest error and, in the event of inconsistency, shall prevail over any records of Borrower and any written confirmations of the Loan given by Borrower.

(i)     Notwithstanding the foregoing or any other provision hereof or of any Related Document, in no event shall the interest rate under the Note exceed the maximum interest rate allowed under applicable law.

(j)     Notwithstanding the foregoing or anything to the contrary herein, if at any time(s) Borrower and Lender enter into any Swap Agreement with respect to the Loan, then the Loan shall bear interest at the Daily Simple SOFR-Based Rate and Lender, in its reasonable discretion, may adjust, to coordinate with its and/or industry practices pursuant to the Swap Agreement, any or all of: (i) the capitalized terms defined in this Section, and the determination and application thereof; and (ii) interest

9

payment dates.  In such circumstances the remainder of this Section and the Note shall continue to apply without change.  Borrower confirms that its obligations under any Swap Agreement are in addition to and not in contravention of its obligations under the Note.  Any full or partial repayment or prepayment of the Note shall not in and of itself relieve Borrower from its obligations under any Swap Agreement.

4.      **CONDITIONS OF LENDING.**

(a)      Any obligation of Lender to make the Loan is subject to the following conditions precedent:

(i)      <u>Documents.</u>  Promptly upon the execution and delivery hereof, and in any event prior to the Loan, Lender shall have received all of the following, each duly executed and dated the date hereof, in form and substance satisfactory to Lender and its counsel, at the expense of Borrower, and in such number of signed counterparts as Lender may request (except for the Note, of which only the original will be signed):

(A)      <u>Term Note.</u>  The Note.

(B)      <u>Related Documents</u>.  This Agreement and all Related Documents, including any collateral documents and the ND Agreements (which may be delivered post closing on or before October 1, 2025).

(C)      <u>Collateral documents and searches</u>.  Duly recorded copies of mortgages, deeds of trust and financing statements, as well as lien searches, title insurance commitments and policies, environmental studies, and other documents as Lender may require, to confirm the following to Lender's satisfaction, subject only to such exceptions as Lender may permit:

(1)      Lender has a first-priority, sole security interest in any and all collateral for the Loan; and

(2)      any related environmental and other laws and regulations pertaining to any collateral have been complied with.

(D)      <u>Resolution; Certificate of Incumbency</u>.  Unless Borrower is a trust, a copy of a resolution of Borrower's board of directors (if Borrower is a corporation), members and managers (if Borrower is a limited liability company), limited and general partners (if Borrower is a partnership), authorizing or ratifying the execution, delivery and performance, respectively, of this Agreement, the Note and all Related Documents (including any collateral documents), certified by an appropriate officer, member, manager or partner of Borrower authorized to do so, as applicable, together with a certificate of an appropriate officer, member, manager, or partner of Borrower, certifying the names of the parties authorized to execute, deliver, and perform Borrower's obligations under, this Agreement, the Note and the Related Documents, together with a sample of the true signature of each such person (Lender may rely without inquiry on such certificate until formally advised by a like certificate of any changes therein).  If Borrower is a trust which is not

10

a registered organization, the trustee(s) of Borrower shall certify and otherwise provide evidence that the trustee(s) is the sole trustee(s) of Borrower and authorized to execute, deliver and perform Borrower's obligations hereunder and under all Related Documents without approval, consent, notice or waiver of, to or by any beneficiary or other person or entity.

(E)     Governing Documents.  A copy of the Constituent Documents of Borrower, certified by an appropriate officer, member, manager, partner or trustee of Borrower.

(F)     Good Standing Certificate.  Unless Borrower is a trust which is not a registered organization, a good standing certificate or the equivalent for Borrower issued by the Secretary of State or other appropriate agency of the state where Borrower was organized, dated within thirty days prior to the date of this Agreement.

(G)     Credit Support Party Diligence.  For each of the Trust Guarantor and the LLC Guarantor, all of the due diligence items in subsections (D), (E) and (F) above.

(G)     [Intentionally Deleted].

(H)     Opinion of Counsel.  An opinion of counsel to Borrower and each Credit Support Party to such effect as Lender may require.

(I)     Miscellaneous.  Such other documents and certificates as Lender may reasonably request in connection with the Loan.

(ii)     No Default, Etc..  At the time of the Loan, and after giving effect thereto:

(A)     Representations and Warranties True. Borrower's and each Credit Support Party's representations and warranties herein and in all Related Documents shall be true and correct.

(B)     No Default.  No Event of Default or Unmatured Event of Default shall have occurred and be continuing.

(iii)     Fees.  Payment of a fully earned, non-refundable origination fee of $50,000, together with all other fees and costs incurred by the Lender in connection with the transaction contemplated hereby.

(iv)     Unit Location Documents.  With respect to each Unit Location, (A) a Lease, (B) a Franchise Agreement, together with franchisor approval for operation of the Carl's Jr. branded restaurant at such Unit Location which may be included within the Tri Party Agreement, and (C) such other documents related to each Unit Location and corresponding Franchise Agreement as are reasonably satisfactory to Lender.

Northern Trust/FCC
Term Loan Agreement

(b) <u>Update of Representations and Warranties</u>.  The request or application for the Loan shall constitute a representation and warranty by Borrower as of the date of such request or application that:

(i)     no Event of Default or Unmatured Event of Default has occurred and is continuing as of such date or will exist after the Loan is made; and

(ii)     Borrower's and each Credit Support Party's representations and warranties herein and in any Related Document are true and correct, and will be true and correct after the Loan is made.

5.     **CROSS-REFERENCES.**

(a)     The Loan and other Liabilities are secured without limitation as provided in the following and all related documents, in each case as amended, modified, renewed, restated or replaced from time to time:

i.     The Note.

ii.     The Security Documents.

(b)     Payment and performance of the Loan and other Liabilities have been unconditionally guaranteed by the Guarantors pursuant to the Guaranties.

6.     **USE OF PROCEEDS.**

(a)     Borrower represents and warrants that the proceeds of the Loan will be used solely for business purposes, and not for personal, family or household use, within the meaning of Federal Truth-in-Lending and similar state laws and regulations. Borrower further represents and warrants to Lender that the proceeds of the Loan shall only be used to finance the acquisition of all assets related to the ownership and operation of the Carl's Jr. branded restaurants identified on <u>Schedule 7(m)</u>.

(b)     Borrower agrees not to use the Loan or proceeds thereof, directly or indirectly, to purchase or carry any margin stock unless on or prior to the date of this Agreement (i) Borrower furnishes to Lender a signed Federal Reserve Form U-1 indicating Borrower may do so, <u>and</u> (ii) Lender consents in writing to Loan proceeds being so used.  Borrower agrees to comply with such Regulation U and any related regulations in the manner deemed appropriate by Lender.

7.     **REPRESENTATIONS AND WARRANTIES.**  Borrower represents and warrants to, and agrees in favor of Lender, that:

(a)     (i)     If Borrower is an organization (including a trust that is a registered organization), then Borrower is an entity of the type, and is organized under the laws of the jurisdiction, specified in the preamble hereto.  Borrower's name as shown in the preamble hereto is the full exact name that appears in Borrower's organizational documents.  If Borrower is a registered organization, Borrower's name as shown in the preamble hereto is  as shown on the public organic record most recently filed with or issued or enacted by Borrower's jurisdiction of organization which purports to state, amend, or restate Borrower's name.  If Borrower is an organization but not a registered organization, if it has only one place of business that place of business is at

12

Borrower's address indicated in the preamble hereto, but if it has more than one place of business, its chief executive office is at such address.

(ii)      If Borrower is a trust which is not itself a registered organization, then: (1) if the Trust Agreement specifies a name for the trust, Borrower's name as shown in the preamble hereto is the name so specified; (2) Borrower has provided the name of its settlor(s) or testator(s) to Lender; and (3) if Borrower has only one place of business, that place of business is at Borrower's address indicated in the preamble hereto, but if it has more than one place of business, its chief executive office is at such address.

(iii)     If Borrower is a natural person, then:

(A)      Borrower's principal residence is located at the address shown in the preamble hereto; and

(B)      (1)      if Borrower has a driver's license or alternative identification that has not expired and that was issued by the state of Borrower's principal residence, Borrower's name shown in the preamble hereto is exactly the same as shown on that driver's license or alternative identification card; or

(2)      if Borrower does not have a driver's license or alternative identification card that has not expired and that was issued by the state of Borrower's principal residence, then: (x) Borrower's first given name and surname are as shown in the preamble hereto; and (y) if Borrower obtains a driver's license or alternative identification card from the state of Borrower's principal residence, then Borrower shall, within thirty (30) days of the issuance of such driver's license or alternative identification card, provide Lender with a true and accurate copy of such driver's license or alternative identification card, showing Borrower's name and address, the state of issuance and the expiration date thereof; and

(3)      in any event, Borrower shall provide Lender notice within thirty (30) days of the happening of each of the following events:

i.      Borrower's principal residence has changed;

ii.      the name of Borrower on Borrower's driver's license or alternative identification card has changed in any manner, no matter how small;

iii.      Borrower's driver's license or alternative identification has been surrendered, suspended, changed or terminated in any manner, no matter how small or for how short a time;

13

Northern Trust/FCC
Term Loan Agreement

iv.      Borrower's driver's license or alternative identification card has expired; or

v.      Borrower has changed his or her first given name or surname, whether as a result of marriage, divorce, legal proceeding or otherwise.

(iv)    The representations and warranties made by Borrower in (i)-(iii) of this (a), as applicable, would have been accurate at all times during the five years and six months prior to the date hereof except as and if Borrower has specifically notified Lender in writing prior to Borrower's execution of this Agreement.

(b)    Borrower (if Borrower is not a natural person) and any Subsidiary and each Related Party are validly existing and in good standing under the laws of their state of organization or formation, and are duly qualified, in good standing and authorized to do business in each jurisdiction where failure to do so would reasonably be expected to have a material adverse impact on the assets, condition or prospects of Borrower.

(c)    The execution, delivery and performance of this Agreement and all Related Documents:  are within Borrower's powers and have been authorized by all necessary action required by law and (unless Borrower is a natural person) Borrower's Constituent Documents; have received any and all necessary governmental approval; and do not and will not contravene or conflict with any provision of law, any Constituent Document or any agreement affecting Borrower or its property.  This Agreement and all Related Documents are enforceable against Borrower and/or the applicable Related Parties in accord with their terms, except to the extent, if any, that such enforceability may be limited by equitable principles, whether applied in a court of law or equity, or by bankruptcy, insolvency and other laws affecting creditors' rights generally.

(d)    There has been no material adverse change in the business, financial condition, properties, assets, operations or prospects of Borrower or any Related Party since the date of the latest financial statements or other documentation provided by or on behalf of Borrower or any Related Party to Lender.

(e)    Borrower and each Related Party has filed or caused to be filed all federal, state, and local tax returns that are required to be filed, and has paid or has caused to be paid all of its taxes, including any taxes shown on such returns or on any assessment received by it, to the extent that such taxes have become due, except taxes contested in good faith and by appropriate proceedings, and as to which adequate reserves shall have been established and no foreclosure, sale or similar proceedings have commenced.

(f)    There do not exist any security interests, mortgages, or other liens or encumbrances of any kind or nature upon any of Borrower's or any Subsidiary's assets, nor has Borrower or any Subsidiary acquired or agreed to acquire any property or assets of any character under any conditional sale agreement or other title retention agreement, except for:  (i) liens existing on the date of this Agreement of which Lender has been advised by Borrower in writing before this Agreement was signed; (ii) liens of landlords, contractors, laborers or supplymen, tax liens, liens securing performance or appeal bonds, or other similar liens or charges arising out of Borrower's or any Subsidiary's business, _provided_ that tax liens are removed before related taxes become delinquent and other liens are promptly removed, in either case unless contested in good faith and by appropriate proceedings, and as to which adequate

14

reserves have been established and no foreclosure, sale or similar proceedings have commenced; and (iii) liens in favor of Lender.

(g)        Neither Borrower nor any Subsidiary nor any Related Party is a party to any agreement or instrument or subject to any restriction under any Constituent Document, nor is it subject to any judgment, decree or order of any court or governmental body, which may have a material and adverse effect on the business, assets, liabilities, financial condition, operations or business prospects of Borrower and any Subsidiaries taken as a whole or on the ability of Borrower to perform its obligations under this Agreement, the Note or any Related Document.  Neither Borrower nor any Subsidiary nor any Related Party has, nor with reasonable diligence should have had, knowledge of or notice that it is in default in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any such agreement, instrument, restriction, judgment, decree or order.

(h)        Borrower is not engaged principally in, nor is one of the Borrower's important activities, the business of extending credit for the purpose of purchasing or carrying margin stock.  Assets which constitute margin stock constitute less than twenty-five percent (25%) by market value of all assets of Borrower.

(i)        No litigation (including derivative actions), arbitration proceedings or governmental proceedings are pending or threatened against Borrower or any Subsidiary or any Related Party which would (singly or in the aggregate), if adversely determined, have a material and adverse effect on the financial condition, continued operations or prospects of Borrower or any Subsidiary.

(j)        Attached hereto as Exhibit B is a correct and complete list of all Subsidiaries of Borrower, indicating the exact name thereof, the type of entity and the jurisdiction of formation or organization; if there are no Subsidiaries, Borrower has indicated "None" or "N/A" on Exhibit B.

(k)        The execution, delivery and performance of this Agreement and all Related Documents are in Borrower's best interest in its current and future operations and will materially benefit Borrower. Borrower has received adequate, fair and valuable consideration, and at least reasonably equivalent value, to enter into and perform this Agreement and all Related Documents. Borrower's assets at fair valuation exceed the sum of Borrower's debts.  Borrower is able to pay its debts as they become due. Borrower does not have unreasonably small capital with which to conduct its business.

(l)        This sub-subsection applies if and only if "Borrower" consists of two or more persons.  Each person comprising "Borrower" acknowledges that by acting together to borrow on a combined joint and several basis, each Borrower is able to and does obtain a larger amount of credit, better terms and conditions, and a lower cost of funds than would otherwise be available to each Borrower individually. Each Borrower acknowledges that it thereby receives fair, reasonable and equivalent value for the joint and several obligations undertaken under this Agreement.  Each Borrower's obligations hereunder shall not be subject to any setoff, defense or counterclaim that is or would be available at law or in equity to Guarantors, surety or accommodation party, all of which setoffs, defenses or counterclaims each Borrower hereby expressly waives.  Each party comprising Borrower shall be jointly and severally liable hereunder and under the Related Documents regardless of whether such Borrower has received the proceeds of the Loan or has benefited from the Loan.

(m)        The address (including street address, county and state) of all Unit Locations is set forth on Schedule 7(m) attached hereto and made a part hereof.  Each Borrower has either a fee or a leasehold interest to its Unit Locations and owns all other property (tangible and intangible) necessary to, or used in the ordinary conduct of, its business.  All buildings and other improvements at each Unit Location

15

and all major building systems associated therewith, are (i) in working condition and repair, ordinary wear and tear excepted; (ii) fully equipped and operational in all material respects; (iii) to each Borrower's knowledge, free from structural defects; (iv) to each Borrower's knowledge, in compliance in all material respects with all applicable regulations relating to public safety; and (v) properly lighted as required by law. The equipment, including all machinery, furniture, appliances, trade fixtures, tools, and office and record keeping equipment, of each Borrower now located at such locations includes all of the equipment, machinery, furniture, appliances, trade fixtures, tools, and office and record keeping equipment necessary for the proper and prudent operation of such locations operated by the applicable Borrower as a Carl's Jr. branded restaurant, and all such equipment is in working condition and repair, ordinary wear and tear excepted, in each case in all material respects.

(n)      There is a Lease in full force and effect for each Unit Location which constitutes a legal, valid and binding obligation of each Borrower that is a party thereto and, to the knowledge of Borrower, each of the other parties thereto, enforceable against such parties in accordance with its terms, subject (i) as to the enforcement of remedies, as applicable bankruptcy, insolvency reorganization, moratorium, fraudulent conveyance and other similar laws affecting the enforcement of creditors' rights generally, from time to time in effect and (ii) to general principles of equity. Each Lease is without amendment or modification from the form or copy delivered to Lender except for amendments or modifications permitted hereunder. No default by any party exists under any Lease that could result in cancellation, termination or early expiration of such Lease, nor has any event occurred which, with the passage of time or the giving of notice, or both, would constitute such a default. The expiration date of each Lease, as fully extended, is set forth on Schedule 7(n) attached hereto and made a part hereof.

(o)      There is a Franchise Agreement in full force and effect for each Unit Location leased by a Borrower which constitutes a legal, valid and binding obligation of such Borrower and, to the knowledge of each Borrower, each of the other parties thereto, enforceable against such parties in accordance with its terms, subject (a) as to the enforcement of remedies, as applicable bankruptcy, insolvency reorganization, moratorium, fraudulent conveyance and other similar laws affecting the enforcement of creditors' rights generally, from time to time in effect and (b) to general principles of equity. Each Franchise Agreement is without amendment or modification from the form or copy delivered to Lender except for amendments or modifications permitted hereunder. To each Borrower's knowledge, no default by any party exists under any Franchise Agreement that could result in cancellation, termination or early expiration of such Franchise Agreement, nor has any event occurred which, with the passage of time or the giving of notice, or both, would constitute such a default. The expiration date of each Franchise Agreement, as fully extended, is set forth on Schedule 7(o) attached hereto and made a part hereof.

(p)      No Borrower has received written notice of, and has no knowledge of, (i) any proceedings, whether actual, pending or threatened, for the taking under the power of eminent domain or any similar power or right, of all or any portion of the Unit Locations, or of any other collateral security for the Loan; or (ii) any damage to or destruction of any portion of the Unit Locations or such other property; or (iii) any zoning, building, fire or health code violations in respect of the Unit Locations which have not heretofore been corrected.

8.      **COVENANTS.**

(a)      **Name Changes.** BORROWER AGREES TO NOTIFY LENDER IN WRITING AT LEAST SIXTY (60) DAYS IN ADVANCE OF: (i) ANY CHANGE WHATSOEVER IN THE NAME OF BORROWER; (ii) ANY CHANGE WHATSOEVER IN THE STATE OR JURISDICTION IN

16

WHICH BORROWER IS ORGANIZED OR FORMED OR, IF BORROWER IS A NATURAL PERSON, IN WHICH BORROWER'S PRINCIPAL RESIDENCE IS LOCATED; (iii) ANY NEW NAMES UNDER WHICH BORROWER INTENDS TO DO BUSINESS; AND (iv) ANY NEW ADDRESSES AT OR FROM WHICH BORROWER INTENDS TO DO BUSINESS. IF BORROWER IS A REGISTERED ORGANIZATION, SUCH AS A CORPORATION, LIMITED LIABILITY COMPANY, OR LIMITED PARTNERSHIP, BORROWER AGREES TO NOTIFY LENDER IMMEDIATELY IF BORROWER'S STATE OR JURISDICTION OF ORGANIZATION DISSOLVES, SUSPENDS OR TERMINATES BORROWER'S EXISTENCE OR PRIVILEGES, OR NOTIFIES BORROWER THAT IT IS NOT IN COMPLIANCE WITH ANY REQUIREMENTS OF SUCH STATE OR OTHER JURISDICTION. IF BORROWER IS A NATURAL PERSON THE FOREGOING PORTION OF THIS (a) DOES NOT LIMIT BORROWER'S AGREEMENTS IN SUBSECTION (a)(iii) OF THE SECTION ENTITLED "REPRESENTATIONS AND WARRANTIES."

(b)     **Organizations—Financial Reporting**.  Borrower shall furnish (or cause to be furnished) to Lender:

(i)     Within thirty (30) days after the end of each quarter of each fiscal year of Borrower, a copy of an unaudited consolidated financial statement of Borrower and any Subsidiary, signed by an authorized officer or manager of the Borrower and consisting of at least (i) a balance sheet as at the close of such quarter, (ii) an income statement, and (iii) store level financial statements for each Unit Location, consisting of at least statements of profit and loss for such fiscal quarter and for the period from the beginning of such fiscal year to the end of such fiscal quarter.

(ii)     Within one hundred twenty (120) days after the end of each fiscal year of Borrower, a copy of the reviewed financial statements of Borrower and any Subsidiary referred to in (i) of this subsection (b) and including a statement of cash flows, duly signed by certified public accountant acceptable to the Lender and containing a computation of, and showing compliance with, any financial ratio or restriction contained in this Agreement, and to the effect that, in making the examination necessary for the signing of such annual report by such accountants, they have not become aware of any Event of Default or Unmatured Event of Default, or if they have become aware of any such event, describing it.

(iii)     Within 30 days of filing, (i) copies of Borrower's and Guarantors' federal and state tax returns prepared by a tax professional, including all Schedules thereto (including specifically Schedules E and K-1), or (ii) if Borrower or any of the Guarantors has applied for an extension of the period for filing thereof, a copy of such extension and the draft of the tax returns of Borrower and/or such Guarantor, as applicable, and (iii) if any such extension is filed, not later than thirty (30) days after filing of such returns or November 1st of the year in which the extension was filed (whichever occurs first), copies of such returns.

(iv)     Within one hundred twenty (120) days after the end of each calendar year, fully-completed personal financial statements of the Personal Guarantor and any Related Party which is a natural person on Lender's then–current form, together with such supporting information and schedules as Lender may request.

17

(v)        Contemporaneously with the furnishing of a copy of each annual report and of each quarterly statement provided for in this section, a certificate dated the date of such annual report or such quarterly statement and signed by an authorized officer or manager on behalf of Borrower to the effect that no Event of Default or Unmatured Event of Default has occurred and is continuing or, if there is any such event, describing it and the steps, if any, being taken to cure it, and containing (except in the case of the certificate dated the date of the annual report) a computation of, and showing compliance with, any financial ratio or restriction contained in this Agreement, in the form attached hereto as Exhibit C (the "Compliance Certificate").

(vi) If securities issued by Borrower or any Subsidiary are traded on any securities exchange or are registered with the United States Securities and Exchange Commission, copies of each filing and report made by Borrower or any Subsidiary with or to any such securities exchange or such Commission, except in respect of any single equity holder, and of each communication from Borrower or any Subsidiary to equity holders generally, promptly upon the filing or making thereof.

(vii) Immediately upon learning of the occurrence of any of the following, written notice describing the same and the steps being taken by Borrower or any Subsidiary in respect thereof:  (A) the occurrence of an Event of Default or an Unmatured Event of Default; or (B) the institution of, or any adverse determination in, any litigation, arbitration or governmental proceeding which is material to Borrower or any Subsidiary on a consolidated basis; or (C) the occurrence of a reportable event under, or the institution of steps by Borrower or any Subsidiary to withdraw from, or the institution of any steps to terminate, any employee benefit plans as to which Borrower or any Subsidiary may have any liability and which may have a material adverse impact on the ability of Borrower to repay the Liabilities in full and comply with this Agreement and all Related Documents on a timely basis.

(viii)     From time to time such other information, financial or otherwise, concerning Borrower or any Related Party as Lender may reasonably request, including fully-completed personal financial statements of Borrower or any Related Party who is a natural person on Lender's then-current form on and as of such dates as Lender may reasonably request.

(c)        **Organizations—Capital Structure and Dividends**.  Borrower agrees, and agrees to cause any Subsidiary, not to purchase or redeem, or obligate itself to purchase or redeem, any equity interests in Borrower (including debt convertible into equity). Borrower agrees not to declare or pay any Distributions (other than any such payable in its own common stock) or make any other distribution in respect of such equity interests; provided, however, that Borrower agrees that no Distributions shall be permitted if an Event of Default or Unmatured Event of Default has occurred and is continuing. Borrower agrees to continue to own, directly or indirectly, the same (or greater) percentage of the stock and other equity interest of each Subsidiary that it held on the date of this Agreement.  Borrower agrees to ensure that no Subsidiary issues any additional securities or other equity interests, options or warrants in respect thereof, or securities convertible into such securities or interests, other than to Borrower.

(d)        **Organizations—Existence, Mergers, Etc.**  Borrower agrees, and agrees to cause any Subsidiary: (i) to preserve and maintain its existence, rights, franchises, licenses and privileges; and (ii) not to liquidate, dissolve, or merge, or consolidate with or into any other entity, or sell, lease,

18

transfer or otherwise dispose of all or a substantial part of its (their) assets other than in the ordinary course of business as now conducted.

(e)     **Organizations—Fiscal Year**.  Borrower represents and warrants to Lender that its fiscal year ends December 31st, and agrees that it will not change its fiscal year-end without Lender's express prior written consent.

(f)     **Lease-Adjusted Leverage Ratio**.  Borrower agrees to maintain at all times a Lease-Adjusted Leverage Ratio, measured as of the end of each fiscal quarter of Borrower commencing with the quarter ending December 31, 2025, on a rolling 12-month basis, of not greater than (i) 5.75 to 1.00 at all times through December 31, 2026, and (ii) 5.50 to 1.00, at all times thereafter during the term of the Loan.

(g)     **Pre and Post Distribution Fixed Charge Coverage Ratios**.  Borrower shall maintain the following Fixed Charge Coverage Ratios, measured as of the end of each fiscal quarter of Borrower commencing with the quarter ending September 30, 2025, on a rolling 12-month basis: (i) a Pre-Distribution Fixed Charge Coverage Ratio of at least 1.25 to 1.00 at all times during the term of the Loan, and (ii) a Post Distribution Fixed Charge Coverage Ratio of at least 1.10 to 1.00 at all times during the term of the Loan.

(h)     [**Intentionally Deleted**.]

(i)     **[Intentionally Deleted]**.

(j)     **Inspection.**  Borrower agrees, and agrees to cause any Related Party, to permit Lender and its agents at any time during normal business hours to inspect their properties and to inspect and make copies of their books and records.

(k)     **Indebtedness.** Borrower agrees, and agrees to cause any Subsidiary, not to incur, permit to remain outstanding, assume or in any way become committed for indebtedness in respect of borrowed money, except (i) indebtedness incurred hereunder or to Lender, (ii) indebtedness existing on the date of this Agreement shown on the annual financial statements furnished to Lender referred to in this Agreement, and (iii) purchase money indebtedness not to exceed (A) during calendar year 2025 through calendar year 2026, $1,000,000 individually or in the aggregate for new equipment, (B) during calendar year 2027, $2,000,000 individually or in the aggregate for new equipment, and (C) during calendar year 2028 and each calendar year thereafter during the term hereof, $3,000,000 individually or in the aggregate for new equipment.

(l)     **Negative Pledge on Assets.**  Borrower agrees, and agrees to cause any Subsidiary, not to create, suffer or permit to exist any lien or encumbrance of any kind or nature upon any of their assets now or hereafter owned or acquired, or acquire or agree to acquire any property or assets of any character under any conditional sale agreement or other title retention agreement, but this section shall not be deemed to apply to:  (i) liens existing on the date of this Agreement of which Lender has been advised by Borrower in writing before this Agreement was signed; (ii) liens of landlords, contractors, laborers or supplymen, tax liens, liens securing performance or appeal bonds, or other similar liens or charges arising out of Borrower's or any Subsidiary's business, provided that tax liens are removed before related taxes become delinquent and other liens are promptly removed, in either case unless contested in good faith and by appropriate proceedings, and as to which adequate reserves have been established and no foreclosure, sale or similar proceedings have commenced; (iii) liens in favor of

Lender, and (iv) liens on new equipment solely to secure the permitted purchase money indebtedness under subsection (k) above.

(m)     **Taxes.**  Borrower agrees, and agrees to cause any Subsidiary, to pay and discharge all taxes, assessments and governmental charges or levies imposed upon them, upon their income or profits or upon any properties belonging to them, prior to the date on which penalties attach thereto, and all lawful claims for labor, materials and supplies when due, except that no such tax, assessment, charge, levy or claim need be paid which is being contested in good faith by appropriate proceedings as to which adequate reserves have been established, and as to which no foreclosure, sale or similar proceedings have commenced.  Each Borrower shall cause each Unit Location to be taxed as one or more separate tax parcels which do not include any property other such Unit Location or another Unit Location.

(n)     **Guaranties & Keep Well Agreements.**  Borrower agrees, and agrees to cause any Subsidiary, not to assume, guarantee, indorse or otherwise become or be responsible in any manner (whether by agreement to purchase any obligations, stock, assets, goods or services, or to supply or advance any funds, assets, goods or services, or otherwise) with respect to the obligations of any other person or entity, except by the indorsement of negotiable instruments for deposit or collection in the ordinary course of business and except as and if permitted by this Agreement.

(o)     **Investments and Loans by Borrower.** Borrower agrees, and agrees to cause any Subsidiary, not to make any loan, advance, extension of credit or capital contribution to, or purchase or otherwise acquire for a consideration, evidences of indebtedness, capital stock or other securities of any legal entity, except that Borrower and any Subsidiary may:

(i)     purchase or otherwise acquire and own short-term money market items; and

(ii)     extend credit upon customary terms to their customers in the ordinary course of their business.

(p)     **Maintenance of Properties.**  Borrower agrees, and agrees to cause any Subsidiary, to maintain, or cause to be maintained, in good repair, working order and condition, all their properties (whether owned or held under lease), ordinary wear and tear excepted, and to make, or cause to be made, all needed and appropriate repairs, renewals, replacements, additions, and improvements thereto.

(q)     **Insurance.**  Borrower agrees, and agrees to cause any Subsidiary, to maintain insurance in responsible companies in such amounts and against such risks as is required by Lender and, at a minimum, if Borrower is engaged in a business, such insurance as is usually carried by similar responsible businesses conducting operations in similar areas.

(r)     **Regulation U.**  Borrower agrees not to be engaged principally in, nor to have as one of Borrower's important activities, the business of extending credit for the purpose of purchasing or carrying margin stock.  Borrower agrees to ensure that assets which are margin stock at all times constitute less than twenty-five percent (25%) by market value of all assets of Borrower.

(s)     **Franchise Agreements, Leases and Material Contracts**.  Borrower shall comply in all material respects with the terms and provisions of the Franchise Agreements.  Borrower agrees to comply in all material respects with all Leases and other material contracts of Borrower, and to cause such Franchise Agreements, Leases and material contracts to be kept in full force and effect without

20

termination, amendment or modification, except for (a) any modification or amendments made in the ordinary course of business consistent with past practice and which amendment or modification is not materially adverse to any Borrower, Lender, and (b) renewals or extensions (i) on either substantially the same terms as the existing Franchise Agreements, Leases and material contracts, or (ii) as otherwise approved by Lender in writing, which approval shall not be unreasonably withheld.  No Borrower will cause or permit any Franchise Agreement (a) to be terminated or cancelled prior to its stated term or (b) to expire in accordance with its terms, in each case without a replacement, in form and substance satisfactory to Lender in its sole and absolute discretion.

(t) **Operations.**  No Borrower shall permit the sale, transfer, closure or abandonment of any restaurant located at a Unit Location other than Permitted Closures of up to five (5) restaurants during the term hereof.

9.      **EVENTS OF DEFAULT.**  Each of the following shall constitute an "Event of Default":

(a)      (i) failure to pay, within three (3) Business Days of when and as due, any principal payable on any of the Liabilities; (ii) failure by any Affiliate to pay, within three (3) Business Days of when and as due, any principal, interest or other amounts payable under any note or instrument issued by Affiliate to Lender in connection with a loan from Lender to such Affiliate; (iii) failure to pay, within three (3) Business Days of when and as due, any interest or other amounts payable on any of the Liabilities; or (iv) except as otherwise set forth in another subsection of this Section 9, failure to comply with or perform any agreement or covenant of Borrower or any Related Party contained herein or in any Related Document, which failure does not otherwise constitute an Event of Default, subject to a grace period of sixty (60) days from the date of such failure; or

(b)      any default, event of default, or similar event shall occur or continue under any Related Document or under any note, agreement, guaranty, Swap Agreement or other instrument delivered by any affiliate to Lender in connection with a loan from Lender to such Affiliate, and shall continue beyond any applicable notice, grace or cure period set forth in such Related Document; or

(c)      there shall occur any default or event of default, any similar event, any event that requires the prepayment of borrowed money or permits the acceleration of the maturity thereof, or any event or condition that might become any of the foregoing with notice or the passage of time or both, under the terms of any evidence of indebtedness or other agreement issued or assumed or entered into by Borrower or any Related Party, or under the terms of any document or instrument under which any such evidence of indebtedness or other agreement is issued, assumed, secured, or guaranteed, and such event shall continue beyond any applicable notice, grace or cure period; or

(d)      any representation, warranty, certificate, financial statement, report, notice, or other writing furnished by or on behalf of Borrower or any Related Party to Lender is false or misleading in any material respect on the date as of which the facts therein set forth are stated or certified; or

(e)      this Agreement or any Related Document, including any Guaranty of or pledge of collateral security for the Liabilities, shall be repudiated or shall become unenforceable or incapable of performance in accord with its terms; or

(f)      Borrower or any Related Party (in each case if not a natural person) shall fail to maintain their existence in good standing in their state of organization or formation or shall fail to be duly qualified, in good standing and authorized to do business in each jurisdiction where failure to do so would

21

reasonably be expected to have a material adverse impact on the assets, condition or prospects of Borrower or any Related Party; or

(g)      Borrower or any Related Party shall die, be declared legally incompetent, dissolve, liquidate, merge, consolidate, or cease to be in existence for any reason; or, if Borrower is a partnership or joint venture, any general or limited partner or joint venturer of Borrower shall withdraw from Borrower, or any general partner shall become a limited partner; or the trust under any Trust Agreement shall terminate in whole or in part or be the subject of a distribution of other than income but, in the case of a distribution, only if such distribution would otherwise cause an Event of Default or Unmatured Event of Default to occur; or

(h)      except for a successor trustee under any Trust Agreement, any person presently not in control of a Borrower or Related Party which is not a natural person shall obtain control directly or indirectly of such a Borrower or Related Party, whether by purchase or gift of stock or assets, by contract, or otherwise; or

(i)      any proceeding (judicial or administrative) shall be commenced against Borrower or any Related Party, or with respect to any of their assets, which would reasonably be expected to have a material and adverse effect on the ability of Borrower to repay the Liabilities; or a judgment or settlement shall be entered or agreed to in any such proceeding which would reasonably be expected to have a material and adverse effect on the ability of Borrower to repay the Liabilities; or any garnishment, summons, writ of attachment, citation, levy or the like is issued against or served upon Lender for the attachment of any property of Borrower or any Related Party in Lender's possession or control; or

(j)      Borrower shall grant or any person (other than Lender) shall obtain or perfect a security interest in, or file any financing statement covering, any assets constituting security for the Liabilities; Lender shall not have a security interest in any assets constituting security for the Liabilities, of first-priority and enforceable in accord with the related collateral documents; or any notice of a federal tax lien against Borrower or any Related Party shall be filed with any public recorder; or

(k)      there shall be any material loss or depreciation in the value of any assets constituting security for the Liabilities for any reason; or Lender shall otherwise reasonably deem itself insecure; or, unless expressly permitted by this Agreement or the Related Documents, all or any part of any assets constituting security for the Liabilities, or any direct, indirect, legal, equitable or beneficial interest therein, is assigned, transferred or sold without Lender's prior written consent; or

(l)      any default under any Lease shall occur and (i) the lessor or lessee under such Lease has made a demand for the cure of such default, or (ii) such default is reasonably expected to result in the termination of such Lease; or

(m)      any default under any Franchise Agreement shall occur and be continuing or any Franchise Agreement shall be terminated for any reason; or

(n)      any bankruptcy, insolvency, reorganization, arrangement, readjustment, liquidation, dissolution, or similar proceeding, domestic or foreign, is instituted by or against Borrower or any Related Party, and, if instituted against Borrower or any Related Party, shall not be dismissed or vacated within sixty (60) days after the filing or other institution thereof; or

22

(o)     Borrower or any Related Party shall become insolvent, generally shall fail or be unable to pay its debts as they mature, shall admit in writing its inability to pay its debts as they mature, shall make a general assignment for the benefit of its creditors, shall enter into any composition or similar agreement, or shall suspend the transaction of all or a substantial portion of its usual business; or

(p)     Borrower's failure to provide a duly executed ND Agreements on or before October 1, 2025.

10.     **DEFAULT REMEDIES.**

(a)     Upon the occurrence of any Event of Default specified in (a)-(m) of Section 9, Lender at its option may declare the Liabilities (principal, interest and other amounts) immediately due and payable without notice or demand of any kind, **ALL OF WHICH ARE HEREBY EXPRESSLY WAIVED BY BORROWER** (except as and if otherwise specifically set forth herein), whereupon the entire unpaid principal balance of the Liabilities, all interest accrued thereon, and any other Liabilities shall thereupon at once mature and become due and payable. Upon the occurrence of any Event of Default specified in (n)-(o) of Section 9, all Liabilities (principal, interest and other amounts) shall be immediately and automatically due and payable without notice, demand or other action of any kind, **ALL OF WHICH ARE HEREBY EXPRESSLY WAIVED BY BORROWER.** Upon the occurrence of any Event of Default, Lender may exercise any rights and remedies under this Agreement or any Related Document (including any Related Document pertaining to collateral), and at law or in equity. The time of payment of the Liabilities is also subject to acceleration if an Event of Default occurs.

(b)     Lender may, by written notice to Borrower, at any time and from time to time, waive any Event of Default or Unmatured Event of Default, which shall be for such period and subject to such conditions as shall be specified in any such notice. In the case of any such waiver, Lender and Borrower shall be restored to their former position and rights hereunder, and any Event of Default or Unmatured Event of Default so waived shall be deemed to be cured and not continuing; but no such waiver shall extend to or impair any subsequent or other Event of Default or Unmatured Event of Default. No failure to exercise, and no delay in exercising, on the part of Lender of any right, power or privilege hereunder shall preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies of Lender herein provided are cumulative and not exclusive of any rights or remedies provided by law.

11.     **OBLIGATIONS UNCONDITIONAL; WAIVER OF DEFENSES.** No fact or circumstance whatsoever which might at law or in equity constitute a discharge or release of, or defense to the obligations of, a co-signer, accommodation party, guarantors or surety shall limit or affect any obligations of Borrower under this Agreement or any Related Document. Without limiting the generality of the foregoing:

(a)     Lender may at any time and from time to time, without notice to Borrower, take any or all of the following actions without affecting or impairing the liability of Borrower under this Agreement and any Related Document:

(i)     renew or extend time of payment of the Liabilities;

(ii)     accept, substitute, release or surrender any security for the Liabilities; and

(iii)     release any person primarily or secondarily liable on the Liabilities (including any Credit Support Party and any other Related Party).

23

Northern Trust/FCC
Term Loan Agreement

(b)     No delay in enforcing payment of the Liabilities, nor any amendment, waiver, change, or modification of any terms of any Related Document, shall release Borrower from any obligation hereunder.  The obligations of Borrower under this Agreement are and shall be primary, continuing, unconditional and absolute, irrespective of the value, genuineness, regularity, validity or enforceability of any Related Documents.  In order to hold Borrower liable or exercise rights or remedies hereunder, there shall be no obligation on the part of Lender, at any time, to resort for payment to any Related Party or to any security for the Liabilities.  Lender shall have the right to enforce this Agreement irrespective of whether or not other proceedings or steps are being taken against any property securing the Liabilities or any other party primarily or secondarily liable on any of the Liabilities.

(c)     Except as and if otherwise specifically set forth herein, Borrower irrevocably waives presentment, protest, notice of protest, notice of intent to accelerate, notice of acceleration, demand, diligence, grace, notice of dishonor or default, notice of nonpayment, notice of acceptance, notice of any loans made, extensions granted or other action taken in reliance hereon, and all other demands and notices of any kind in connection with this Agreement or the Liabilities.

12.     **ARM'S LENGTH TRANSACTIONS.**  Borrower acknowledges and agrees that:

(a)     The transactions contemplated by the Related Documents are arm's length commercial transactions among Borrower, Lender and any other parties thereto.

(b)     In connection with such transactions, Lender is acting solely as a principal and not as an agent or a fiduciary of Borrower or any Related Party.

(c)     With respect to any advances of Liabilities or the process leading thereto (whether or not Lender or any Lender Affiliate has advised or is currently advising Borrower or any Related Party on other matters), Lender has not assumed a fiduciary responsibility in favor of Borrower or any Related Party or any other obligation of Borrower or any Related Party.

(d)     Borrower and the Related Parties have consulted with their own legal and financial advisors to the extent they deem appropriate in connection with the transactions contemplated by the Related Documents.

13.     **NO INTEREST OVER LEGAL RATE.**  It is the intent of Lender and Borrower in the execution of this Agreement and all Related Documents to contract in strict compliance with applicable usury law.  In furtherance thereof, Lender and Borrower stipulate and agree that none of the terms and provisions contained in the Related Documents shall ever be construed to create a contract to pay for the use, forbearance or detention of money, interest at a rate in excess of the maximum interest rate permitted to be charged by applicable law; that neither Borrower nor any Guarantors, endorsers or other parties now or hereafter becoming liable for payment of the Loan  shall ever be obligated or required to pay interest on the Loan  at a rate in excess of the maximum interest that may be lawfully charged under applicable law; and that the provisions of this paragraph shall control over all other provisions of the Related Documents which may be in apparent conflict herewith.  Lender expressly disavows any intention to charge or collect excessive unearned interest or finance charges in the event the maturity of the Loan is accelerated.  If the maturity of the Loan shall be accelerated for any reason or if the principal of the Loan is paid prior to the Scheduled Maturity Date, and as a result thereof the interest received for the actual period of existence of the Loan exceeds the applicable maximum lawful rate, Lender shall, at its option, either refund to Borrower the amount of such excess or credit the amount of such excess against the principal balance of the Loan then outstanding and thereby shall render inapplicable any and all penalties of any kind provided by applicable law as a result of such excess interest.  In the event that Lender shall contract for, charge or receive any amount or amounts and/or any other thing of

24

value which are determined to constitute interest which would increase the effective interest rate on the Loan to a rate in excess of that permitted to be charged by applicable law, an amount equal to interest in excess of the lawful rate shall, upon such determination, at the option of Lender, be either immediately returned to Borrower or credited against the principal balance of the Loan then outstanding, in which event any and all penalties of any kind under applicable law as a result of such excess interest shall be inapplicable. Borrower acknowledges that it believes the Loan to be non-usurious and agrees that if, at any time, Borrower should have reason to believe that the Loan is in fact usurious, it will give Lender notice of such condition, and agrees that Lender shall have ninety (90) days in which to make appropriate refund or other adjustment in order to correct such condition if in fact such exists. The term "applicable law" as used herein shall mean the laws of the State of Illinois or the laws of the United States, whichever laws allow the greater rate of interest, as such laws now exist or may be changed or amended or come into effect in the future.

14. **PAYMENTS, ETC.** All payments hereunder shall be made in immediately available funds, and shall be applied first to accrued interest and then to principal; however, if an Event of Default occurs, Lender may, in its sole discretion, and in such order as it may choose, apply any payment to interest, principal and/or lawful charges and expenses then accrued. Borrower shall receive immediate credit on payments received during Lender's normal banking hours if made in cash, immediately available funds, or by debit to available balances in an account at Lender; otherwise payments shall be credited after clearance through normal banking channels. Borrower authorizes Lender to charge any account of Borrower maintained with Lender for any amounts of principal, interest, taxes, duties, or other charges or amounts due or payable hereunder or under any Related Document, with the amount of such payment subject in Lender's discretion to availability of collected balances. Unless Borrower instructs otherwise, the Loan shall be credited to an account(s) of Borrower with Lender. All payments shall be made without deduction for or on account of any present or future taxes, duties or other charges levied or imposed on the Loan, the proceeds thereof, Lender, Borrower or any Related Party by any government or political subdivision thereof. Borrower shall upon request of Lender pay all such taxes, duties or other charges in addition to principal and interest, including all documentary stamp and intangible taxes, but excluding income taxes based solely on Lender's income.

15. **SETOFF.** If an Event of Default has occurred and is continuing, then, to the maximum extent permitted by law, any account, deposit or other indebtedness owing by Lender to Borrower, and any securities or other property of Borrower delivered to or left in the possession of Lender or any Lender Affiliate, or its or their nominee or bailee, may (at any time and without notice of any kind) be set off against and applied in payment of any obligation hereunder or under any Related Document.

16. **NOTICES.** Except as and if otherwise provided herein, all notices, requests and demands to or upon the respective parties pursuant hereto shall be in writing and shall deemed to have been given or made five business days after a record has been deposited in the mail, postage prepaid, or one business day after a record has been deposited with a recognized overnight courier, charges prepaid or to be billed to the sender, or on the day of delivery if delivered manually with receipt acknowledged, in each case addressed or delivered:

    (a)    **if to Lender to The Northern Trust Company, Attention: Credit Administration Team, IL-CD-BB-11, 50 South LaSalle, Chicago, IL 60603,** with a copy to Winthrop & Weinstine, P.A., 225 South Sixth Street, Suite 3500, Minneapolis, Minnesota 55402, Attn: Jonathan W.J. Armour; and

    (b)    if to Borrower to its address indicated in the preamble hereto,

or to such other address as may be hereafter designated in writing by the respective parties hereto by a notice in accord with this Section.

17.    **MISCELLANEOUS**.  Except as and if otherwise specifically agreed in any Related Document, and to the extent, if any, that the UCC or other law provides for the application of the law of a different state, this Agreement and the Related Documents shall be:  (i) governed by and construed in accordance with the internal law of the State of Illinois; and (ii) deemed to have been executed in the State of Illinois.  This Agreement shall bind Borrower, its(his)(her) heirs, trustees (including successor and replacement trustees), executors, personal representatives, successors and assigns, and shall inure to the benefit of Lender, its successors and assigns, except that Borrower may not transfer or assign any rights or obligations hereunder without the prior written consent of Lender.  If an Event of Default has occurred and is continuing, Borrower agrees to pay upon demand all expenses (including reasonable attorneys' fees, legal costs and expenses, and time charges of attorneys who may be employees of Lender, in each case whether in or out of court, in original or appellate proceedings or in bankruptcy) incurred or paid by Lender in connection with the enforcement or preservation of its rights hereunder or under any Related Document.  This Agreement may be executed in two or more counterparts, and (if there is more than one party) by each party on separate counterparts, each of which shall be deemed an original but which together shall constitute one and the same instrument.  **Delivery of an executed counterpart of a signature page of this Agreement, whether with or without the remainder hereof, by facsimile or in electronic (e.g., "pdf" or "tif") format shall be effective as delivery of a manually executed counterpart hereof.**  Time is of the essence in the performance of all obligations under this Agreement.  This Agreement is, and is intended to take effect as, an instrument under seal.  Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under such law, such provision shall be ineffective only to the extent and duration of such prohibition or invalidity without invalidating the remainder of such provision, the applicability of such provision in any other instance, or the remaining provisions of this Agreement.  To the maximum extent permitted by applicable law, Lender is hereby authorized by Borrower without notice to Borrower to fill in any blank spaces and dates herein or in any Related Document to conform to the terms of the transaction and/or understanding evidenced hereby.  This Agreement may not be amended, waived or terminated without the prior written consent of Lender.  **THIS AGREEMENT AND THE RELATED DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AS TO THE SUBJECT MATTER HEREOF AND THEREOF, AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.  THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

18.    **NO PUNITIVE DAMAGES.  NO PARTY HERETO MAY SEEK OR RECOVER PUNITIVE DAMAGES IN ANY PROCEEDING BROUGHT UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY RELATED DOCUMENT.  THIS PROVISION IS A MATERIAL INDUCEMENT TO LENDER TO EXTEND CREDIT.**

19.    **TELEPHONIC INSTRUCTIONS; AUTHORIZATION TO RECORD PHONE CALLS. LENDER AT ITS OPTION MAY MAKE LOANS HEREUNDER UPON TELEPHONIC INSTRUCTIONS AND IN SO DOING SHALL BE FULLY ENTITLED TO RELY SOLELY UPON INSTRUCTIONS, INCLUDING INSTRUCTIONS TO MAKE TRANSFERS TO THIRD PARTIES, REASONABLY BELIEVED BY LENDER TO HAVE BEEN GIVEN BY AN AUTHORIZED PERSON, WITHOUT INDEPENDENT INQUIRY OF ANY TYPE. FOR ITSELF AS WELL AS ANY RELATED PARTY AND ANY AGENT, DIRECTOR, EMPLOYEE, MANAGER, MEMBER, OFFICER, OR PARTNER OF BORROWER, AS APPLICABLE, BORROWER IRREVOCABLY CONSENTS TO LENDER'S RECORDING OF ANY TELEPHONE CONVERSATION PERTAINING TO THE LOAN HEREUNDER.**

20.    **ANTI-TERRORISM LAW.**

<div align="center">26</div>

**(a)      Lender hereby notifies Borrower and any Related Party that, pursuant to the requirements of the USA Patriot Act, Lender may be required to obtain, verify and record information that identifies Borrower and any Related Party, which information may include the name and address of Borrower and any Related Party and other information that will allow Lender to identify Borrower and any Related Party in accord with the USA Patriot Act. Borrower hereby agrees to take any action necessary to enable Lender to comply with the requirements of the USA Patriot Act.**

(b)      Borrower covenants, represents and warrants as follows:

(i)      Neither Borrower nor any Related Party is or, to the best of Borrower's knowledge, will be in violation of any Anti-Terrorism Law.

(ii)      Neither Borrower nor any Related Party is or, to the best of Borrower's knowledge, will be a Prohibited Person.

(iii)      Neither Borrower nor any Related Party:  (A) conducts any business or engages in any transaction or dealing with any Prohibited Person, including  making or receiving any contribution of funds, goods or services to or for the benefit of any Prohibited Person; (B) deals in, or otherwise engages in any transaction relating to, any property or interests in property blocked pursuant to Executive Order No. 13224; or (C) engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law.

(iv)      Neither Borrower nor any Related Party will engage in any of the activities described in (iii) of this subsection (b) in the future.

(v)      Borrower and each Related Party will ensure that the proceeds of the Liabilities are not used to violate any foreign asset control regulations of the U.S. Office of Foreign Assets Control ("OFAC") or of any enabling statute or any Executive Order relating thereto.

(vi)      Borrower will deliver to Lender any certification or other evidence requested from time to time by Lender in its sole reasonable discretion, confirming Borrower's and any Related Party's compliance with this Section.

(vii)      Borrower has implemented procedures, and will consistently apply those procedures while this Agreement is in effect, to ensure that the representations and warranties in this Section remain true and correct while this Agreement is in effect.

21.      **JURISDICTION AND VENUE.  Except as and if otherwise specifically agreed in any Related Document, and only as to suits, actions or other proceedings pertaining to such Related Document, Borrower and Lender:**

**(a)      agree irrevocably that all suits, actions or other proceedings with respect to, arising out of or in connection with this Agreement or any Related Document shall be subject to litigation in courts having situs within or jurisdiction over Cook County, State of Illinois;**

**(b)      consent and submit to the jurisdiction of any such court; and**

27

(c)     waive any right to transfer or change the venue of any suit, action or other proceeding brought in accordance with this Section, or to claim that any such proceeding has been brought in an inconvenient forum.

22.     **WAIVER OF JURY TRIAL.  TO THE FULLEST EXTENT PERMITTED BY LAW, BORROWER AND LENDER VOLUNTARILY, KNOWINGLY, IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY RIGHT THEY OR ANY OF THEM MAY HAVE TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) BETWEEN OR AMONG BORROWER AND LENDER ARISING OUT OF OR IN ANY WAY RELATED TO THIS AGREEMENT, ANY OTHER RELATED DOCUMENT, OR ANY RELATIONSHIP BETWEEN LENDER AND BORROWER.**

15341.18
31935562v8

**[SIGNATURE PAGES TO FOLLOW]**

1758371410.docx-9/4/2025 1:25 PM
©The Northern Trust Company 2016

Northern Trust/FCC
Term Loan Agreement

To the extent applicable under any state law, the parties executed this Agreement as of the date stated at the top of the first page, intending to create an instrument executed under seal.

**BORROWER**:

**SENIOR CLASSIC LEASING, LLC**, a
California limited liability company

By: _____
Harshad Dharod
Its: Manager

S-1

Northern Trust/FCC
Term Loan Agreement

**BORROWER**:

**DFG RESTAURANTS, INCORPORATED**, a
California corporation

By: _____

Harshad Dharod
Its: President

S-2

1479146871.docx-7/30/2025 12:48 PM
©The Northern Trust Company 2016

<div align="right">Northern Trust/FCC<br>Term Loan Agreement</div>

**BORROWER**:

**HARSHAD & NASIR CORPORATION**, a
California corporation

By: _____

      Harshad Dharod
      Its: President

<div align="center">S-3</div>

1479146871.docx-7/30/2025 12:48 PM
©The Northern Trust Company 2016

Northern Trust/FCC
Term Loan Agreement

**BORROWER**:

**SUN GIR INCORPORATED**, a California corporation

By: _____

Harshad Dharod
Its: President

S-4

1479146871.docx-7/30/2025 12:48 PM
©The Northern Trust Company 2016

<div align="right">
Northern Trust/FCC
Term Loan Agreement
</div>

**BORROWER**:

**SECOND STAR HOLDINGS LLC**, a Nevada
limited liability company

By: _____

Harshad Dharod
Its: Manager

S-5

Northern Trust/FCC
Term Loan Agreement

**BORROWER**:

**THIRD STAR INVESTMENTS LLC**, a
California limited liability company

By: _____
Harshad Dharod
Its: Manager

S-6

Northern Trust/FCC
Term Loan Agreement

**LENDER:**

**THE NORTHERN TRUST COMPANY**, an
Illinois banking corporation

By: _____
Tim Rohde
Its: Senior Vice President

S-7

<div align="right">Northern Trust/FCC<br>Term Loan Agreement</div>

## **EXHIBIT A**

[Intentionally Omitted.]

A-1

1758371410.docx-9/4/2025 1:25 PM
©The Northern Trust Company 2016

<div align="right">Northern Trust/FCC<br>Term Loan Agreement</div>

## EXHIBIT B

## LIST OF SUBSIDIARIES

None.

B-1

1758371410.docx6-9/4/2025 1:25 PM
®The Northern Trust Company 2016

<div align="right">Northern Trust/FCC<br>Term Loan Agreement</div>

## EXHIBIT C

[Form Covenant Compliance Certificate]

<div align="center">C-1</div>

1758371410.docx6-9/4/2025 1:25 PM
®The Northern Trust Company 2016

**FFC Compliance Certificate Calculation**
**Date:_____**

1. **Fixed Charge Coverage Ratio (for the most recent 12 consecutive months)**

(a) **Adjusted EBITDAR**

    (A)  Net Income (Loss) for such period      _____

    (B)  Interest Charges      _____

    (C)  Federal, State, Local and Foreign Income Taxes      _____

    (D)  Depreciation and Amortization Expense      _____

    (E)  Non-Cash Expenses      _____

    (F)  Closed Store Expenses      _____

    (G)  Non-recurring expenses      _____

    (H)  Rent and Lease Expense      _____

    (I)  General and Administrative Expenses      _____

    (J)  Extraordinary Gains      _____

    (K)  **Adjusted EBITDAR**
         [(A)+(B)+(C)+(D)+(E)+(F)+(G)+(H)] – (I)-(J)      _____

(b) **Fixed Charges**

(i)      Interest Charges      _____

(ii)      Mandatory Principal Payments Made on Indebtedness      _____

(iii)      Rent and Lease Expense      _____

(iv)      [Post FCC Only] Distributions*      _____

(v)      Taxes      _____

(vi)      **Fixed Charges** [Sum of (i)+(ii)+(iii)+*(iv)+(v)]      _____

NTAC:3NS-20

**Pre Fixed Charge Coverage Ratio**

[(a)(K)] / [(b)(i)+(b)(ii)+(b)(iii)+(b)(v)]                    _____

**Post Fixed Charge Coverage Ratio**

[(a)(K)] / [(b)(i)+(b)(ii)+(b)(iii)+(b)(iv)+(b)(v)]           _____

Required (not less than 1.25 to 1.00 for Pre and not less than 1.10 to 1.00 for Post*)

Compliance          _____Y/N_____

\*includes any payments made to shareholders as dividends, loans, equity repayments or other forms of payment

2.  **Lease Adjusted Leverage Ratio (For the most recent 12 consecutive months)**

(a)      Funded Debt

      (A)  Outstanding Debt                    _____

(b)      Lease Adjusted Rentals (Rent and Lease Expense x8)       _____

(c)      **Adjusted EBITDAR**                    _____

**Lease-Adjusted Leverage Ratio**

[(a)(A)+(b)] / [(c)]                    _____

Required:

| Fiscal Quarter | Lease-Adjusted Leverage Ratio |
|---|---|
| Closing Date until December 31, 2026 | 5:75:1:00 |
| January 1, 2026 and thereafter | 5:50:1:00 |

Compliance          _____Y/N_____

31934957v1

NTAC:3NS-20

**<u>Guarantor Compliance Certificate:</u>**

1.  **Minimum Global Liquidity not less than $15,000,000 at all times**          Actual:_____

                                                                                  Compliant:  Y/N

2.  **Quarterly CRE Updates**
    a.  Schedule of Loans to mature within next 12 months period to be delivered concurrent with Compliance

    Including but not limited to: (amount, maturity, lender, progress update an tenor)

NTAC:3NS-20

## **SCHEDULE 7(m)**

## **Unit Locations**

| Unit # | Address | City | State | Zip |
|---|---|---|---|---|
| 7351 | 6310 Platt Ave./Victory | Woodland Hills | CA | 91367 |
| 7352 | 1625 Santa Anita Ave. | S. El Monte | CA | 91733 |
| 7355 | 14344 Roscoe Bl/Lennox | Panorama City | CA | 91404 |
| 7358 | 9803 E. Las Tunas | Temple City | CA | 91780 |
| 7359 | 18756 Sherman Way/Geyser | Reseda | CA | 91335 |
| 7360 | 1465 E. Colorado Blvd. | Pasadena | CA | 91106 |
| 7361 | 14080 Francisquito | Baldwin Park | CA | 91706 |
| 7362 | 165 E. Duarte Rd. | Arcadia | CA | 91006 |
| 7363 | 18237 Colima Rd. | Rowland Heights | CA | 91745 |
| 7365 | 810 S. Grand | Glendora | CA | 91740 |
| 7366 | 19305 Victory Bll/Tampa | Reseda | CA | 91335 |
| 7367 | 2400 S. Azusa | West Covina | CA | 91792 |
| 7368 | 5575 Woodman Ave./Burbank | Van Nuys | CA | 91401 |
| 7369 | 141 S. Diamond Bar Blvd. | Diamond Bar | CA | 91765 |
| 7371 | 16815 Devonshire St./Petit | Granada Hills | CA | 91344 |
| 7372 | 5633 Whittier Blvd. | Los Angeles | CA | 90022 |
| 7373 | 1320 N. San Fernando Rd. | Burbank | CA | 91504 |
| 7374 | 12358 Washington Blvd | Whittier | CA | 90606 |
| 7375 | 1900 San Gabriel Blvd. | San Gabriel | CA | 91776 |
| 7376 | 11509 Laurel Cyn/Kalisher | San Fernando | CA | 91340 |
| 7377 | 210 S. Hacienda Blvd. | City of Industry | CA | 91744 |
| 7378 | 6457 Sepulveda Bl/Haynes | Van Nuys | CA | 91411 |
| 7379 | 9861 DeSoto Ave/Lassen | Chatsworth | CA | 91311 |
| 7380 | 505 W. Las Tunas | San Gabriel | CA | 91776 |
| 7381 | 10409 Whittier Blvd. | Whittier | CA | 90606 |
| 7382 | 1124 W. Glenoaks | Glendale | CA | 91202 |
| 7383 | 20105 Saticoy St/Winnetka | Canoga Park | CA | 91306 |
| 7384 | 19400 Ventura Blvd. | Tarzana | CA | 91356 |
| 7385 | 1400 Foothill Blvd. | La Verne | CA | 91750 |
| 7386 | 3832 Peck Rd. | El Monte | CA | 91732 |
| 7387 | 18090 W. Chatsworth St. | Granada Hills | CA | 91344 |
| 7389 | 9505 Sepulveda Bl/Plummer | Sepulveda | CA | 91343 |
| 7391 | 2980 E. Workman Ave. | West Covina | CA | 91791 |
| 7392 | 2521 W. Commonwealth | Alhambra | CA | 91803 |
| 7393 | 573 N. Azusa Ave. | Covina | CA | 91722 |
| 7394 | 140 E. Foothill Blvd. | Pomona | CA | 91767 |
| 7396 | 1302 Huntington Dr. | Duarte | CA | 91010 |
| 7397 | 2030 Montrose Ave. | Montrose | CA | 91020 |
| 7398 | 19782 E. Walnut Dr. N | City of Industry | CA | 91789 |
| 7400 | 21201 Sherman Way | Canoga Park | CA | 91303 |
| 7401 | 20900 Roscoe Bl/DeSoto | Canoga Park | CA | 91304 |
| 7402 | 8875 Glenoaks Blvd. | Sun Valley | CA | 91352 |
| 7403 | 12653 Sherman Way | North Hollywood | CA | 91605 |
| 7487 | 7649 Van Nuys Bl./Keswick | Van Nuys | CA | 91401 |
| 7488 | 13151 Crossroads Pkwy S. | City of Industry | CA | 91746 |
| 7489 | 1231 W. Caesar Chavez | Monterey Park | CA | 91754 |
| 7491 | 1190 W. Foothill Blvd. | Azusa | CA | 91702 |
| 7492 | 1471 N. Montebello | Montebello | CA | 90640 |
| 7493 | 5166 Vineland | North Hollywood | CA | 91601 |
| 7494 | 15360 Whittier Blvd. | Whittier | CA | 90603 |
| 7495 | 485 N. Rosemead | Pasadena | CA | 91107 |
| 7625 | 3215 N. Broadway | Los Angeles | CA | 90031 |
| 8150 | 6601 Lankershim Blvd | North Hollywood | CA | 91606 |
| 861 | 3640 Industrial Drive | Santa Rosa | CA | 95403 |
| 862 | 495 Stony Point | Santa Rosa | CA | 95401 |
| 864 | 6460 Redwood Drive | Rohnert Park | CA | 94928 |
| 866 | 1000 Farmers Lane | Santa Rosa | CA | 95405 |
| 863 | 1037 Vine Street | Healdsburg | CA | 95448 |
| 7466 | 373 Aviation Blvd | Santa Rosa | CA | 95403 |
| 7780 | 15895 Dam Rd Exit | Clearlake | CA | 95422 |

Schedule 7(m)-1

## **SCHEDULE 7(n)**

### **Leases**

| Unit # | Address | City | State | Zip | Franchise Agreement Effective Date | Franchise Agreement Expiration Date |
|---|---|---|---|---|---|---|
| 7351 | 6310 Platt Ave./Victory | Woodland Hills | CA | 91367 | 12/23/20 | 12/22/30 |
| 7352 | 1625 Santa Anita Ave. | S. El Monte | CA | 91733 | 12/23/20 | 12/22/30 |
| 7355 | 14344 Roscoe Bl/Lennox | Panorama City | CA | 91404 | 12/23/20 | 12/22/30 |
| 7358 | 9803 E. Las Tunas | Temple City | CA | 91780 | 12/12/20 | 12/11/30 |
| 7359 | 18756 Sherman Way/Geyser | Reseda | CA | 91335 | 12/23/20 | 12/22/30 |
| 7360 | 1465 E. Colorado Blvd. | Pasadena | CA | 91106 | 12/23/20 | 12/22/30 |
| 7361 | 14080 Francisquito | Baldwin Park | CA | 91706 | 12/23/20 | 12/22/30 |
| 7362 | 165 E. Duarte Rd. | Arcadia | CA | 91006 | 12/23/20 | 12/22/30 |
| 7363 | 18237 Colima Rd. | Rowland Heights | CA | 91745 | 12/23/20 | 12/22/30 |
| 7365 | 810 S. Grand | Glendora | CA | 91740 | 12/23/20 | 12/22/30 |
| 7366 | 19305 Victory Bll/Tampa | Reseda | CA | 91335 | 12/23/20 | 12/22/30 |
| 7367 | 2400 S. Azusa | West Covina | CA | 91792 | 12/12/20 | 12/11/30 |
| 7368 | 5575 Woodman Ave./Burbank | Van Nuys | CA | 91401 | 12/23/20 | 12/22/30 |
| 7369 | 141 S. Diamond Bar Blvd. | Diamond Bar | CA | 91765 | 12/23/20 | 12/22/30 |
| 7371 | 16815 Devonshire St./Petit | Granada Hills | CA | 91344 | 12/23/20 | 12/22/30 |
| 7372 | 5633 Whittier Blvd. | Los Angeles | CA | 90022 | 12/12/20 | 12/11/30 |
| 7373 | 1320 N. San Fernando Rd. | Burbank | CA | 91504 | 12/12/20 | 12/11/30 |
| 7374 | 12358 Washington Blvd | Whittier | CA | 90606 | 12/23/20 | 12/22/30 |
| 7375 | 1900 San Gabriel Blvd. | San Gabriel | CA | 91776 | 12/23/20 | 12/22/30 |
| 7376 | 11509 Laurel Cyn/Kalisher | San Fernando | CA | 91340 | 12/23/20 | 12/22/30 |
| 7377 | 210 S. Hacienda Blvd. | City of Industry | CA | 91744 | 12/23/20 | 12/22/30 |
| 7378 | 6457 Sepulveda Bl/Haynes | Van Nuys | CA | 91411 | 12/23/20 | 12/22/30 |
| 7379 | 9861 DeSoto Ave/Lassen | Chatsworth | CA | 91311 | 12/23/20 | 12/22/30 |
| 7380 | 505 W. Las Tunas | San Gabriel | CA | 91776 | 12/23/20 | 12/22/30 |
| 7381 | 10409 Whittier Blvd. | Whittier | CA | 90606 | 12/23/20 | 12/22/30 |
| 7382 | 1124 W. Glenoaks | Glendale | CA | 91202 | 12/23/20 | 12/22/30 |
| 7383 | 20105 Saticoy St/Winnetka | Canoga Park | CA | 91306 | 12/23/20 | 12/22/30 |
| 7384 | 19400 Ventura Blvd. | Tarzana | CA | 91356 | 12/12/20 | 12/11/30 |
| 7385 | 1400 Foothill Blvd. | La Verne | CA | 91750 | 12/23/20 | 12/22/30 |
| 7386 | 3832 Peck Rd. | El Monte | CA | 91732 | 12/23/20 | 12/22/30 |
| 7387 | 18090 W. Chatsworth St. | Granada Hills | CA | 91344 | 12/23/20 | 12/22/30 |
| 7389 | 9505 Sepulveda Bl/Plummer | Sepulveda | CA | 91343 | 12/23/20 | 12/22/30 |
| 7391 | 2980 E. Workman Ave. | West Covina | CA | 91791 | 12/23/20 | 12/22/30 |
| 7392 | 2521 W. Commonwealth | Alhambra | CA | 91803 | 12/12/20 | 12/11/30 |
| 7393 | 573 N. Azusa Ave. | Covina | CA | 91722 | 12/23/20 | 12/22/30 |
| 7394 | 140 E. Foothill Blvd. | Pomona | CA | 91767 | 12/23/20 | 12/22/30 |
| 7396 | 1302 Huntington Dr. | Duarte | CA | 91010 | 12/23/20 | 12/22/30 |
| 7397 | 2030 Montrose Ave. | Montrose | CA | 91020 | 12/23/20 | 12/22/30 |
| 7398 | 19782 E. Walnut Dr. N | City of Industry | CA | 91789 | 12/23/20 | 12/22/30 |
| 7400 | 21201 Sherman Way | Canoga Park | CA | 91303 | 12/23/20 | 12/22/30 |
| 7401 | 20900 Roscoe Bl/DeSoto | Canoga Park | CA | 91304 | 12/23/20 | 12/22/30 |
| 7402 | 8875 Glenoaks Blvd. | Sun Valley | CA | 91352 | 12/23/20 | 12/22/30 |
| 7403 | 12653 Sherman Way | North Hollywood | CA | 91605 | 12/23/20 | 12/22/30 |
| 7487 | 7649 Van Nuys Bl./Keswick | Van Nuys | CA | 91401 | 12/12/20 | 12/11/30 |
| 7488 | 13151 Crossroads Pkwy S. | City of Industry | CA | 91746 | 12/12/20 | 12/11/30 |
| 7489 | 1231 W. Caesar Chavez | Monterey Park | CA | 91754 | 12/23/20 | 12/22/30 |
| 7491 | 1190 W. Foothill Blvd. | Azusa | CA | 91702 | 12/23/20 | 12/22/30 |
| 7492 | 1471 N. Montebello | Montebello | CA | 90640 | 12/23/20 | 12/22/30 |
| 7493 | 5166 Vineland | North Hollywood | CA | 91601 | 12/23/20 | 12/22/30 |
| 7494 | 15360 Whittier Blvd. | Whittier | CA | 90603 | 12/23/20 | 12/22/30 |
| 7495 | 485 N. Rosemead | Pasadena | CA | 91107 | 12/12/20 | 12/11/30 |
| 7625 | 3215 N. Broadway | Los Angeles | CA | 90031 | 01/07/22 | 01/06/32 |
| 8150 | 6601 Lankershim Blvd | North Hollywood | CA | 91606 | 09/25/22 | 09/24/32 |
| 861 | 3640 Industrial Drive | Santa Rosa | CA | 95403 | 08/31/14 | 08/31/44 |
| 862 | 495 Stony Point | Santa Rosa | CA | 95401 | 06/28/16 | 06/28/46 |
| 864 | 6460 Redwood Drive | Rohnert Park | CA | 94928 | 04/28/16 | 04/28/46 |
| 866 | 1000 Farmers Lane | Santa Rosa | CA | 95405 | 07/29/16 | 07/29/46 |
| 863 | 1037 Vine Street | Healdsburg | CA | 95448 | 02/27/14 | 02/27/44 |
| 7466 | 373 Aviation Blvd | Santa Rosa | CA | 95403 | 04/19/21 | 04/19/31 |
| 7780 | 15895 Dam Rd Exit | Clearlake | CA | 95422 | 10/13/08 | 10/13/38 |

Schedule 7(n)-1

## SCHEDULE 7(o)

## Franchise Agreements

| Unit # | Address | City | State | Zip | Franchise Agreement Effective Date | Franchise Agreement Expiration Date |
|---|---|---|---|---|---|---|
| 7351 | 6310 Platt Ave./Victory | Woodland Hills | CA | 91367 | 12/23/20 | 12/22/30 |
| 7352 | 1625 Santa Anita Ave. | S. El Monte | CA | 91733 | 12/23/20 | 12/22/30 |
| 7355 | 14344 Roscoe Bl/Lennox | Panorama City | CA | 91404 | 12/23/20 | 12/22/30 |
| 7358 | 9803 E. Las Tunas | Temple City | CA | 91780 | 12/12/20 | 12/11/30 |
| 7359 | 18756 Sherman Way/Geyser | Reseda | CA | 91335 | 12/23/20 | 12/22/30 |
| 7360 | 1465 E. Colorado Blvd. | Pasadena | CA | 91106 | 12/23/20 | 12/22/30 |
| 7361 | 14080 Francisquito | Baldwin Park | CA | 91706 | 12/23/20 | 12/22/30 |
| 7362 | 165 E. Duarte Rd. | Arcadia | CA | 91006 | 12/23/20 | 12/22/30 |
| 7363 | 18237 Colima Rd. | Rowland Heights | CA | 91745 | 12/23/20 | 12/22/30 |
| 7365 | 810 S. Grand | Glendora | CA | 91740 | 12/23/20 | 12/22/30 |
| 7366 | 19305 Victory Bll/Tampa | Reseda | CA | 91335 | 12/23/20 | 12/22/30 |
| 7367 | 2400 S. Azusa | West Covina | CA | 91792 | 12/12/20 | 12/11/30 |
| 7368 | 5575 Woodman Ave./Burbank | Van Nuys | CA | 91401 | 12/23/20 | 12/22/30 |
| 7369 | 141 S. Diamond Bar Blvd. | Diamond Bar | CA | 91765 | 12/23/20 | 12/22/30 |
| 7371 | 16815 Devonshire St./Petit | Granada Hills | CA | 91344 | 12/23/20 | 12/22/30 |
| 7372 | 5633 Whittier Blvd. | Los Angeles | CA | 90022 | 12/12/20 | 12/11/30 |
| 7373 | 1320 N. San Fernando Rd. | Burbank | CA | 91504 | 12/12/20 | 12/11/30 |
| 7374 | 12358 Washington Blvd | Whittier | CA | 90606 | 12/23/20 | 12/22/30 |
| 7375 | 1900 San Gabriel Blvd. | San Gabriel | CA | 91776 | 12/23/20 | 12/22/30 |
| 7376 | 11509 Laurel Cyn/Kalisher | San Fernando | CA | 91340 | 12/23/20 | 12/22/30 |
| 7377 | 210 S. Hacienda Blvd. | City of Industry | CA | 91744 | 12/23/20 | 12/22/30 |
| 7378 | 6457 Sepulveda Bl/Haynes | Van Nuys | CA | 91411 | 12/23/20 | 12/22/30 |
| 7379 | 9861 DeSoto Ave/Lassen | Chatsworth | CA | 91311 | 12/23/20 | 12/22/30 |
| 7380 | 505 W. Las Tunas | San Gabriel | CA | 91776 | 12/23/20 | 12/22/30 |
| 7381 | 10409 Whittier Blvd. | Whittier | CA | 90606 | 12/23/20 | 12/22/30 |
| 7382 | 1124 W. Glenoaks | Glendale | CA | 91202 | 12/23/20 | 12/22/30 |
| 7383 | 20105 Saticoy St/Winnetka | Canoga Park | CA | 91306 | 12/23/20 | 12/22/30 |
| 7384 | 19400 Ventura Blvd. | Tarzana | CA | 91356 | 12/12/20 | 12/11/30 |
| 7385 | 1400 Foothill Blvd. | La Verne | CA | 91750 | 12/23/20 | 12/22/30 |
| 7386 | 3832 Peck Rd. | El Monte | CA | 91732 | 12/23/20 | 12/22/30 |
| 7387 | 18090 W. Chatsworth St. | Granada Hills | CA | 91344 | 12/23/20 | 12/22/30 |
| 7389 | 9505 Sepulveda Bl/Plummer | Sepulveda | CA | 91343 | 12/23/20 | 12/22/30 |
| 7391 | 2980 E. Workman Ave. | West Covina | CA | 91791 | 12/23/20 | 12/22/30 |
| 7392 | 2521 W. Commonwealth | Alhambra | CA | 91803 | 12/12/20 | 12/11/30 |
| 7393 | 573 N. Azusa Ave. | Covina | CA | 91722 | 12/23/20 | 12/22/30 |
| 7394 | 140 E. Foothill Blvd. | Pomona | CA | 91767 | 12/23/20 | 12/22/30 |
| 7396 | 1302 Huntington Dr. | Duarte | CA | 91010 | 12/23/20 | 12/22/30 |
| 7397 | 2030 Montrose Ave. | Montrose | CA | 91020 | 12/23/20 | 12/22/30 |
| 7398 | 19782 E. Walnut Dr. N | City of Industry | CA | 91789 | 12/23/20 | 12/22/30 |
| 7400 | 21201 Sherman Way | Canoga Park | CA | 91303 | 12/23/20 | 12/22/30 |
| 7401 | 20900 Roscoe Bl/DeSoto | Canoga Park | CA | 91304 | 12/23/20 | 12/22/30 |
| 7402 | 8875 Glenoaks Blvd. | Sun Valley | CA | 91352 | 12/23/20 | 12/22/30 |
| 7403 | 12653 Sherman Way | North Hollywood | CA | 91605 | 12/23/20 | 12/22/30 |
| 7487 | 7649 Van Nuys Bl./Keswick | Van Nuys | CA | 91401 | 12/12/20 | 12/11/30 |
| 7488 | 13151 Crossroads Pkwy S. | City of Industry | CA | 91746 | 12/12/20 | 12/11/30 |
| 7489 | 1231 W. Caesar Chavez | Monterey Park | CA | 91754 | 12/23/20 | 12/22/30 |
| 7491 | 1190 W. Foothill Blvd. | Azusa | CA | 91702 | 12/23/20 | 12/22/30 |
| 7492 | 1471 N. Montebello | Montebello | CA | 90640 | 12/23/20 | 12/22/30 |
| 7493 | 5166 Vineland | North Hollywood | CA | 91601 | 12/23/20 | 12/22/30 |
| 7494 | 15360 Whittier Blvd. | Whittier | CA | 90603 | 12/23/20 | 12/22/30 |
| 7495 | 485 N. Rosemead | Pasadena | CA | 91107 | 12/12/20 | 12/11/30 |
| 7625 | 3215 N. Broadway | Los Angeles | CA | 90031 | 01/07/22 | 01/06/32 |
| 8150 | 6601 Lankershim Blvd | North Hollywood | CA | 91606 | 09/25/22 | 09/24/32 |
| 861 | 3640 Industrial Drive | Santa Rosa | CA | 95403 | 08/31/14 | 08/31/44 |
| 862 | 495 Stony Point | Santa Rosa | CA | 95401 | 06/28/16 | 06/28/46 |
| 864 | 6460 Redwood Drive | Rohnert Park | CA | 94928 | 04/28/16 | 04/28/46 |
| 866 | 1000 Farmers Lane | Santa Rosa | CA | 95405 | 07/29/16 | 07/29/46 |
| 863 | 1037 Vine Street | Healdsburg | CA | 95448 | 02/27/14 | 02/27/44 |
| 7466 | 373 Aviation Blvd | Santa Rosa | CA | 95403 | 04/19/21 | 04/19/31 |
| 7780 | 15895 Dam Rd Exit | Clearlake | CA | 95422 | 10/13/08 | 10/13/38 |

Schedule 7(o)-1

®The Northern Trust Company 2016

# EXHIBIT B

<div align="right">
Northern Trust/FFC
Term Note
</div>

**TERM NOTE**

$20,000,000.00

Dated September 5, 2025

      **FOR VALUE RECEIVED**, on or before September 5, 2032 (the "Scheduled Maturity Date"), **SENIOR CLASSIC LEASING, LLC**, a limited liability company organized under the law of the State of California ("Senior"), **DFG RESTAURANTS, INCORPORATED**, a corporation organized under the law of the State of California ("DFG"), **HARSHAD & NASIR CORPORATION**, a corporation organized under the law of the State of California ("H&N"), **SUN GIR INCORPORATED**, a corporation organized under the law of the State of California ("Sun"), **SECOND STAR HOLDINGS LLC**, a limited liability company organized under the law of the State of Nevada ("Second Star"), and **THIRD STAR INVESTMENTS LLC**, a limited liability company organized under the law of the State of California ("Third Star," and together with Senior, DFG, H&N, Sun and Second Star, individually, collectively and jointly and severally "Borrower" or "Borrowers"), promise to pay to the order of **THE NORTHERN TRUST COMPANY**, an Illinois banking corporation (hereafter, together with any subsequent holder hereof, called "Lender"), at its main banking office at 50 South LaSalle Street, Chicago, Illinois 60603, or at such other place as Lender may direct, the aggregate unpaid principal amount of $20,000,000.00 (the "Loan"). Borrower agrees to repay the Loan principal as set forth in Section 2(b) of the Loan Agreement (defined herein), provided that Borrower shall pay any remaining principal outstanding on the Scheduled Maturity Date.

      This Note evidences indebtedness incurred under that certain Term Loan Agreement of even date herewith (as amended, restated, renewed or replaced from time to time, the "Loan Agreement"), among Borrowers and Lender, to which Loan Agreement reference is hereby made for a statement of its terms and provisions, including without limitation those under which this Note may be paid prior to its due date or have its due date accelerated.

      Borrowers also agree to pay interest on the unpaid principal amount from time to time outstanding under this Note on the dates and at the rate(s) set forth in and determined pursuant to the Loan Agreement. Payments of both principal and interest are to be made in immediately available funds in lawful money of the United States of America.

      This Note shall be governed by and construed in accordance with the internal law of the State of Illinois. This Note shall bind Borrowers and their heirs, trustees (including without limitation successor and replacement trustees), executors, personal representatives, successors and assigns, and shall inure to the benefit of Lender, its successors and assigns, except that Borrowers may not transfer or assign any rights or obligations hereunder without the prior written consent of Lender.

      **TO THE FULLEST EXTENT PERMITTED BY LAW, BORROWERS AND (BY ITS ACCEPTANCE OF THIS NOTE) LENDER VOLUNTARILY, KNOWINGLY, IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY RIGHT THEY OR ANY OF THEM MAY HAVE TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) BETWEEN OR AMONG BORROWERS AND LENDER ARISING OUT OF THIS NOTE.**

31897289v3
15341.18

<div align="center">1</div>

Northern Trust/FFC
Term Note

To the extent applicable under any state law, Borrowers executed this Note as of the date stated at the top of the first page, intending to create an instrument executed under seal.

**BORROWER:**

**SENIOR CLASSIC LEASING, LLC**, a
California limited liability company

By: _____
Harshad Dharod
Its: Manager

S-1

S-2

<div align="right">
Northern Trust/FFC<br>
Term Note
</div>

**BORROWER:**

**DFG RESTAURANTS, INCORPORATED**, a
California corporation

By: _____
     Harshad Dharod
     Its: President

<div align="right">Northern Trust/FFC<br>Term Note</div>

**BORROWER:**

**HARSHAD & NASIR CORPORATION**, a
California corporation

By: _____
Harshad Dharod
Its: President

<div align="center">S-3</div>

<div align="right">
Northern Trust/FFC
Term Note
</div>

**BORROWER:**

**SUN GIR INCORPORATED**, a California corporation

By: _____

Harshad Dharod
Its: President

Northern Trust/FFC
Term Note

**BORROWER:**

**SECOND STAR HOLDINGS LLC**, a Nevada
limited liability company

By: _____
Harshad Dharod
Its: Manager

<div align="right">

Northern Trust/FFC
Term Note

</div>

**BORROWER:**

**THIRD STAR INVESTMENTS LLC,** a
California limited liability company

By: _____
Harshad Dharod
Its: Manager

<div align="center">

S-6

</div>

# EXHIBIT C

<div align="right">Northern Trust/FFC<br>Guaranty –Dharod Family, LLC</div>

## GUARANTY
### (Short Form)

This Guaranty (as modified from time to time, the "Guaranty") has been executed on September 5, 2025, by **DHAROD FAMILY, LLC**, a limited liability company organized under the law of the State of Nevada ("Guarantor"), with Guarantor's principal residence at 1 Centerpointe Drive, Suite 400, La Palma, CA 90623, in favor of **THE NORTHERN TRUST COMPANY**, an Illinois banking corporation ("Lender"), with a banking office at 50 S. LaSalle Street, Chicago, Illinois 60603.  If more than one party executes this Guaranty, "Guarantor" refers to each of them individually and some or all of them collectively, and their obligations hereunder shall be joint and several.  If any party comprising "Guarantor" is a trustee(s), "Trust Agreement" means the governing trust agreement and/or instruments governing the trust, as modified from time to time, and all related documents and instruments, and "Guarantor" also refers to the trustee(s) in its capacity as such and the trust individually and collectively.  Various capitalized terms have the meanings set forth in the Section entitled "DEFINITIONS."

In consideration of Lender's extension of new financial accommodations or continuation of existing financial accommodations to **SENIOR CLASSIC LEASING, LLC**, a limited liability company organized under the law of the State of California ("Senior"), **DFG RESTAURANTS, INCORPORATED**, a corporation organized under the law of the State of California ("DFG"), **HARSHAD & NASIR CORPORATION**, a corporation organized under the law of the State of California ("H&N"), **SUN GIR INCORPORATED**, a corporation organized under the law of the State of California ("Sun"), **SECOND STAR HOLDINGS LLC**, a limited liability company organized under the law of the State of Nevada ("Second Star"), and **THIRD STAR INVESTMENTS LLC**, a limited liability company organized under the law of the State of California ("Third Star," and together with Senior, DFG, H&N, Sun and Second Star, individually, collectively and jointly and severally "Borrower" or "Borrowers"), and other valuable consideration, the receipt and adequacy of which are hereby acknowledged, Guarantor agrees as follows:

1.      **DEFINITIONS**.

      (a)      As used in this Guaranty the following terms shall have the indicated meanings:

"Anti-Terrorism Law" means any law relating to terrorism or money-laundering, including Executive Order No. 13224 and the USA Patriot Act.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. §1 et. seq.), as amended from time to time, and any successor statute.

"Constituent Documents" means the articles or certificate of incorporation, by-laws, partnership agreement, certificate of limited partnership, limited liability company operating agreement, limited liability company articles of organization or certificate of formation, trust agreement, and all other documents and instruments pertaining to the formation and ongoing existence of any person which is not a natural person.

"Control" or "Controlled" means the power to direct the management and policies of a Person, directly or indirectly, whether through the ownership of voting securities or other beneficial interests, by contract or otherwise.

"Credit Support Party" means any Person, or any Persons severally, who now or hereafter guarantees payment or collection of all or any part of the Liabilities or provides any collateral to secure the Liabilities.

"Dollar" and "$" means lawful money of the United States of America, unless otherwise specified.

"Excluded Swap Obligation" means, with respect to any Guarantor, any Swap Obligation if, and to the extent that, all or a portion of the guaranty hereunder of such Guarantor of, or the grant by such Guarantor of a security interest to secure, such Swap Obligation (or any guaranty thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder at the time the guaranty of such Guarantor or the grant of such security interest becomes effective with respect to such Swap Obligation. If a Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such guaranty hereunder or security interest is or becomes illegal.

"Lender Affiliate" means Northern Trust Corporation or any direct or indirect subsidiary thereof (other than Lender itself).

"Liabilities" has the meaning given to such term in Section 2 hereof.

"Liquid Assets" means unencumbered insured cash deposits, U.S. Government securities and securities listed on public exchanges and cash surrender value of life insurance policies.

"Loan Agreement" means that certain Term Loan Agreement of even date herewith by and between the Borrowers and the Lender, as amended, restated or replaced from time to time.

"Note" means that certain Term Note of even date herewith in the original principal amount of $20,000,000 executed by the Borrowers and payable to the order of the Lender, as amended, restated or replaced from time to time.

"Payment Event" has the meaning given to such term in Section 3 hereof.

"Person" means any individual, corporation, company, limited liability company, voluntary association, partnership, trust, estate, unincorporated organization, other entity, or government (or any agency, instrumentality, or political subdivision thereof).

"Prohibited Person" means: (i) a person that is listed in the Annex to, or is otherwise subject to the provisions of, Executive Order No. 13224; (ii) a person owned or controlled by, or acting for or on behalf of, any person that is listed in the Annex to, or is otherwise subject to the provisions of, Executive Order No. 13224; (iii) a person with whom Lender is prohibited from dealing or otherwise engaging in any transaction by any Anti-Terrorism Law; (iv) a person who commits, threatens or conspires to commit or supports "terrorism" as defined in Executive Order No. 13224; (v) a person that is named as a "specially designated national and blocked person" on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control at its official website or at any replacement website or at any other official publication of such list; and (vi) a person who is affiliated with a person described in clauses (i) – (v) above.

"Qualified ECP Guarantor" means, in respect of any Swap Obligation, each Guarantor that has total assets exceeding $10,000,000 at the time the relevant guaranty or grant of the relevant security interest becomes effective with respect to such Swap Obligation or such other person as constitutes

an "eligible contract participant" under the Commodity Exchange Act or any regulations promulgated thereunder and can cause another person to qualify as an "eligible contract participant" at such time by entering into a "keepwell, support or other agreement" under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"Related Document(s)" means this Guaranty, the Note, the Loan Agreement and any other note, application and agreement for letter of credit (reimbursement agreement), Swap Agreement, mortgage, deed of trust, security or pledge agreement, or other agreement, document or instrument previously, now or hereafter delivered to Lender in connection with the Liabilities.

"Related Party(ies)" means Borrower, any Credit Support Party, any Subsidiary, and, in addition: (i) as to any Guarantor which is a natural person, trusts for the benefit of Guarantor; and (ii) as to any Guarantor which is not a natural person, to the extent applicable, any general or limited partner, controlling shareholder, joint venturer, member or manager, of Guarantor.

"Subsidiary" means any corporation, partnership, limited liability company, joint venture, trust, or other legal entity of which Guarantor owns directly or indirectly 50% or more of the outstanding voting stock or interest, or of which Guarantor has effective control, by contract or otherwise.

"Swap Agreement" means any agreement, document or instrument executed or delivered by Borrower or Guarantor pertaining to any Swap Obligation.

"Swap Obligation" means, with respect to Borrower or any Guarantor, any obligation to pay or perform under any agreement, contract, or transaction that constitutes a "swap" within the meaning of section 1(a)(47) of the Commodity Exchange Act, as amended from time to time, if entered into with Lender or any Lender Affiliate.

"USA Patriot Act" means the "Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001" (Public Law 107-56, signed into law on October 26, 2001), as amended from time to time.

(b)       As used in this Guaranty, unless otherwise specified:  the term "including" means "including without limitation"; the term "days" means "calendar days"; and terms such as "herein," "hereof" and words of similar import refer to this Guaranty as a whole.  Unless otherwise defined herein or the context requires otherwise, all terms (including those not capitalized) that are defined in the Uniform Commercial Code of Illinois shall have the same meanings herein as in such Code, as such Code may be amended from time to time (the "UCC"); however, no amendment to the UCC after the date hereof shall limit any rights of Lender hereunder or in connection herewith. Unless the context requires otherwise, wherever used herein the singular shall include the plural and vice versa, and the use of one gender shall also denote the others.  Captions herein are for convenience of reference only and shall not define or limit any of the terms or provisions hereof; references herein to sections or provisions without reference to the document in which they are contained are references to this Guaranty.

## 2.        LIABILITIES COVERED.

(a)       Subject to subsections (b) and (c) below, Guarantor hereby guarantee(s) absolutely and unconditionally the prompt payment and performance when due, whether at maturity, by declaration, by demand or otherwise, and at any and all times thereafter, of all indebtedness and other obligations of every kind and nature of Borrower to Lender, direct or indirect, absolute or

contingent, due or to become due, now or hereafter existing, joint, several or joint and several (all such indebtedness and other obligations being hereinafter collectively called the "Liabilities"). Notwithstanding the foregoing, the term "Liabilities" includes all Swap Obligations except for any Excluded Swap Obligations, which shall not be guaranteed pursuant to the terms hereof.

(b)     Notwithstanding anything to the contrary in subsection (a) above but subject at all times to subsection (c) below, so long as (i) the Guarantor has provided a written request to the Lender in the form attached hereto as Exhibit A (a "Burndown Request"), (ii) no Event of Default and no Unmatured Event of Default (as those terms are defined in the Related Documents) has occurred in the prior twelve (12) months prior to the date of the Burndown Request, (iii) the outstanding principal balance of the Note has been paid down to $10,000,000, and (iv) the Lease-Adjusted Leverage Ratio (as defined in the Loan Agreement) has been less than 4.50 to 1.00 for four (4) consecutive calendar quarters, then effective on the date of achievement of all of the foregoing conditions, the maximum liability of the Guarantor shall be reduced to zero.

(c)     Notwithstanding anything to the contrary contained herein, *in addition to, and not in lieu of*, any other liability of Guarantor under this Guaranty or the other Related Documents, Guarantor guarantees and promises to pay to Lender, or order, on demand, in lawful money of the United States of America, in immediately available funds (and to defend, indemnify and hold harmless Lender, its directors, officers, employees, successors and assigns from and against any and all claims, suits, liabilities (including, without limitation, strict liabilities and any impairment of Lender's security for the Liabilities), actions, or proceedings), any obligations, debts, damages, losses, costs, expenses, fines, penalties, charges, fees, judgments, awards, court costs, and legal or other expenses (including, without limitation, attorneys' fees and expenses and amounts paid in settlement of whatever kind or nature), which Lender may incur as a direct or indirect consequence of:

(i)     fraud or intentional or willful misrepresentation by Borrower, Guarantor, or any Affiliate (as defined in the Loan Agreement) or agent of Borrower or Guarantor, or their failure to disclose a material fact;

(ii)     the filing by the Borrower or the Guarantor of a voluntary petition under the Bankruptcy Reform Act of 1978 (11 USC Section 101-1330) as now or hereafter amended or recodified ("Bankruptcy Code"), or under any other present or future state or federal law regarding bankruptcy, reorganization or other debtor relief law, or any Affiliate, officer, director, or representative which Controls Borrower, consents to or acquiesces in or joins in an application for the appointment of a custodian, receiver, trustee, or examiner for Borrower or any portion of the Project, or Borrower or Guarantor makes an assignment for the benefit of creditors, or admits in any legal proceeding its or his insolvency or inability to pay its or his debts as they become due;

(iii)     the filing against the Borrower or the Guarantor of an involuntary petition under the Bankruptcy Reform Act of 1978 (11 USC Section 101-1330) as now or hereafter amended or recodified ("Bankruptcy Code"), or under any other present or future state or federal law regarding bankruptcy, reorganization or other debtor relief law, which is not dismissed within ninety (90) days of such filing;

(iv)     the gross negligence, willful misconduct, or commission of a criminal act by Borrower, Guarantor, or any Affiliate or agent of Borrower or Guarantor which results in a forfeiture of any collateral secured pursuant to the Security Documents (the "Collateral");

(v)      material physical waste of the Collateral;

(vi)     failure to maintain insurance as required by the Loan Agreement and any other Related Documents;

(vii)    failure to deliver any insurance proceeds or awards received by Borrower to Lender or to otherwise apply such sums as required under the terms of the Related Documents or any other instrument now or hereafter securing the Liabilities;

(viii)   misappropriation or misapplication of any funds from any account pledged by Borrower to Lender under the Loan Agreement or the other Related Documents; and

(ix)    any litigation or other legal proceeding related to the Loan is filed by Borrower or Guarantor that delays, opposes, impedes, obstructs, hinders, enjoins or otherwise interferes with or frustrates the efforts of Lender to exercise any rights and remedies available to Lender as provided herein and in the other Related Documents.

(d)      To the extent that (i) there is more than one guarantor of the Liabilities and (ii) Guarantor is a Qualified ECP Guarantor, Guarantor hereby jointly, severally, absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each other guarantor to honor all of its obligations under this Guaranty in respect of Swap Obligations (provided, however, that each Qualified ECP Guarantor shall only be liable under this subsection (c) for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this subsection (c), or otherwise under this Guaranty, voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount). The obligations of any Qualified ECP Guarantor under this subsection (c) shall remain in full force and effect until the Liabilities have been paid and performed in full and Lender has no further commitment to lend to Borrower. Such Qualified ECP Guarantor intends that this subsection (c) constitute, and this subsection (c) shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each other guarantor for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

(e)      The right of recovery under this Guaranty is in addition to and not in contravention of the amounts Lender may recover against Guarantor under any and all other guaranties or other Related Documents previously, now or hereafter executed by Guarantor, whether pertaining to Borrower or to any other person.

3.      **WHEN PAYMENT BY GUARANTOR REQUIRED**.

(a)      For purposes of this Guaranty, "<u>Payment Event</u>" means the occurrence of any of the following:

(i)     a default, event of default or similar event occurs under any note, mortgage, deed of trust, pledge agreement, security agreement, letter of credit reimbursement agreement, Swap Agreement, or other Related Document, and shall continue beyond any applicable notice, grace or cure period set forth in such Related Document; or Guarantor shall die or be declared legally incompetent; or

(ii)    any bankruptcy, insolvency, reorganization, arrangement, readjustment, liquidation, dissolution, or similar proceeding, domestic or foreign,

is instituted by or against Guarantor or Borrower, and, if instituted against Guarantor or Borrower, shall not be dismissed or vacated within sixty (60) days after the filing or other institution thereof; or

(iii)   Guarantor or Borrower shall become insolvent, generally shall fail or be unable to pay its debts as they mature, shall admit in writing its inability to pay its debts as they mature, shall make a general assignment for the benefit of its creditors, shall enter into any composition or similar agreement, or shall suspend the transaction of all or a substantial portion of its usual business.

(b)   If a Payment Event occurs, Guarantor agrees to pay Lender immediately upon Lender's demand the full amount of all Liabilities.  If a Payment Event specified in (ii) or (iii) of subsection (a) of this Section occurs, Guarantor's obligation to pay all Liabilities (principal, interest and other amounts) shall be immediately and automatically due and payable without notice, demand or other action of any kind.

4.   **NO RELIANCE ON LENDER.**  Guarantor represents and warrants to Lender that in making its decision to enter into this Guaranty, Guarantor has independently taken whatever steps Guarantor considers necessary to evaluate the condition and affairs of Borrower without reliance upon Lender, and has made an independent judgment.  As long as this Guaranty remains in effect, Guarantor will continue to make an independent evaluation of the financial condition and affairs of Borrower without reliance upon Lender. Lender has no obligation to provide to Guarantor any financial or other information concerning Borrower.

5.   **TERM OF GUARANTY; REINSTATEMENT.**  This Guaranty shall remain in full force and effect until all Liabilities have been paid and performed in full and until Lender has not extended to Borrower any committed or uncommitted loan or other credit facility of any kind.  This Guaranty and Guarantor's obligations hereunder may not be amended or waived without the prior written consent of Lender, and shall remain in effect notwithstanding that at any particular time there shall be no Liabilities outstanding.  This Guaranty shall continue to be effective or be reinstated, as the case may be, if at any time payment, or any part thereof, of the Liabilities to Lender is rescinded or must otherwise be returned by Lender upon the insolvency, bankruptcy or reorganization of Borrower or otherwise, all as though such payment to Lender had not been made.

6.   **WAIVERS OF DEFENSES AND COUNTERCLAIMS.**  Without limiting any other provision hereof, Guarantor irrevocably waives and relinquishes any setoff, defense or counterclaim that is or may be available to an accommodation party, co-signer, guarantor or surety at law or in equity.  Without limiting the generality of the previous sentence or of any other protection to Lender hereunder or at law or in equity:

(a)   Lender may at any time and from time to time, without notice to Guarantor, take any or all of the following actions without affecting or impairing the liability of Guarantor on this Guaranty: (i) renew or extend time of payment of the Liabilities; (ii) accept, substitute, release or surrender any security for the Liabilities; (iii) accept other guarantors; and (iv) release any person primarily or secondarily liable on the Liabilities (including Borrower and any maker, indorser or guarantor).

(b)   The liability of Guarantor under this Guaranty shall in no way be affected or impaired by any failure or delay in enforcing payment of the Liabilities or this Guaranty or any security therefor or herefor, or in exercising any right or power in respect thereto or hereto, or by any compromise, waiver, settlement, change, subordination, modification or disposition of the Liabilities or of any security for the Liabilities or for this Guaranty.  In order to hold Guarantor liable hereunder, there shall be no obligation on the part of Lender, at any time, to resort for payment to Borrower or any

other guaranty or to any security for the Liabilities or this Guaranty, and Lender shall have the right to enforce this Guaranty irrespective of whether or not other proceedings or steps are being taken against any property securing the Liabilities or any other party primarily or secondarily liable on any of the Liabilities.

(c)      Except as and if otherwise specifically set forth herein, Guarantor irrevocably waives notice of acceptance of this Guaranty, presentment, protest, notice of protest, notice of intent to accelerate, notice of acceleration, demand, diligence, grace, notice of dishonor or default, notice of nonpayment, notice of acceptance, notice of any loans made, extensions granted or other action taken in reliance hereon, and all other demands and notices of any kind in connection with this Guaranty or the Liabilities.

(d)      Any and all payments upon the Liabilities made by Borrower, by Guarantor, or by any other person, and the proceeds of any and all security for any of the Liabilities may be applied by Lender upon such of the items of the Liabilities as it may determine.

(e)      Until payment and performance in full of the Liabilities, Guarantor waives any claim or other right which Guarantor might now have or hereafter acquire against Borrower or any other person primarily or contingently liable on the Liabilities (including any maker, indorser or guarantor) or that arises from the existence or performance of Guarantor's obligations under this Guaranty, including any right of subrogation, reimbursement, exoneration, contribution or indemnification, or any right of participation in any claim or remedy of Lender against Borrower or any security for the Liabilities which Lender now has or hereafter acquires, however arising.

(f)      If any person other than Borrower (any such person, a "Third Party Obligor") shall be obligated in respect of the Liabilities, as a pledgor, a guarantor or otherwise, and shall make any payment in respect of the Liabilities, Guarantor agrees, after payment in full of the Liabilities and termination of all commitments by Lender and Lender Affiliates to extend credit to Borrower, to make a contribution to any such Third Party Obligor. The amount of the contribution made by Guarantor shall be an amount sufficient to cause the contributions for payments on the Liabilities made by Guarantor and all such Third Party Obligors to be proportionate to the respective benefits received by Guarantor and the Third Party Obligors. Nothing in this subsection (f) shall limit the obligations of Guarantor to Lender and Lender Affiliates hereunder.

7.      **REPRESENTATIONS AND WARRANTIES.**

(a)      Guarantor represents and warrants to, and agrees in favor of, Lender that:

(i)      (A)      If Guarantor is an organization (including a trust that is a registered organization), then Guarantor is an entity of the type, and is organized under the laws of the jurisdiction, specified in the preamble hereto. Guarantor's name as shown in the preamble hereto is the full exact name that appears in Guarantor's organizational documents. If Guarantor is a registered organization, Guarantor's name as shown in the preamble hereto is as shown on the public organic record most recently filed with or issued or enacted by Guarantor's jurisdiction of organization which purports to state, amend, or restate Guarantor's name. If Guarantor is an organization but not a registered organization, if it has only one place of business that place of business is at Guarantor's address indicated in the preamble hereto, but if it has

more than one place of business, its chief executive office is at such address.

(B)     If Guarantor is a trust which is not itself a registered organization, then: (1) if the Trust Agreement specifies a name for the trust, Guarantor's name as shown in the preamble hereto is the name so specified; (2) Guarantor has provided the name of its settlor(s) or testator(s) to Lender; and (3) if Guarantor has only one place of business, that place of business is at Guarantor's address indicated in the preamble hereto, but if it has more than one place of business, its chief executive office is at such address.

(C)     If Guarantor is a natural person, then:

(1)     Guarantor's principal residence is located at the address shown in the preamble hereto; and

(2)     i.     if Guarantor has a driver's license or alternative identification that has not expired and that was issued by the state of Guarantor's principal residence, Guarantor's name shown in the preamble hereto is exactly the same as shown on that driver's license or alternative identification card; or

ii.     if Guarantor does not have a driver's license or alternative identification card that has not expired and that was issued by the state of Guarantor's principal residence, then: (x) Guarantor's first given name and surname are as shown in the preamble hereto; and (y) if Guarantor obtains a driver's license or alternative identification card from the state of Guarantor's principal residence, then Guarantor shall, within thirty (30) days of the issuance of such driver's license or alternative identification card, provide Lender with a true and accurate copy of such driver's license or alternative identification card, showing Guarantor's name and address, the state of issuance and the expiration date thereof; and

(3)     in any event, Guarantor shall provide Lender notice within thirty (30) days of the happening of each of the following events:

i.     Guarantor's principal residence has changed;

ii.     the name of Guarantor on Guarantor's driver's license or alternative identification card has changed in any manner, no matter how small;

   iii. Guarantor's driver's license or alternative identification has been surrendered, suspended, changed or terminated in any manner, no matter how small or for how short a time;

   iv. Guarantor's driver's license or alternative identification card has expired; or

   v. Guarantor has changed his or her first given name or surname, whether as a result of marriage, divorce, legal proceeding or otherwise.

  (D) The representations and warranties made by Guarantor in (A)-(C) of this (i), as applicable, would have been accurate at all times during the five years and six months prior to the date hereof except as and if Guarantor has specifically notified Lender in writing prior to Guarantor's execution of this Guaranty.

(ii) Guarantor (if Guarantor is not a natural person) and any Subsidiary are validly existing and in good standing under the laws of their state of organization or formation, and are duly qualified, in good standing and authorized to do business in each jurisdiction where failure to do so would reasonably be expected to have a material adverse impact on the assets, condition or prospects of Guarantor.

(iii) The execution, delivery and performance of this Guaranty and all Related Documents: are within Guarantor's powers and have been authorized by all necessary action required by law and (unless Guarantor is a natural person) Guarantor's Constituent Documents; have received any and all necessary governmental approval; and do not and will not contravene or conflict with any provision of law, any Constituent Document or any agreement affecting Guarantor or its property. This Guaranty and all Related Documents are enforceable against Guarantor and/or the applicable Related Parties in accord with their terms, except to the extent, if any, that such enforceability may be limited by equitable principles, whether applied in a court of law or equity, or by bankruptcy, insolvency and other laws affecting creditors' rights generally.

(iv) There has been no material adverse change in the business, condition, properties, assets, operations or prospects of Guarantor since the date of the latest financial statements or other documentation provided by or on behalf of Guarantor to Lender.

(v) Guarantor has filed or caused to be filed all foreign, federal, state, and local tax returns that are required to be filed, and has paid or has caused to be paid all of its taxes, including any taxes shown on such returns or on any assessment received by it, to the extent that such taxes have become due.

(vi) The execution, delivery and performance of this Guaranty and all Related Documents are in Guarantor's best interest in its current and future operations and will materially benefit Guarantor. Guarantor has received adequate, fair and valuable consideration, and at least reasonably equivalent value, to enter into and

perform this Guaranty and all Related Documents.  Guarantor's assets at fair valuation exceed the sum of Guarantor's debts.  Guarantor is able to pay its debts as they become due.  Guarantor does not have unreasonably small capital with which to conduct its business.

8.      **GUARANTOR COVENANTS.**  Guarantor agrees that so long as this Guaranty remains in effect, it will:

(a)      NOTIFY LENDER IN WRITING AT LEAST SIXTY (60) DAYS IN ADVANCE OF: (i) ANY CHANGE WHATSOEVER IN THE NAME OF GUARANTOR; (ii) ANY CHANGE WHATSOEVER IN THE STATE OR JURISDICTION IN WHICH GUARANTOR IS ORGANIZED OR FORMED OR, IF GUARANTOR IS A NATURAL PERSON, IN WHICH GUARANTOR'S PRINCIPAL RESIDENCE IS LOCATED; (iii) ANY NEW NAMES UNDER WHICH GUARANTOR INTENDS TO DO BUSINESS; OR (iv) ANY NEW ADDRESSES AT OR FROM WHICH GUARANTOR INTENDS TO DO BUSINESS.  IF GUARANTOR IS A REGISTERED ORGANIZATION, SUCH AS A CORPORATION, LIMITED LIABILITY COMPANY, OR LIMITED PARTNERSHIP, GUARANTOR AGREES TO NOTIFY LENDER IMMEDIATELY IF GUARANTOR'S STATE OR JURISDICTION OF ORGANIZATION DISSOLVES, SUSPENDS OR TERMINATES GUARANTOR'S EXISTENCE OR PRIVILEGES, OR NOTIFIES GUARANTOR THAT IT IS NOT IN COMPLIANCE WITH ANY REQUIREMENTS OF SUCH STATE OR OTHER JURISDICTION.  IF GUARANTOR IS A NATURAL PERSON THE FOREGOING PORTION OF THIS (a) DOES NOT LIMIT GUARANTOR'S AGREEMENTS IN SUBSECTION (a)(i)(C) OF THE SECTION ENTITLED "REPRESENTATIONS AND WARRANTIES."

(b)      Furnish (or cause to be furnished) to Lender:

(i)      the information and documentation required under Section 8(b) of the Loan Agreement for the Guarantor.

(ii)      Within ninety (90) days after the end of each calendar year, information concerning commercial real estate indebtedness of the Guarantor or any Affiliates scheduled to mature over the next twelve (12) calendar months including, without limitation, amount, maturity, lender, and a progress update on whether such debt will be extended, modified or otherwise refinanced along with other information reasonably requested by the Lender in connection therewith.

(iii)      From time to time such other information, financial or otherwise, concerning Guarantor or any Related Party as Lender may reasonably request.

(c)      Furnish (or cause to be furnished) to Lender:

(i)      Immediately upon the institution of, or any adverse determination in, any litigation, arbitration or governmental proceeding which is material to Guarantor or any Subsidiary on a consolidated basis, written notice describing the same and the steps being taken by Guarantor or any Subsidiary in respect thereof.

(ii)      From time to time such other information, financial or otherwise, concerning Guarantor or any Related Party as Lender may reasonably request, including fully-completed personal financial statements of any Related Party who

is a natural person on Lender's then-current form on and as of such dates as Lender may reasonably request.

(d)     If Guarantor is not a natural person:  (a) preserve and maintain its existence, rights, franchises, licenses and privileges; and (b) not liquidate, dissolve, merge, or consolidate with or into any other entity, or sell, lease, transfer or otherwise dispose of all or a substantial part of its assets other than in the ordinary course of business as now conducted.

(e)     Guarantor, on a combined basis with all other Guarantors, shall maintain Liquid Assets of at least $15,000,000 at all times, subject to reduction on a dollar-for-dollar basis with the monthly principal amount paid by the Borrower on the Note.  In addition, the foregoing covenant shall no longer be measured once the Borrower has reduced the outstanding principal balance on the Note to $10,000,000.

9.     **SECURITY INTEREST; SETOFF.**  To secure the payment and performance of Guarantor's obligations hereunder, Guarantor grants to Lender a security interest in all property of Guarantor now or at any time hereafter in the possession of Lender for any purpose.  Lender shall have the rights and remedies of a secured party under the UCC in respect to such property, including the right to sell or otherwise dispose of any or all of such property.  Lender may apply or set off any deposit or other indebtedness at any time credited by or due from Lender to Guarantor against any liability of Guarantor under this Guaranty when any amount is payable hereunder by Guarantor.

10.     **LENDER MAY ALSO BE FIDUCIARY.**  Guarantor hereby irrevocably waives, releases and forever relinquishes any claim or right of any nature whatsoever based upon the fact that a trustee or other fiduciary of any Guarantor or Related Party is or may be Lender itself or a Lender Affiliate, and irrevocably consents to any such circumstance.  The rights and powers of Lender shall not in any way be restricted by reason of any such present or future circumstance.

11.     **ARM'S LENGTH TRANSACTIONS.**  Guarantor acknowledges and agrees that:

(a)     The transactions contemplated by the Related Documents are arm's length commercial transactions among Guarantor, Lender and any other parties thereto.

(b)     In connection with such transactions, Lender is acting solely as a principal and not as an agent or a fiduciary of Guarantor or any Related Party.

(c)     With respect to any advances of Liabilities or the process leading thereto (whether or not Lender or any Lender Affiliate has advised or is currently advising Guarantor or any Related Party on other matters), Lender has not assumed a fiduciary responsibility in favor of Guarantor or any Related Party or any other obligation of Guarantor or any Related Party.

(d)     Guarantor and the Related Parties have consulted with their own legal and financial advisors to the extent they deem appropriate in connection with the transactions contemplated by the Related Documents.

12.     **NOTICES.**  Except as and if otherwise provided herein, all notices, requests and demands to or upon the respective parties pursuant hereto shall be in writing and shall be deemed to have been given or made five business days after a record has been deposited in the mail, postage prepaid, or one business day after a record has been deposited with a recognized overnight courier, charges prepaid or to be billed to the

sender, or on the day of delivery if delivered manually with receipt acknowledged, in each case addressed or delivered:

(a)      if to Lender to **The Northern Trust Company, Attention: Credit Administration Team, IL-CD-BB-11, 50 South LaSalle, Chicago, IL 60603,** with a copy to Winthrop & Weinstine, P.A., 225 South Sixth Street, Suite 3500, Minneapolis, Minnesota 55402, Attn: Jonathan W.J. Armour; and

(b)      if to Guarantor to its address indicated in the preamble hereto,

or to such other address as may be hereafter designated in writing by the respective parties hereto by a notice in accord with this Section.

13.      **MISCELLANEOUS**.  Except as and if otherwise specifically agreed in any Related Document, and only as to such Related Document, and to the extent, if any, that the UCC or other law provides for the application of the law of a different state, this Guaranty and the Related Documents shall be:  (i) governed by and construed in accordance with the internal law of the State of Illinois; and (ii) deemed to have been executed in the State of Illinois.  This Guaranty shall bind Guarantor, its(his)(her) heirs, trustees (including successor and replacement trustees), executors, personal representatives, successors and assigns, except that Guarantor may not transfer or assign any rights or obligations hereunder without the prior written consent of Lender.  Without limiting Guarantor's obligations under any other provision hereof, Guarantor agrees to pay upon demand all expenses (including reasonable attorneys' fees, legal costs and expenses, and time charges of attorneys who may be employees of Lender, in each case whether in or out of court, in original or appellate proceedings or in bankruptcy) incurred or paid by Lender in connection with the enforcement or preservation of its rights hereunder or under any Related Document.  This Guaranty may be executed in two or more counterparts, and (if there is more than one party) by each party on separate counterparts, each of which shall be deemed an original but which together shall constitute one and the same instrument.  **Delivery of an executed counterpart of a signature page of this Guaranty, whether with or without the remainder hereof, by facsimile or in electronic (e.g., "pdf" or "tif") format shall be effective as delivery of a manually executed counterpart hereof.**  Time is of the essence in the performance of all obligations under this Guaranty.  This Guaranty is, and is intended to take effect as, an instrument under seal.  Whenever possible, each provision of this Guaranty shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Guaranty shall be prohibited by or invalid under such law, such provision shall be ineffective only to the extent and duration of such prohibition or invalidity without invalidating the remainder of such provision, the applicability of such provision in any other instance, or the remaining provisions of this Guaranty.  To the maximum extent permitted by applicable law, Lender is hereby authorized by Guarantor without notice to Guarantor to fill in any blank spaces and dates herein or in any Related Document to conform to the terms of the transaction and/or understanding evidenced hereby.  **THIS GUARANTY AND THE RELATED DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AS TO THE SUBJECT MATTER HEREOF AND THEREOF, AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

14.      **NO PUNITIVE DAMAGES. NO PARTY HERETO MAY SEEK OR RECOVER PUNITIVE DAMAGES IN ANY PROCEEDING BROUGHT UNDER OR IN CONNECTION WITH THIS GUARANTY OR ANY RELATED DOCUMENT.  THIS PROVISION IS A MATERIAL INDUCEMENT TO LENDER TO EXTEND CREDIT SUPPORTED BY THIS GUARANTY.**

Northern Trust/FFC
Guaranty –Dharod Family, LLC

15. **AUTHORIZATION TO RECORD PHONE CALLS. FOR ITSELF AS WELL AS ANY RELATED PARTY AND ANY AGENT, DIRECTOR, EMPLOYEE, MANAGER, MEMBER, OFFICER, OR PARTNER OF GUARANTOR, AS APPLICABLE, GUARANTOR IRREVOCABLY CONSENTS TO LENDER'S RECORDING OF ANY TELEPHONE CONVERSATION PERTAINING TO THIS GUARANTY.**

16. **ANTI-TERRORISM LAW.**

**(a)** **Lender hereby notifies Guarantor and any Related Party that, pursuant to the requirements of the USA Patriot Act, Lender may be required to obtain, verify and record information that identifies Guarantor and any Related Party, which information may include the name and address of Guarantor and any Related Party and other information that will allow Lender to identify Guarantor and any Related Party in accord with the USA Patriot Act. Guarantor hereby agrees to take any action necessary to enable Lender to comply with the requirements of the USA Patriot Act.**

(b) Guarantor covenants, represents and warrants as follows:

(i) Neither Guarantor nor any Related Party is or, to the best of Guarantor's knowledge, will be in violation of any Anti-Terrorism Law.

(ii) Neither Guarantor nor any Related Party is or, to the best of Guarantor's knowledge, will be a Prohibited Person.

(iii) Neither Guarantor nor any Related Party: (A) conducts any business or engages in any transaction or dealing with any Prohibited Person, including making or receiving any contribution of funds, goods or services to or for the benefit of any Prohibited Person; (B) deals in, or otherwise engages in any transaction relating to, any property or interests in property blocked pursuant to Executive Order No. 13224; or (C) engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law.

(iv) Neither Guarantor nor any Related Party will engage in any of the activities described in (iii) of this subsection (b) in the future.

(v) Guarantor and each Related Party will ensure that the proceeds of the Liabilities are not used to violate any foreign asset control regulations of the U.S. Office of Foreign Assets Control ("OFAC") or of any enabling statute or any Executive Order relating thereto.

(vi) Guarantor will deliver to Lender any certification or other evidence requested from time to time by Lender in its sole reasonable discretion, confirming Guarantor's and any Related Party's compliance with this Section.

(vii) Guarantor has implemented procedures, and will consistently apply those procedures while this Guaranty is in effect, to ensure that the representations and warranties in this Section remain true and correct while this Guaranty is in effect.

Guaranty 2016-4/27/16
©The Northern Trust Company 2016

17. **SAVINGS CLAUSE.** Notwithstanding any provision herein contained to the contrary, Guarantor's liability under this Guaranty shall be limited to an amount not to exceed as of any date of determination the amount which could be claimed by Lender from Guarantor under this Guaranty without rendering such claim voidable or avoidable under Section 548 of the Bankruptcy Code (Title 11, U.S.C.) or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law (for purposes of this Section, the "Avoidance Provisions") after taking into account, among other things, Guarantor's right of contribution and indemnification from each other guarantor, if any. To the end set forth above in this Section, but only to the extent that the obligations of Guarantor hereunder (for purposes of this Section, the "Guarantee Obligations") would otherwise be subject to avoidance under the Avoidance Provisions, if Guarantor is not deemed to have received valuable consideration, fair value, fair consideration or reasonably equivalent value for the Guarantee Obligations, or if the Guarantee Obligations would render Guarantor insolvent, leave Guarantor with unreasonably small capital to conduct its business, or cause Guarantor to have incurred debts (or to have intended to have incurred debts) beyond its ability to pay such debts as they mature, in each case as of the time any of the Guarantee Obligations is deemed to have been incurred for the purposes of the Avoidance Provisions, then the maximum Guarantee Obligations shall be reduced to that amount which, after giving effect thereto, would not cause the Guarantee Obligations as so reduced to be subject to avoidance under the Avoidance Provisions.

18. **JURISDICTION AND VENUE. Except as and if otherwise specifically agreed in any Related Document, and only as to suits, actions or other proceedings pertaining to such Related Document, Guarantor and (by its acceptance hereof as evidenced by its extension of any Liabilities) Lender:**

    **(a)    agree irrevocably that all suits, actions or other proceedings with respect to, arising out of or in connection with this Guaranty or any Related Document shall be subject to litigation in courts having situs within or jurisdiction over Cook County, State of Illinois;**

    **(b)    consent and submit to the jurisdiction of any such court; and**

    **(c)    waive any right to transfer or change the venue of any suit, action or other proceeding brought in accordance with this Section, or to claim that any such proceeding has been brought in an inconvenient forum.**

19. **WAIVER OF JURY TRIAL. TO THE FULLEST EXTENT PERMITTED BY LAW, GUARANTOR AND (BY ITS ACCEPTANCE HEREOF AS EVIDENCED BY ITS EXTENSION OF ANY LIABILITIES) LENDER VOLUNTARILY, KNOWINGLY, IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY RIGHT THEY OR ANY OF THEM MAY HAVE TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) BETWEEN OR AMONG GUARANTOR AND LENDER ARISING OUT OF OR IN ANY WAY RELATED TO THIS GUARANTY, ANY RELATED DOCUMENT, OR ANY RELATIONSHIP BETWEEN LENDER AND GUARANTOR.**

40070094v3
15341.18

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

Northern Trust/FFC
Guaranty –Dharod Family, LLC

To the extent applicable under any state law, Guarantor executed and Lender accepted this Guaranty as of the date stated at the top of the first page, intending to create an instrument executed under seal.

**GUARANTOR:**

**DHAROD FAMILY, LLC**, a Nevada
limited liability company

By: Harshad Dharod
Its: Manager

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of _____Orange_____ )

On __August 6th__, 2025, before me, __Blanca Nunez, Notary Public__
(insert name and title of the officer)
personally appeared Harshad Dharod, the Manager of Dharod Family, LLC, a Nevada limited liability company, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

I certify that under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

BLANCA NUNEZ
Notary Public - California
Orange County
Commission # 2401651
My Comm. Expires Apr 21, 2026

**NOTICE TO COSIGNER**

You are being asked to guarantee this debt. Think carefully before you do. If Borrower doesn't pay the debt, you will have to. Be sure you can afford to pay if you have to and that you want to accept this responsibility.

You may have to pay up to the full amount of the debt if Borrower does not pay. You may also have to pay late fees or collection costs, which increases this amount.

The bank can collect this debt from you without first trying to collect from Borrower. The bank can use the same collection methods against you that can be used against Borrower, such as suing you, garnishing your wages, etc. If this debt is ever in default, that fact may become a part of your credit record.

This notice is not the contract that makes you liable for the debt.

Guaranty 2016-4/27/16
©The Northern Trust Company 2016

<div align="right">Northern Trust/FFC<br>Guaranty – Dharod Family, LLC</div>

<div align="center">

**EXHIBIT A**

(Form of Burndown Request)

</div>

***[NOTE:  MUST PRINT ON GUARANTOR LETTERHEAD]***

**DATE**


The Northern Trust Company
IL-CD-BB-11
50 South LaSalle, Chicago, IL 60603
Attention: Credit Administration Team

RE:  Guaranty of $20,000,000 Term Loan ("Loan")

Pursuant to the terms of that certain Guaranty dated as of September 5, 2025 (the "Guaranty"), executed by the undersigned in favor of The Northern Trust Company, an Illinois banking corporation (the "Lender"), the undersigned hereby requests the Lender to reduce liability under the Guaranty as set forth in paragraph 2(b) of the Guaranty.  The Guarantor hereby certifies and the Lender acknowledges that (i) no Event of Default and no Unmatured Event of Default has occurred in the twelve (12) months prior to the date of this Burndown Request, (ii) the outstanding principal balance of the Note has been paid down to $10,000,000, and (iii) the Lease-Adjusted Leverage Ratio has been less than 4.50 to 1.00 for four (4) consecutive calendar quarters.  All capitalized terms used herein, which are not defined herein, shall have the meanings given to them in the Guaranty.

<div style="margin-left:50%">

**GUARANTOR:**

**DHAROD FAMILY, LLC**, a Nevada
limited liability company


*EXHIBIT – DO NOT SIGN*                  
By:  Harshad Dharod
Its:  Manager


**ACKNOWLEDGED BY:**

**THE NORTHERN TRUST COMPANY**, an
Illinois banking corporation


By: *EXHIBIT – DO NOT SIGN*                  
    Tim Rohde
    Its: Senior Vice President

</div>

<div align="center">A-1</div>

# EXHIBIT D

## GUARANTY
### (Short Form)

This Guaranty (as modified from time to time, the "Guaranty") has been executed on September 5, 2025, by **DHAROD FAMILY TRUST**, a revocable trust organized under the law of the State of California ("Guarantor"), with Guarantor's principal place of business at 1 Centerpointe Drive, Suite 400, in favor of **THE NORTHERN TRUST COMPANY**, an Illinois banking corporation ("Lender"), with a banking office at 50 S. LaSalle Street, Chicago, Illinois 60603.  If more than one party executes this Guaranty, "Guarantor" refers to each of them individually and some or all of them collectively, and their obligations hereunder shall be joint and several.  If any party comprising "Guarantor" is a trustee(s), "Trust Agreement" means the governing trust agreement and/or instruments governing the trust, as modified from time to time, and all related documents and instruments, and "Guarantor" also refers to the trustee(s) in its capacity as such and the trust individually and collectively.  Various capitalized terms have the meanings set forth in the Section entitled "DEFINITIONS."

In consideration of Lender's extension of new financial accommodations or continuation of existing financial accommodations to **SENIOR CLASSIC LEASING, LLC**, a limited liability company organized under the law of the State of California ("Senior"), **DFG RESTAURANTS, INCORPORATED**, a corporation organized under the law of the State of California ("DFG"), **HARSHAD & NASIR CORPORATION**, a corporation organized under the law of the State of California ("H&N"), **SUN GIR INCORPORATED**, a corporation organized under the law of the State of California ("Sun"), **SECOND STAR HOLDINGS LLC**, a limited liability company organized under the law of the State of Nevada ("Second Star"), and **THIRD STAR INVESTMENTS LLC**, a limited liability company organized under the law of the State of California ("Third Star," and together with Senior, DFG, H&N, Sun and Second Star, individually, collectively and jointly and severally "Borrower" or "Borrowers"), and other valuable consideration, the receipt and adequacy of which are hereby acknowledged, Guarantor agrees as follows:

1.      **DEFINITIONS**.

        (a)      As used in this Guaranty the following terms shall have the indicated meanings:

"Anti-Terrorism Law" means any law relating to terrorism or money-laundering, including Executive Order No. 13224 and the USA Patriot Act.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. §1 et. seq.), as amended from time to time, and any successor statute.

"Constituent Documents" means the articles or certificate of incorporation, by-laws, partnership agreement, certificate of limited partnership, limited liability company operating agreement, limited liability company articles of organization or certificate of formation, trust agreement, and all other documents and instruments pertaining to the formation and ongoing existence of any person which is not a natural person.

"Control" or "Controlled" means the power to direct the management and policies of a Person, directly or indirectly, whether through the ownership of voting securities or other beneficial interests, by contract or otherwise.

"Credit Support Party" means any Person, or any Persons severally, who now or hereafter guarantees payment or collection of all or any part of the Liabilities or provides any collateral to secure the Liabilities.

"Dollar" and "$" means lawful money of the United States of America, unless otherwise specified.

"Excluded Swap Obligation" means, with respect to any Guarantor, any Swap Obligation if, and to the extent that, all or a portion of the guaranty hereunder of such Guarantor of, or the grant by such Guarantor of a security interest to secure, such Swap Obligation (or any guaranty thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder at the time the guaranty of such Guarantor or the grant of such security interest becomes effective with respect to such Swap Obligation.  If a Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such guaranty hereunder or security interest is or becomes illegal.

"Lender Affiliate" means Northern Trust Corporation or any direct or indirect subsidiary thereof (other than Lender itself).

"Liabilities" has the meaning given to such term in Section 2 hereof.

"Liquid Assets" means unencumbered insured cash deposits, U.S. Government securities and securities listed on public exchanges and cash surrender value of life insurance policies.

"Loan Agreement" means that certain Term Loan Agreement of even date herewith by and between the Borrowers and the Lender, as amended, restated or replaced from time to time.

"Note" means that certain Term Note of even date herewith in the original principal amount of $20,000,000 executed by the Borrowers and payable to the order of the Lender, as amended, restated or replaced from time to time.

"Payment Event" has the meaning given to such term in Section 3 hereof.

"Person" means any individual, corporation, company, limited liability company, voluntary association, partnership, trust, estate, unincorporated organization, other entity, or government (or any agency, instrumentality, or political subdivision thereof).

"Prohibited Person" means:  (i) a person that is listed in the Annex to, or is otherwise subject to the provisions of, Executive Order No. 13224; (ii) a person owned or controlled by, or acting for or on behalf of, any person that is listed in the Annex to, or is otherwise subject to the provisions of, Executive Order No. 13224; (iii) a person with whom Lender is prohibited from dealing or otherwise engaging in any transaction by any Anti-Terrorism Law; (iv) a person who commits, threatens or conspires to commit or supports "terrorism" as defined in Executive Order No. 13224; (v) a person that is named as a "specially designated national and blocked person" on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control at its official website or at any replacement website or at any other official publication of such list; and (vi) a person who is affiliated with a person described in clauses (i) – (v) above.

"Qualified ECP Guarantor" means, in respect of any Swap Obligation, each Guarantor that has total assets exceeding $10,000,000 at the time the relevant guaranty or grant of the relevant security interest becomes effective with respect to such Swap Obligation or such other person as constitutes

an "eligible contract participant" under the Commodity Exchange Act or any regulations promulgated thereunder and can cause another person to qualify as an "eligible contract participant" at such time by entering into a "keepwell, support or other agreement" under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"Related Document(s)" means this Guaranty, the Note, the Loan Agreement and any other note, application and agreement for letter of credit (reimbursement agreement), Swap Agreement, mortgage, deed of trust, security or pledge agreement, or other agreement, document or instrument previously, now or hereafter delivered to Lender in connection with the Liabilities.

"Related Party(ies)" means Borrower, any Credit Support Party, any Subsidiary, and, in addition: (i) as to any Guarantor which is a natural person, trusts for the benefit of Guarantor; and (ii) as to any Guarantor which is not a natural person, to the extent applicable, any general or limited partner, controlling shareholder, joint venturer, member or manager, of Guarantor.

"Subsidiary" means any corporation, partnership, limited liability company, joint venture, trust, or other legal entity of which Guarantor owns directly or indirectly 50% or more of the outstanding voting stock or interest, or of which Guarantor has effective control, by contract or otherwise.

"Swap Agreement" means any agreement, document or instrument executed or delivered by Borrower or Guarantor pertaining to any Swap Obligation.

"Swap Obligation" means, with respect to Borrower or any Guarantor, any obligation to pay or perform under any agreement, contract, or transaction that constitutes a "swap" within the meaning of section 1(a)(47) of the Commodity Exchange Act, as amended from time to time, if entered into with Lender or any Lender Affiliate.

"USA Patriot Act" means the "Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001" (Public Law 107-56, signed into law on October 26, 2001), as amended from time to time.

(b)     As used in this Guaranty, unless otherwise specified:  the term "including" means "including without limitation"; the term "days" means "calendar days"; and terms such as "herein," "hereof" and words of similar import refer to this Guaranty as a whole.  Unless otherwise defined herein or the context requires otherwise, all terms (including those not capitalized) that are defined in the Uniform Commercial Code of Illinois shall have the same meanings herein as in such Code, as such Code may be amended from time to time (the "UCC"); however, no amendment to the UCC after the date hereof shall limit any rights of Lender hereunder or in connection herewith. Unless the context requires otherwise, wherever used herein the singular shall include the plural and vice versa, and the use of one gender shall also denote the others.  Captions herein are for convenience of reference only and shall not define or limit any of the terms or provisions hereof; references herein to sections or provisions without reference to the document in which they are contained are references to this Guaranty.

2.      **LIABILITIES COVERED.**

(a)     Subject to subsections (b) and (c) below, Guarantor hereby guarantee(s) absolutely and unconditionally the prompt payment and performance when due, whether at maturity, by declaration, by demand or otherwise, and at any and all times thereafter, of all indebtedness and other obligations of every kind and nature of Borrower to Lender, direct or indirect, absolute or

contingent, due or to become due, now or hereafter existing, joint, several or joint and several (all such indebtedness and other obligations being hereinafter collectively called the "Liabilities"). Notwithstanding the foregoing, the term "Liabilities" includes all Swap Obligations except for any Excluded Swap Obligations, which shall not be guaranteed pursuant to the terms hereof.

(b)     Notwithstanding anything to the contrary in subsection (a) above but subject at all times to subsection (c) below, so long as (i) the Guarantor has provided a written request to the Lender in the form attached hereto as Exhibit A (a "Burndown Request"), (ii) no Event of Default and no Unmatured Event of Default (as those terms are defined in the Related Documents) has occurred in the prior twelve (12) months prior to the date of the Burndown Request, (iii) the outstanding principal balance of the Note has been paid down to $10,000,000, and (iv) the Lease-Adjusted Leverage Ratio (as defined in the Loan Agreement) has been less than 4.50 to 1.00 for four (4) consecutive calendar quarters, then effective on the date of achievement of all of the foregoing conditions, the maximum liability of the Guarantor shall be reduced to zero.

(c)     Notwithstanding anything to the contrary contained herein, *in addition to, and not in lieu of*, any other liability of Guarantor under this Guaranty or the other Related Documents, Guarantor guarantees and promises to pay to Lender, or order, on demand, in lawful money of the United States of America, in immediately available funds (and to defend, indemnify and hold harmless Lender, its directors, officers, employees, successors and assigns from and against any and all claims, suits, liabilities (including, without limitation, strict liabilities and any impairment of Lender's security for the Liabilities), actions, or proceedings), any obligations, debts, damages, losses, costs, expenses, fines, penalties, charges, fees, judgments, awards, court costs, and legal or other expenses (including, without limitation, attorneys' fees and expenses and amounts paid in settlement of whatever kind or nature), which Lender may incur as a direct or indirect consequence of:

     (i)     fraud or intentional or willful misrepresentation by Borrower, Guarantor, or any Affiliate (as defined in the Loan Agreement) or agent of Borrower or Guarantor, or their failure to disclose a material fact;

     (ii)     the filing by the Borrower or the Guarantor of a voluntary petition under the Bankruptcy Reform Act of 1978 (11 USC Section 101-1330) as now or hereafter amended or recodified ("Bankruptcy Code"), or under any other present or future state or federal law regarding bankruptcy, reorganization or other debtor relief law, or any Affiliate, officer, director, or representative which Controls Borrower, consents to or acquiesces in or joins in an application for the appointment of a custodian, receiver, trustee, or examiner for Borrower or any portion of the Project, or Borrower or Guarantor makes an assignment for the benefit of creditors, or admits in any legal proceeding its or his insolvency or inability to pay its or his debts as they become due;

     (iii)     the filing against the Borrower or the Guarantor of an involuntary petition under the Bankruptcy Reform Act of 1978 (11 USC Section 101-1330) as now or hereafter amended or recodified ("Bankruptcy Code"), or under any other present or future state or federal law regarding bankruptcy, reorganization or other debtor relief law, which is not dismissed within ninety (90) days of such filing;

     (iv)     the gross negligence, willful misconduct, or commission of a criminal act by Borrower, Guarantor, or any Affiliate or agent of Borrower or Guarantor which results in a forfeiture of any collateral secured pursuant to the Security Documents (the "Collateral");

(v)     material physical waste of the Collateral;

(vi)    failure to maintain insurance as required by the Loan Agreement and any other Related Documents;

(vii)   failure to deliver any insurance proceeds or awards received by Borrower to Lender or to otherwise apply such sums as required under the terms of the Related Documents or any other instrument now or hereafter securing the Liabilities;

(viii)  misappropriation or misapplication of any funds from any account pledged by Borrower to Lender under the Loan Agreement or the other Related Documents; and

(ix)    any litigation or other legal proceeding related to the Loan is filed by Borrower or Guarantor that delays, opposes, impedes, obstructs, hinders, enjoins or otherwise interferes with or frustrates the efforts of Lender to exercise any rights and remedies available to Lender as provided herein and in the other Related Documents.

(d)     To the extent that (i) there is more than one guarantor of the Liabilities and (ii) Guarantor is a Qualified ECP Guarantor, Guarantor hereby jointly, severally, absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each other guarantor to honor all of its obligations under this Guaranty in respect of Swap Obligations (provided, however, that each Qualified ECP Guarantor shall only be liable under this subsection (c) for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this subsection (c), or otherwise under this Guaranty, voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount).  The obligations of any Qualified ECP Guarantor under this subsection (c) shall remain in full force and effect until the Liabilities have been paid and performed in full and Lender has no further commitment to lend to Borrower.  Such Qualified ECP Guarantor intends that this subsection (c) constitute, and this subsection (c) shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each other guarantor for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

(e)     The right of recovery under this Guaranty is in addition to and not in contravention of the amounts Lender may recover against Guarantor under any and all other guaranties or other Related Documents previously, now or hereafter executed by Guarantor, whether pertaining to Borrower or to any other person.

3.      **WHEN PAYMENT BY GUARANTOR REQUIRED**.

(a)     For purposes of this Guaranty, "Payment Event" means the occurrence of any of the following:

(i)     a default, event of default or similar event occurs under any note, mortgage, deed of trust, pledge agreement, security agreement, letter of credit reimbursement agreement, Swap Agreement, or other Related Document, and shall continue beyond any applicable notice, grace or cure period set forth in such Related Document; or Guarantor shall die or be declared legally incompetent; or

(ii)    any bankruptcy, insolvency, reorganization, arrangement, readjustment, liquidation, dissolution, or similar proceeding, domestic or foreign,

is instituted by or against Guarantor or Borrower, and, if instituted against Guarantor or Borrower, shall not be dismissed or vacated within sixty (60) days after the filing or other institution thereof; or

(iii)    Guarantor or Borrower shall become insolvent, generally shall fail or be unable to pay its debts as they mature, shall admit in writing its inability to pay its debts as they mature, shall make a general assignment for the benefit of its creditors, shall enter into any composition or similar agreement, or shall suspend the transaction of all or a substantial portion of its usual business.

(b)    If a Payment Event occurs, Guarantor agrees to pay Lender immediately upon Lender's demand the full amount of all Liabilities.  If a Payment Event specified in (ii) or (iii) of subsection (a) of this Section occurs, Guarantor's obligation to pay all Liabilities (principal, interest and other amounts) shall be immediately and automatically due and payable without notice, demand or other action of any kind.

4.    **NO RELIANCE ON LENDER.**  Guarantor represents and warrants to Lender that in making its decision to enter into this Guaranty, Guarantor has independently taken whatever steps Guarantor considers necessary to evaluate the condition and affairs of Borrower without reliance upon Lender, and has made an independent judgment.  As long as this Guaranty remains in effect, Guarantor will continue to make an independent evaluation of the financial condition and affairs of Borrower without reliance upon Lender. Lender has no obligation to provide to Guarantor any financial or other information concerning Borrower.

5.    **TERM OF GUARANTY; REINSTATEMENT.**  This Guaranty shall remain in full force and effect until all Liabilities have been paid and performed in full and until Lender has not extended to Borrower any committed or uncommitted loan or other credit facility of any kind.  This Guaranty and Guarantor's obligations hereunder may not be amended or waived without the prior written consent of Lender, and shall remain in effect notwithstanding that at any particular time there shall be no Liabilities outstanding.  This Guaranty shall continue to be effective or be reinstated, as the case may be, if at any time payment, or any part thereof, of the Liabilities to Lender is rescinded or must otherwise be returned by Lender upon the insolvency, bankruptcy or reorganization of Borrower or otherwise, all as though such payment to Lender had not been made.

6.    **WAIVERS OF DEFENSES AND COUNTERCLAIMS.**  Without limiting any other provision hereof, Guarantor irrevocably waives and relinquishes any setoff, defense or counterclaim that is or may be available to an accommodation party, co-signer, guarantor or surety at law or in equity.  Without limiting the generality of the previous sentence or of any other protection to Lender hereunder or at law or in equity:

(a)    Lender may at any time and from time to time, without notice to Guarantor, take any or all of the following actions without affecting or impairing the liability of Guarantor on this Guaranty: (i) renew or extend time of payment of the Liabilities; (ii) accept, substitute, release or surrender any security for the Liabilities; (iii) accept other guarantors; and (iv) release any person primarily or secondarily liable on the Liabilities (including Borrower and any maker, indorser or guarantor).

(b)    The liability of Guarantor under this Guaranty shall in no way be affected or impaired by any failure or delay in enforcing payment of the Liabilities or this Guaranty or any security therefor or herefor, or in exercising any right or power in respect thereto or hereto, or by any compromise, waiver, settlement, change, subordination, modification or disposition of the Liabilities or of any security for the Liabilities or for this Guaranty.  In order to hold Guarantor liable hereunder, there shall be no obligation on the part of Lender, at any time, to resort for payment to Borrower or any

other guaranty or to any security for the Liabilities or this Guaranty, and Lender shall have the right to enforce this Guaranty irrespective of whether or not other proceedings or steps are being taken against any property securing the Liabilities or any other party primarily or secondarily liable on any of the Liabilities.

(c)     Except as and if otherwise specifically set forth herein, Guarantor irrevocably waives notice of acceptance of this Guaranty, presentment, protest, notice of protest, notice of intent to accelerate, notice of acceleration, demand, diligence, grace, notice of dishonor or default, notice of nonpayment, notice of acceptance, notice of any loans made, extensions granted or other action taken in reliance hereon, and all other demands and notices of any kind in connection with this Guaranty or the Liabilities.

(d)     Any and all payments upon the Liabilities made by Borrower, by Guarantor, or by any other person, and the proceeds of any and all security for any of the Liabilities may be applied by Lender upon such of the items of the Liabilities as it may determine.

(e)     Until payment and performance in full of the Liabilities, Guarantor waives any claim or other right which Guarantor might now have or hereafter acquire against Borrower or any other person primarily or contingently liable on the Liabilities (including any maker, indorser or guarantor) or that arises from the existence or performance of Guarantor's obligations under this Guaranty, including any right of subrogation, reimbursement, exoneration, contribution or indemnification, or any right of participation in any claim or remedy of Lender against Borrower or any security for the Liabilities which Lender now has or hereafter acquires, however arising.

(f)     If any person other than Borrower (any such person, a "<u>Third Party Obligor</u>") shall be obligated in respect of the Liabilities, as a pledgor, a guarantor or otherwise, and shall make any payment in respect of the Liabilities, Guarantor agrees, after payment in full of the Liabilities and termination of all commitments by Lender and Lender Affiliates to extend credit to Borrower, to make a contribution to any such Third Party Obligor. The amount of the contribution made by Guarantor shall be an amount sufficient to cause the contributions for payments on the Liabilities made by Guarantor and all such Third Party Obligors to be proportionate to the respective benefits received by Guarantor and the Third Party Obligors. Nothing in this subsection (f) shall limit the obligations of Guarantor to Lender and Lender Affiliates hereunder.

7.     **REPRESENTATIONS AND WARRANTIES.**

(a)     Guarantor represents and warrants to, and agrees in favor of, Lender that:

(i)     (A)     If Guarantor is an organization (including a trust that is a registered organization), then Guarantor is an entity of the type, and is organized under the laws of the jurisdiction, specified in the preamble hereto. Guarantor's name as shown in the preamble hereto is the full exact name that appears in Guarantor's organizational documents. If Guarantor is a registered organization, Guarantor's name as shown in the preamble hereto is as shown on the public organic record most recently filed with or issued or enacted by Guarantor's jurisdiction of organization which purports to state, amend, or restate Guarantor's name. If Guarantor is an organization but not a registered organization, if it has only one place of business that place of business is at Guarantor's address indicated in the preamble hereto, but if it has

more than one place of business, its chief executive office is at such address.

(B)     If Guarantor is a trust which is not itself a registered organization, then: (1) if the Trust Agreement specifies a name for the trust, Guarantor's name as shown in the preamble hereto is the name so specified; (2) Guarantor has provided the name of its settlor(s) or testator(s) to Lender; and (3) if Guarantor has only one place of business, that place of business is at Guarantor's address indicated in the preamble hereto, but if it has more than one place of business, its chief executive office is at such address.

(C)     If Guarantor is a natural person, then:

(1)     Guarantor's principal residence is located at the address shown in the preamble hereto; and

(2)     i.     if Guarantor has a driver's license or alternative identification that has not expired and that was issued by the state of Guarantor's principal residence, Guarantor's name shown in the preamble hereto is exactly the same as shown on that driver's license or alternative identification card; or

ii.     if Guarantor does not have a driver's license or alternative identification card that has not expired and that was issued by the state of Guarantor's principal residence, then: (x) Guarantor's first given name and surname are as shown in the preamble hereto; and (y) if Guarantor obtains a driver's license or alternative identification card from the state of Guarantor's principal residence, then Guarantor shall, within thirty (30) days of the issuance of such driver's license or alternative identification card, provide Lender with a true and accurate copy of such driver's license or alternative identification card, showing Guarantor's name and address, the state of issuance and the expiration date thereof; and

(3)     in any event, Guarantor shall provide Lender notice within thirty (30) days of the happening of each of the following events:

i.     Guarantor's principal residence has changed;

ii.     the name of Guarantor on Guarantor's driver's license or alternative identification card has changed in any manner, no matter how small;

©The Northern Trust Company 2016

iii.     Guarantor's driver's license or alternative identification has been surrendered, suspended, changed or terminated in any manner, no matter how small or for how short a time;

iv.     Guarantor's driver's license or alternative identification card has expired; or

v.     Guarantor has changed his or her first given name or surname, whether as a result of marriage, divorce, legal proceeding or otherwise.

(D)     The representations and warranties made by Guarantor in (A)-(C) of this (i), as applicable, would have been accurate at all times during the five years and six months prior to the date hereof except as and if Guarantor has specifically notified Lender in writing prior to Guarantor's execution of this Guaranty.

(ii)     Guarantor (if Guarantor is not a natural person) and any Subsidiary are validly existing and in good standing under the laws of their state of organization or formation, and are duly qualified, in good standing and authorized to do business in each jurisdiction where failure to do so would reasonably be expected to have a material adverse impact on the assets, condition or prospects of Guarantor.

(iii)     The execution, delivery and performance of this Guaranty and all Related Documents:  are within Guarantor's powers and have been authorized by all necessary action required by law and (unless Guarantor is a natural person) Guarantor's Constituent Documents; have received any and all necessary governmental approval; and do not and will not contravene or conflict with any provision of law, any Constituent Document or any agreement affecting Guarantor or its property.  This Guaranty and all Related Documents are enforceable against Guarantor and/or the applicable Related Parties in accord with their terms, except to the extent, if any, that such enforceability may be limited by equitable principles, whether applied in a court of law or equity, or by bankruptcy, insolvency and other laws affecting creditors' rights generally.

(iv)     There has been no material adverse change in the business, condition, properties, assets, operations or prospects of Guarantor since the date of the latest financial statements or other documentation provided by or on behalf of Guarantor to Lender.

(v)     Guarantor has filed or caused to be filed all foreign, federal, state, and local tax returns that are required to be filed, and has paid or has caused to be paid all of its taxes, including any taxes shown on such returns or on any assessment received by it, to the extent that such taxes have become due.

(vi)     The execution, delivery and performance of this Guaranty and all Related Documents are in Guarantor's best interest in its current and future operations and will materially benefit Guarantor.  Guarantor has received adequate, fair and valuable consideration, and at least reasonably equivalent value, to enter into and

perform this Guaranty and all Related Documents. Guarantor's assets at fair valuation exceed the sum of Guarantor's debts. Guarantor is able to pay its debts as they become due. Guarantor does not have unreasonably small capital with which to conduct its business.

8. **GUARANTOR COVENANTS.** Guarantor agrees that so long as this Guaranty remains in effect, it will:

(a) NOTIFY LENDER IN WRITING AT LEAST SIXTY (60) DAYS IN ADVANCE OF: (i) ANY CHANGE WHATSOEVER IN THE NAME OF GUARANTOR; (ii) ANY CHANGE WHATSOEVER IN THE STATE OR JURISDICTION IN WHICH GUARANTOR IS ORGANIZED OR FORMED OR, IF GUARANTOR IS A NATURAL PERSON, IN WHICH GUARANTOR'S PRINCIPAL RESIDENCE IS LOCATED; (iii) ANY NEW NAMES UNDER WHICH GUARANTOR INTENDS TO DO BUSINESS; OR (iv) ANY NEW ADDRESSES AT OR FROM WHICH GUARANTOR INTENDS TO DO BUSINESS. IF GUARANTOR IS A REGISTERED ORGANIZATION, SUCH AS A CORPORATION, LIMITED LIABILITY COMPANY, OR LIMITED PARTNERSHIP, GUARANTOR AGREES TO NOTIFY LENDER IMMEDIATELY IF GUARANTOR'S STATE OR JURISDICTION OF ORGANIZATION DISSOLVES, SUSPENDS OR TERMINATES GUARANTOR'S EXISTENCE OR PRIVILEGES, OR NOTIFIES GUARANTOR THAT IT IS NOT IN COMPLIANCE WITH ANY REQUIREMENTS OF SUCH STATE OR OTHER JURISDICTION. IF GUARANTOR IS A NATURAL PERSON THE FOREGOING PORTION OF THIS (a) DOES NOT LIMIT GUARANTOR'S AGREEMENTS IN SUBSECTION (a)(i)(C) OF THE SECTION ENTITLED "REPRESENTATIONS AND WARRANTIES."

(b) Furnish (or cause to be furnished) to Lender:

(i) the information and documentation required under Section 8(b) of the Loan Agreement for the Guarantor.

(ii) Within ninety (90) days after the end of each calendar year, information concerning commercial real estate indebtedness of the Guarantor or any Affiliates scheduled to mature over the next twelve (12) calendar months including, without limitation, amount, maturity, lender, and a progress update on whether such debt will be extended, modified or otherwise refinanced along with other information reasonably requested by the Lender in connection therewith.

(iii) From time to time such other information, financial or otherwise, concerning Guarantor or any Related Party as Lender may reasonably request.

(c) Furnish (or cause to be furnished) to Lender:

(i) Immediately upon the institution of, or any adverse determination in, any litigation, arbitration or governmental proceeding which is material to Guarantor or any Subsidiary on a consolidated basis, written notice describing the same and the steps being taken by Guarantor or any Subsidiary in respect thereof.

(ii) From time to time such other information, financial or otherwise, concerning Guarantor or any Related Party as Lender may reasonably request, including fully-completed personal financial statements of any Related Party who

is a natural person on Lender's then-current form on and as of such dates as Lender may reasonably request.

(d)    If Guarantor is not a natural person:  (a) preserve and maintain its existence, rights, franchises, licenses and privileges; and (b) not liquidate, dissolve, merge, or consolidate with or into any other entity, or sell, lease, transfer or otherwise dispose of all or a substantial part of its assets other than in the ordinary course of business as now conducted.

(e)    Guarantor, on a combined basis with all other Guarantors, shall maintain Liquid Assets of at least $15,000,000 at all times, subject to reduction on a dollar-for-dollar basis with the monthly principal amount paid by the Borrower on the Note.  In addition, the foregoing covenant shall no longer be measured once the Borrower has reduced the outstanding principal balance on the Note to $10,000,000.

9.    **SECURITY INTEREST; SETOFF.**  To secure the payment and performance of Guarantor's obligations hereunder, Guarantor grants to Lender a security interest in all property of Guarantor now or at any time hereafter in the possession of Lender for any purpose.  Lender shall have the rights and remedies of a secured party under the UCC in respect to such property, including the right to sell or otherwise dispose of any or all of such property.  Lender may apply or set off any deposit or other indebtedness at any time credited by or due from Lender to Guarantor against any liability of Guarantor under this Guaranty when any amount is payable hereunder by Guarantor.

10.    **LENDER MAY ALSO BE FIDUCIARY.**  Guarantor hereby irrevocably waives, releases and forever relinquishes any claim or right of any nature whatsoever based upon the fact that a trustee or other fiduciary of any Guarantor or Related Party is or may be Lender itself or a Lender Affiliate, and irrevocably consents to any such circumstance.  The rights and powers of Lender shall not in any way be restricted by reason of any such present or future circumstance.

11.    **ARM'S LENGTH TRANSACTIONS.**  Guarantor acknowledges and agrees that:

(a)    The transactions contemplated by the Related Documents are arm's length commercial transactions among Guarantor, Lender and any other parties thereto.

(b)    In connection with such transactions, Lender is acting solely as a principal and not as an agent or a fiduciary of Guarantor or any Related Party.

(c)    With respect to any advances of Liabilities or the process leading thereto (whether or not Lender or any Lender Affiliate has advised or is currently advising Guarantor or any Related Party on other matters), Lender has not assumed a fiduciary responsibility in favor of Guarantor or any Related Party or any other obligation of Guarantor or any Related Party.

(d)    Guarantor and the Related Parties have consulted with their own legal and financial advisors to the extent they deem appropriate in connection with the transactions contemplated by the Related Documents.

12.    **NOTICES.**  Except as and if otherwise provided herein, all notices, requests and demands to or upon the respective parties pursuant hereto shall be in writing and shall be deemed to have been given or made five business days after a record has been deposited in the mail, postage prepaid, or one business day after a record has been deposited with a recognized overnight courier, charges prepaid or to be billed to the

sender, or on the day of delivery if delivered manually with receipt acknowledged, in each case addressed or delivered:

(a)  if to Lender to **The Northern Trust Company, Attention: Credit Administration Team, IL-CD-BB-11, 50 South LaSalle, Chicago, IL 60603,** with a copy to Winthrop & Weinstine, P.A., 225 South Sixth Street, Suite 3500, Minneapolis, Minnesota 55402, Attn: Jonathan W.J. Armour; and

(b)  if to Guarantor to its address indicated in the preamble hereto,

or to such other address as may be hereafter designated in writing by the respective parties hereto by a notice in accord with this Section.

13.  **MISCELLANEOUS**.  Except as and if otherwise specifically agreed in any Related Document, and only as to such Related Document, and to the extent, if any, that the UCC or other law provides for the application of the law of a different state, this Guaranty and the Related Documents shall be:  (i) governed by and construed in accordance with the internal law of the State of Illinois; and (ii) deemed to have been executed in the State of Illinois.  This Guaranty shall bind Guarantor, its(his)(her) heirs, trustees (including successor and replacement trustees), executors, personal representatives, successors and assigns, except that Guarantor may not transfer or assign any rights or obligations hereunder without the prior written consent of Lender.  Without limiting Guarantor's obligations under any other provision hereof, Guarantor agrees to pay upon demand all expenses (including reasonable attorneys' fees, legal costs and expenses, and time charges of attorneys who may be employees of Lender, in each case whether in or out of court, in original or appellate proceedings or in bankruptcy) incurred or paid by Lender in connection with the enforcement or preservation of its rights hereunder or under any Related Document.  This Guaranty may be executed in two or more counterparts, and (if there is more than one party) by each party on separate counterparts, each of which shall be deemed an original but which together shall constitute one and the same instrument.  **Delivery of an executed counterpart of a signature page of this Guaranty, whether with or without the remainder hereof, by facsimile or in electronic (e.g., "pdf" or "tif") format shall be effective as delivery of a manually executed counterpart hereof.**  Time is of the essence in the performance of all obligations under this Guaranty.  This Guaranty is, and is intended to take effect as, an instrument under seal.  Whenever possible, each provision of this Guaranty shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Guaranty shall be prohibited by or invalid under such law, such provision shall be ineffective only to the extent and duration of such prohibition or invalidity without invalidating the remainder of such provision, the applicability of such provision in any other instance, or the remaining provisions of this Guaranty.  To the maximum extent permitted by applicable law, Lender is hereby authorized by Guarantor without notice to Guarantor to fill in any blank spaces and dates herein or in any Related Document to conform to the terms of the transaction and/or understanding evidenced hereby.  **THIS GUARANTY AND THE RELATED DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AS TO THE SUBJECT MATTER HEREOF AND THEREOF, AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

14.  **NO PUNITIVE DAMAGES. NO PARTY HERETO MAY SEEK OR RECOVER PUNITIVE DAMAGES IN ANY PROCEEDING BROUGHT UNDER OR IN CONNECTION WITH THIS GUARANTY OR ANY RELATED DOCUMENT.  THIS PROVISION IS A MATERIAL INDUCEMENT TO LENDER TO EXTEND CREDIT SUPPORTED BY THIS GUARANTY.**

15.     **AUTHORIZATION TO RECORD PHONE CALLS.  FOR ITSELF AS WELL AS ANY RELATED PARTY AND ANY AGENT, DIRECTOR, EMPLOYEE, MANAGER, MEMBER, OFFICER, OR PARTNER OF GUARANTOR, AS APPLICABLE, GUARANTOR IRREVOCABLY CONSENTS TO LENDER'S RECORDING OF ANY TELEPHONE CONVERSATION PERTAINING TO THIS GUARANTY.**

16.     **ANTI-TERRORISM LAW.**

**(a)     Lender hereby notifies Guarantor and any Related Party that, pursuant to the requirements of the USA Patriot Act, Lender may be required to obtain, verify and record information that identifies Guarantor and any Related Party, which information may include the name and address of Guarantor and any Related Party and other information that will allow Lender to identify Guarantor and any Related Party in accord with the USA Patriot Act.  Guarantor hereby agrees to take any action necessary to enable Lender to comply with the requirements of the USA Patriot Act.**

(b)     Guarantor covenants, represents and warrants as follows:

(i)     Neither Guarantor nor any Related Party is or, to the best of Guarantor's knowledge, will be in violation of any Anti-Terrorism Law.

(ii)     Neither Guarantor nor any Related Party is or, to the best of Guarantor's knowledge, will be a Prohibited Person.

(iii)     Neither Guarantor nor any Related Party:  (A) conducts any business or engages in any transaction or dealing with any Prohibited Person, including making or receiving any contribution of funds, goods or services to or for the benefit of any Prohibited Person; (B) deals in, or otherwise engages in any transaction relating to, any property or interests in property blocked pursuant to Executive Order No. 13224; or (C) engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law.

(iv)     Neither Guarantor nor any Related Party will engage in any of the activities described in (iii) of this subsection (b) in the future.

(v)     Guarantor and each Related Party will ensure that the proceeds of the Liabilities are not used to violate any foreign asset control regulations of the U.S. Office of Foreign Assets Control ("OFAC") or of any enabling statute or any Executive Order relating thereto.

(vi)     Guarantor will deliver to Lender any certification or other evidence requested from time to time by Lender in its sole reasonable discretion, confirming Guarantor's and any Related Party's compliance with this Section.

(vii)     Guarantor has implemented procedures, and will consistently apply those procedures while this Guaranty is in effect, to ensure that the representations and warranties in this Section remain true and correct while this Guaranty is in effect.

©The Northern Trust Company 2016

17. **SAVINGS CLAUSE.** Notwithstanding any provision herein contained to the contrary, Guarantor's liability under this Guaranty shall be limited to an amount not to exceed as of any date of determination the amount which could be claimed by Lender from Guarantor under this Guaranty without rendering such claim voidable or avoidable under Section 548 of the Bankruptcy Code (Title 11, U.S.C.) or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law (for purposes of this Section, the "Avoidance Provisions") after taking into account, among other things, Guarantor's right of contribution and indemnification from each other guarantor, if any. To the end set forth above in this Section, but only to the extent that the obligations of Guarantor hereunder (for purposes of this Section, the "Guarantee Obligations") would otherwise be subject to avoidance under the Avoidance Provisions, if Guarantor is not deemed to have received valuable consideration, fair value, fair consideration or reasonably equivalent value for the Guarantee Obligations, or if the Guarantee Obligations would render Guarantor insolvent, leave Guarantor with unreasonably small capital to conduct its business, or cause Guarantor to have incurred debts (or to have intended to have incurred debts) beyond its ability to pay such debts as they mature, in each case as of the time any of the Guarantee Obligations is deemed to have been incurred for the purposes of the Avoidance Provisions, then the maximum Guarantee Obligations shall be reduced to that amount which, after giving effect thereto, would not cause the Guarantee Obligations as so reduced to be subject to avoidance under the Avoidance Provisions.

18. **JURISDICTION AND VENUE. Except as and if otherwise specifically agreed in any Related Document, and only as to suits, actions or other proceedings pertaining to such Related Document, Guarantor and (by its acceptance hereof as evidenced by its extension of any Liabilities) Lender:**

    **(a)    agree irrevocably that all suits, actions or other proceedings with respect to, arising out of or in connection with this Guaranty or any Related Document shall be subject to litigation in courts having situs within or jurisdiction over Cook County, State of Illinois;**

    **(b)    consent and submit to the jurisdiction of any such court; and**

    **(c)    waive any right to transfer or change the venue of any suit, action or other proceeding brought in accordance with this Section, or to claim that any such proceeding has been brought in an inconvenient forum.**

19. **WAIVER OF JURY TRIAL. TO THE FULLEST EXTENT PERMITTED BY LAW, GUARANTOR AND (BY ITS ACCEPTANCE HEREOF AS EVIDENCED BY ITS EXTENSION OF ANY LIABILITIES) LENDER VOLUNTARILY, KNOWINGLY, IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY RIGHT THEY OR ANY OF THEM MAY HAVE TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) BETWEEN OR AMONG GUARANTOR AND LENDER ARISING OUT OF OR IN ANY WAY RELATED TO THIS GUARANTY, ANY RELATED DOCUMENT, OR ANY RELATIONSHIP BETWEEN LENDER AND GUARANTOR.**

40070108v3
15341.18

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

To the extent applicable under any state law, Guarantor executed and Lender accepted this Guaranty as of the date stated at the top of the first page, intending to create an instrument executed under seal.

**GUARANTOR:**

**DHAROD FAMILY TRUST**, a revocable
California trust

By: Harshad Dharod
    Settlor and Trustee under the Trust Agreement dated
    October 26, 1995

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of _____ Orange _____ )

On ___August 10th___, 2025, before me, ___Blanca Nunez, Notary Public___
(insert name and title of the officer)
personally appeared Harshad Dharod, the Settlor and Trustee of Dharod Family Trust, a revocable California trust, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

I certify that under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

> BLANCA NUNEZ
> Notary Public - California
> Orange County
> Commission # 2401651
> My Comm. Expires Apr 21, 2026

**NOTICE TO COSIGNER**

    **You are being asked to guarantee this debt. Think carefully before you do. If Borrower doesn't pay the debt, you will have to. Be sure you can afford to pay if you have to and that you want to accept this responsibility.**

    **You may have to pay up to the full amount of the debt if Borrower does not pay. You may also have to pay late fees or collection costs, which increases this amount.**

    **The bank can collect this debt from you without first trying to collect from Borrower. The bank can use the same collection methods against you that can be used against Borrower, such as suing you, garnishing your wages, etc. If this debt is ever in default, that fact may become a part of your credit record.**

    **This notice is not the contract that makes you liable for the debt.**

Northern Trust/FFC
Guaranty – Dharod Family Trust

**EXHIBIT A**
(Form of Burndown Request)

*[NOTE: MUST PRINT ON GUARANTOR LETTERHEAD]*

**DATE**

The Northern Trust Company
IL-CD-BB-11
50 South LaSalle, Chicago, IL 60603
Attention: Credit Administration Team

RE: Guaranty of $20,000,000 Term Loan ("<u>Loan</u>")

Pursuant to the terms of that certain Guaranty dated as of September 5, 2025 (the "<u>Guaranty</u>"), executed by the undersigned in favor of The Northern Trust Company, an Illinois banking corporation (the "<u>Lender</u>"), the undersigned hereby requests the Lender to reduce liability under the Guaranty as set forth in paragraph 2(b) of the Guaranty. The Guarantor hereby certifies and the Lender acknowledges that (i) no Event of Default and no Unmatured Event of Default has occurred in the twelve (12) months prior to the date of this Burndown Request, (ii) the outstanding principal balance of the Note has been paid down to $10,000,000, and (iii) the Lease-Adjusted Leverage Ratio has been less than 4.50 to 1.00 for four (4) consecutive calendar quarters. All capitalized terms used herein, which are not defined herein, shall have the meanings given to them in the Guaranty.

**GUARANTOR:**

**DHAROD FAMILY TRUST**, a revocable California trust

*EXHIBIT – DO NOT SIGN*
By: Harshad Dharod,
Settlor and Trustee under the Trust Agreement dated October 26, 1995

**ACKNOWLEDGED BY:**

**THE NORTHERN TRUST COMPANY**, an Illinois banking corporation

By: *EXHIBIT – DO NOT SIGN*
     Tim Rohde
     Its: Senior Vice President

A-1

# EXHIBIT E

**GUARANTY**
**(Short Form)**

This Guaranty (as modified from time to time, the "Guaranty") has been executed on September 5, 2025, by **HARSHAD DHAROD**, a natural person ("Guarantor"), with Guarantor's principal residence at 38 Shoreridge, Newport Coast, CA 92657, in favor of **THE NORTHERN TRUST COMPANY**, an Illinois banking corporation ("Lender"), with a banking office at 50 S. LaSalle Street, Chicago, Illinois 60603. If more than one party executes this Guaranty, "Guarantor" refers to each of them individually and some or all of them collectively, and their obligations hereunder shall be joint and several. If any party comprising "Guarantor" is a trustee(s), "Trust Agreement" means the governing trust agreement and/or instruments governing the trust, as modified from time to time, and all related documents and instruments, and "Guarantor" also refers to the trustee(s) in its capacity as such and the trust individually and collectively. Various capitalized terms have the meanings set forth in the Section entitled "DEFINITIONS."

In consideration of Lender's extension of new financial accommodations or continuation of existing financial accommodations to **SENIOR CLASSIC LEASING, LLC**, a limited liability company organized under the law of the State of California ("Senior"), **DFG RESTAURANTS, INCORPORATED**, a corporation organized under the law of the State of California ("DFG"), **HARSHAD & NASIR CORPORATION**, a corporation organized under the law of the State of California ("H&N"), **SUN GIR INCORPORATED**, a corporation organized under the law of the State of California ("Sun"), **SECOND STAR HOLDINGS LLC**, a limited liability company organized under the law of the State of Nevada ("Second Star"), and **THIRD STAR INVESTMENTS LLC**, a limited liability company organized under the law of the State of California ("Third Star," and together with Senior, DFG, H&N, Sun and Second Star, individually, collectively and jointly and severally "Borrower" or "Borrowers"), and other valuable consideration, the receipt and adequacy of which are hereby acknowledged, Guarantor agrees as follows:

1.      **DEFINITIONS**.

(a)      As used in this Guaranty the following terms shall have the indicated meanings:

"Anti-Terrorism Law" means any law relating to terrorism or money-laundering, including Executive Order No. 13224 and the USA Patriot Act.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. §1 et. seq.), as amended from time to time, and any successor statute.

"Constituent Documents" means the articles or certificate of incorporation, by-laws, partnership agreement, certificate of limited partnership, limited liability company operating agreement, limited liability company articles of organization or certificate of formation, trust agreement, and all other documents and instruments pertaining to the formation and ongoing existence of any person which is not a natural person.

"Control" or "Controlled" means the power to direct the management and policies of a Person, directly or indirectly, whether through the ownership of voting securities or other beneficial interests, by contract or otherwise.

"Credit Support Party" means any Person, or any Persons severally, who now or hereafter guarantees payment or collection of all or any part of the Liabilities or provides any collateral to secure the Liabilities.

"Dollar" and "$" means lawful money of the United States of America, unless otherwise specified.

"Excluded Swap Obligation" means, with respect to any Guarantor, any Swap Obligation if, and to the extent that, all or a portion of the guaranty hereunder of such Guarantor of, or the grant by such Guarantor of a security interest to secure, such Swap Obligation (or any guaranty thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder at the time the guaranty of such Guarantor or the grant of such security interest becomes effective with respect to such Swap Obligation. If a Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such guaranty hereunder or security interest is or becomes illegal.

"Lender Affiliate" means Northern Trust Corporation or any direct or indirect subsidiary thereof (other than Lender itself).

"Liabilities" has the meaning given to such term in Section 2 hereof.

"Liquid Assets" means unencumbered insured cash deposits, U.S. Government securities and securities listed on public exchanges and cash surrender value of life insurance policies.

"Loan Agreement" means that certain Term Loan Agreement of even date herewith by and between the Borrowers and the Lender, as amended, restated or replaced from time to time.

"Note" means that certain Term Note of even date herewith in the original principal amount of $20,000,000 executed by the Borrowers and payable to the order of the Lender, as amended, restated or replaced from time to time.

"Payment Event" has the meaning given to such term in Section 3 hereof.

"Person" means any individual, corporation, company, limited liability company, voluntary association, partnership, trust, estate, unincorporated organization, other entity, or government (or any agency, instrumentality, or political subdivision thereof).

"Prohibited Person" means: (i) a person that is listed in the Annex to, or is otherwise subject to the provisions of, Executive Order No. 13224; (ii) a person owned or controlled by, or acting for or on behalf of, any person that is listed in the Annex to, or is otherwise subject to the provisions of, Executive Order No. 13224; (iii) a person with whom Lender is prohibited from dealing or otherwise engaging in any transaction by any Anti-Terrorism Law; (iv) a person who commits, threatens or conspires to commit or supports "terrorism" as defined in Executive Order No. 13224; (v) a person that is named as a "specially designated national and blocked person" on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control at its official website or at any replacement website or at any other official publication of such list; and (vi) a person who is affiliated with a person described in clauses (i) – (v) above.

"Qualified ECP Guarantor" means, in respect of any Swap Obligation, each Guarantor that has total assets exceeding $10,000,000 at the time the relevant guaranty or grant of the relevant security interest becomes effective with respect to such Swap Obligation or such other person as constitutes an "eligible contract participant" under the Commodity Exchange Act or any regulations

promulgated thereunder and can cause another person to qualify as an "eligible contract participant" at such time by entering into a "keepwell, support or other agreement" under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"Related Document(s)" means this Guaranty, the Note, the Loan Agreement and any other note, application and agreement for letter of credit (reimbursement agreement), Swap Agreement, mortgage, deed of trust, security or pledge agreement, or other agreement, document or instrument previously, now or hereafter delivered to Lender in connection with the Liabilities.

"Related Party(ies)" means Borrower, any Credit Support Party, any Subsidiary, and, in addition: (i) as to any Guarantor which is a natural person, trusts for the benefit of Guarantor; and (ii) as to any Guarantor which is not a natural person, to the extent applicable, any general or limited partner, controlling shareholder, joint venturer, member or manager, of Guarantor.

"Subsidiary" means any corporation, partnership, limited liability company, joint venture, trust, or other legal entity of which Guarantor owns directly or indirectly 50% or more of the outstanding voting stock or interest, or of which Guarantor has effective control, by contract or otherwise.

"Swap Agreement" means any agreement, document or instrument executed or delivered by Borrower or Guarantor pertaining to any Swap Obligation.

"Swap Obligation" means, with respect to Borrower or any Guarantor, any obligation to pay or perform under any agreement, contract, or transaction that constitutes a "swap" within the meaning of section 1(a)(47) of the Commodity Exchange Act, as amended from time to time, if entered into with Lender or any Lender Affiliate.

"USA Patriot Act" means the "Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001" (Public Law 107-56, signed into law on October 26, 2001), as amended from time to time.

(b)     As used in this Guaranty, unless otherwise specified:  the term "including" means "including without limitation"; the term "days" means "calendar days"; and terms such as "herein," "hereof" and words of similar import refer to this Guaranty as a whole.  Unless otherwise defined herein or the context requires otherwise, all terms (including those not capitalized) that are defined in the Uniform Commercial Code of Illinois shall have the same meanings herein as in such Code, as such Code may be amended from time to time (the "UCC"); however, no amendment to the UCC after the date hereof shall limit any rights of Lender hereunder or in connection herewith. Unless the context requires otherwise, wherever used herein the singular shall include the plural and vice versa, and the use of one gender shall also denote the others.  Captions herein are for convenience of reference only and shall not define or limit any of the terms or provisions hereof; references herein to sections or provisions without reference to the document in which they are contained are references to this Guaranty.

2.     **LIABILITIES COVERED.**

(a)     Subject to subsections (b) and (c) below, Guarantor hereby guarantee(s) absolutely and unconditionally the prompt payment and performance when due, whether at maturity, by declaration, by demand or otherwise, and at any and all times thereafter, of all indebtedness and other obligations of every kind and nature of Borrower to Lender, direct or indirect, absolute or contingent, due or to become due, now or hereafter existing, joint, several or joint and several (all

such indebtedness and other obligations being hereinafter collectively called the "Liabilities"). Notwithstanding the foregoing, the term "Liabilities" includes all Swap Obligations except for any Excluded Swap Obligations, which shall not be guaranteed pursuant to the terms hereof.

(b)        Notwithstanding anything to the contrary in subsection (a) above but subject at all times to subsection (c) below, so long as (i) the Guarantor has provided a written request to the Lender in the form attached hereto as Exhibit A (a "Burndown Request"), (ii) no Event of Default and no Unmatured Event of Default (as those terms are defined in the Related Documents) has occurred in the prior twelve (12) months prior to the date of the Burndown Request, (iii) the outstanding principal balance of the Note has been paid down to $10,000,000, and (iv) the Lease-Adjusted Leverage Ratio (as defined in the Loan Agreement) has been less than 4.50 to 1.00 for four (4) consecutive calendar quarters, then effective on the date of achievement of all of the foregoing conditions, the maximum liability of the Guarantor shall be reduced to zero.

(c)        Notwithstanding anything to the contrary contained herein, *in addition to, and not in lieu of*, any other liability of Guarantor under this Guaranty or the other Related Documents, Guarantor guarantees and promises to pay to Lender, or order, on demand, in lawful money of the United States of America, in immediately available funds (and to defend, indemnify and hold harmless Lender, its directors, officers, employees, successors and assigns from and against any and all claims, suits, liabilities (including, without limitation, strict liabilities and any impairment of Lender's security for the Liabilities), actions, or proceedings), any obligations, debts, damages, losses, costs, expenses, fines, penalties, charges, fees, judgments, awards, court costs, and legal or other expenses (including, without limitation, attorneys' fees and expenses and amounts paid in settlement of whatever kind or nature), which Lender may incur as a direct or indirect consequence of:

        (i)        fraud or intentional or willful misrepresentation by Borrower, Guarantor, or any Affiliate (as defined in the Loan Agreement) or agent of Borrower or Guarantor, or their failure to disclose a material fact;

        (ii)        the filing by the Borrower or the Guarantor of a voluntary petition under the Bankruptcy Reform Act of 1978 (11 USC Section 101-1330) as now or hereafter amended or recodified ("Bankruptcy Code"), or under any other present or future state or federal law regarding bankruptcy, reorganization or other debtor relief law, or any Affiliate, officer, director, or representative which Controls Borrower, consents to or acquiesces in or joins in an application for the appointment of a custodian, receiver, trustee, or examiner for Borrower or any portion of the Project, or Borrower or Guarantor makes an assignment for the benefit of creditors, or admits in any legal proceeding its or his insolvency or inability to pay its or his debts as they become due;

        (iii)        the filing against the Borrower or the Guarantor of an involuntary petition under the Bankruptcy Reform Act of 1978 (11 USC Section 101-1330) as now or hereafter amended or recodified ("Bankruptcy Code"), or under any other present or future state or federal law regarding bankruptcy, reorganization or other debtor relief law, which is not dismissed within ninety (90) days of such filing;

        (iv)        the gross negligence, willful misconduct, or commission of a criminal act by Borrower, Guarantor, or any Affiliate or agent of Borrower or Guarantor which results in a forfeiture of any collateral secured pursuant to the Security Documents (the "Collateral");

(v)      material physical waste of the Collateral;

(vi)      failure to maintain insurance as required by the Loan Agreement and any other Related Documents;

(vii)      failure to deliver any insurance proceeds or awards received by Borrower to Lender or to otherwise apply such sums as required under the terms of the Related Documents or any other instrument now or hereafter securing the Liabilities;

(viii)      misappropriation or misapplication of any funds from any account pledged by Borrower to Lender under the Loan Agreement or the other Related Documents; and

(ix)      any litigation or other legal proceeding related to the Loan is filed by Borrower or Guarantor that delays, opposes, impedes, obstructs, hinders, enjoins or otherwise interferes with or frustrates the efforts of Lender to exercise any rights and remedies available to Lender as provided herein and in the other Related Documents.

(d)      To the extent that (i) there is more than one guarantor of the Liabilities and (ii) Guarantor is a Qualified ECP Guarantor, Guarantor hereby jointly, severally, absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each other guarantor to honor all of its obligations under this Guaranty in respect of Swap Obligations (provided, however, that each Qualified ECP Guarantor shall only be liable under this subsection (c) for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this subsection (c), or otherwise under this Guaranty, voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount).  The obligations of any Qualified ECP Guarantor under this subsection (c) shall remain in full force and effect until the Liabilities have been paid and performed in full and Lender has no further commitment to lend to Borrower.  Such Qualified ECP Guarantor intends that this subsection (c) constitute, and this subsection (c) shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each other guarantor for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

(e)      The right of recovery under this Guaranty is in addition to and not in contravention of the amounts Lender may recover against Guarantor under any and all other guaranties or other Related Documents previously, now or hereafter executed by Guarantor, whether pertaining to Borrower or to any other person.

3.      **WHEN PAYMENT BY GUARANTOR REQUIRED**.

(a)      For purposes of this Guaranty, "Payment Event" means the occurrence of any of the following:

(i)      a default, event of default or similar event occurs under any note, mortgage, deed of trust, pledge agreement, security agreement, letter of credit reimbursement agreement, Swap Agreement, or other Related Document, and shall continue beyond any applicable notice, grace or cure period set forth in such Related Document; or Guarantor shall die or be declared legally incompetent; or

(ii)      any bankruptcy, insolvency, reorganization, arrangement, readjustment, liquidation, dissolution, or similar proceeding, domestic or foreign,

is instituted by or against Guarantor or Borrower, and, if instituted against Guarantor or Borrower, shall not be dismissed or vacated within sixty (60) days after the filing or other institution thereof; or

(iii)    Guarantor or Borrower shall become insolvent, generally shall fail or be unable to pay its debts as they mature, shall admit in writing its inability to pay its debts as they mature, shall make a general assignment for the benefit of its creditors, shall enter into any composition or similar agreement, or shall suspend the transaction of all or a substantial portion of its usual business.

(b)    If a Payment Event occurs, Guarantor agrees to pay Lender immediately upon Lender's demand the full amount of all Liabilities.  If a Payment Event specified in (ii) or (iii) of subsection (a) of this Section occurs, Guarantor's obligation to pay all Liabilities (principal, interest and other amounts) shall be immediately and automatically due and payable without notice, demand or other action of any kind.

4.    **NO RELIANCE ON LENDER.**  Guarantor represents and warrants to Lender that in making its decision to enter into this Guaranty, Guarantor has independently taken whatever steps Guarantor considers necessary to evaluate the condition and affairs of Borrower without reliance upon Lender, and has made an independent judgment.  As long as this Guaranty remains in effect, Guarantor will continue to make an independent evaluation of the financial condition and affairs of Borrower without reliance upon Lender. Lender has no obligation to provide to Guarantor any financial or other information concerning Borrower.

5.    **TERM OF GUARANTY; REINSTATEMENT.**  This Guaranty shall remain in full force and effect until all Liabilities have been paid and performed in full and until Lender has not extended to Borrower any committed or uncommitted loan or other credit facility of any kind.  This Guaranty and Guarantor's obligations hereunder may not be amended or waived without the prior written consent of Lender, and shall remain in effect notwithstanding that at any particular time there shall be no Liabilities outstanding.  This Guaranty shall continue to be effective or be reinstated, as the case may be, if at any time payment, or any part thereof, of the Liabilities to Lender is rescinded or must otherwise be returned by Lender upon the insolvency, bankruptcy or reorganization of Borrower or otherwise, all as though such payment to Lender had not been made.

6.    **WAIVERS OF DEFENSES AND COUNTERCLAIMS.**  Without limiting any other provision hereof, Guarantor irrevocably waives and relinquishes any setoff, defense or counterclaim that is or may be available to an accommodation party, co-signer, guarantor or surety at law or in equity.  Without limiting the generality of the previous sentence or of any other protection to Lender hereunder or at law or in equity:

(a)    Lender may at any time and from time to time, without notice to Guarantor, take any or all of the following actions without affecting or impairing the liability of Guarantor on this Guaranty: (i) renew or extend time of payment of the Liabilities; (ii) accept, substitute, release or surrender any security for the Liabilities; (iii) accept other guarantors; and (iv) release any person primarily or secondarily liable on the Liabilities (including Borrower and any maker, indorser or guarantor).

(b)    The liability of Guarantor under this Guaranty shall in no way be affected or impaired by any failure or delay in enforcing payment of the Liabilities or this Guaranty or any security therefor or herefor, or in exercising any right or power in respect thereto or hereto, or by any compromise, waiver, settlement, change, subordination, modification or disposition of the Liabilities or of any security for the Liabilities or for this Guaranty.  In order to hold Guarantor liable hereunder, there shall be no obligation on the part of Lender, at any time, to resort for payment to Borrower or any

other guaranty or to any security for the Liabilities or this Guaranty, and Lender shall have the right to enforce this Guaranty irrespective of whether or not other proceedings or steps are being taken against any property securing the Liabilities or any other party primarily or secondarily liable on any of the Liabilities.

(c)　　　Except as and if otherwise specifically set forth herein, Guarantor irrevocably waives notice of acceptance of this Guaranty, presentment, protest, notice of protest, notice of intent to accelerate, notice of acceleration, demand, diligence, grace, notice of dishonor or default, notice of nonpayment, notice of acceptance, notice of any loans made, extensions granted or other action taken in reliance hereon, and all other demands and notices of any kind in connection with this Guaranty or the Liabilities.

(d)　　　Any and all payments upon the Liabilities made by Borrower, by Guarantor, or by any other person, and the proceeds of any and all security for any of the Liabilities may be applied by Lender upon such of the items of the Liabilities as it may determine.

(e)　　　Until payment and performance in full of the Liabilities, Guarantor waives any claim or other right which Guarantor might now have or hereafter acquire against Borrower or any other person primarily or contingently liable on the Liabilities (including any maker, indorser or guarantor) or that arises from the existence or performance of Guarantor's obligations under this Guaranty, including any right of subrogation, reimbursement, exoneration, contribution or indemnification, or any right of participation in any claim or remedy of Lender against Borrower or any security for the Liabilities which Lender now has or hereafter acquires, however arising.

(f)　　　If any person other than Borrower (any such person, a "Third Party Obligor") shall be obligated in respect of the Liabilities, as a pledgor, a guarantor or otherwise, and shall make any payment in respect of the Liabilities, Guarantor agrees, after payment in full of the Liabilities and termination of all commitments by Lender and Lender Affiliates to extend credit to Borrower, to make a contribution to any such Third Party Obligor. The amount of the contribution made by Guarantor shall be an amount sufficient to cause the contributions for payments on the Liabilities made by Guarantor and all such Third Party Obligors to be proportionate to the respective benefits received by Guarantor and the Third Party Obligors. Nothing in this subsection (f) shall limit the obligations of Guarantor to Lender and Lender Affiliates hereunder.

7.　　　**REPRESENTATIONS AND WARRANTIES.**

(a)　　　Guarantor represents and warrants to, and agrees in favor of, Lender that:

(i)　　　(A)　　　If Guarantor is an organization (including a trust that is a registered organization), then Guarantor is an entity of the type, and is organized under the laws of the jurisdiction, specified in the preamble hereto. Guarantor's name as shown in the preamble hereto is the full exact name that appears in Guarantor's organizational documents. If Guarantor is a registered organization, Guarantor's name as shown in the preamble hereto is as shown on the public organic record most recently filed with or issued or enacted by Guarantor's jurisdiction of organization which purports to state, amend, or restate Guarantor's name. If Guarantor is an organization but not a registered organization, if it has only one place of business that place of business is at Guarantor's address indicated in the preamble hereto, but if it has

more than one place of business, its chief executive office is at such address.

(B)     If Guarantor is a trust which is not itself a registered organization, then: (1) if the Trust Agreement specifies a name for the trust, Guarantor's name as shown in the preamble hereto is the name so specified; (2) Guarantor has provided the name of its settlor(s) or testator(s) to Lender; and (3) if Guarantor has only one place of business, that place of business is at Guarantor's address indicated in the preamble hereto, but if it has more than one place of business, its chief executive office is at such address.

(C)     If Guarantor is a natural person, then:

(1)     Guarantor's principal residence is located at the address shown in the preamble hereto; and

(2)     i.     if Guarantor has a driver's license or alternative identification that has not expired and that was issued by the state of Guarantor's principal residence, Guarantor's name shown in the preamble hereto is exactly the same as shown on that driver's license or alternative identification card; or

ii.     if Guarantor does not have a driver's license or alternative identification card that has not expired and that was issued by the state of Guarantor's principal residence, then: (x) Guarantor's first given name and surname are as shown in the preamble hereto; and (y) if Guarantor obtains a driver's license or alternative identification card from the state of Guarantor's principal residence, then Guarantor shall, within thirty (30) days of the issuance of such driver's license or alternative identification card, provide Lender with a true and accurate copy of such driver's license or alternative identification card, showing Guarantor's name and address, the state of issuance and the expiration date thereof; and

(3)     in any event, Guarantor shall provide Lender notice within thirty (30) days of the happening of each of the following events:

i.     Guarantor's principal residence has changed;

ii.     the name of Guarantor on Guarantor's driver's license or alternative identification card has changed in any manner, no matter how small;

Guaranty 2016-4/27/16
©The Northern Trust Company 2016

Northern Trust/FFC
Guaranty – Harshad Dharod

      iii.    Guarantor's driver's license or alternative identification has been surrendered, suspended, changed or terminated in any manner, no matter how small or for how short a time;

      iv.    Guarantor's driver's license or alternative identification card has expired; or

      v.    Guarantor has changed his or her first given name or surname, whether as a result of marriage, divorce, legal proceeding or otherwise.

(D)    The representations and warranties made by Guarantor in (A)-(C) of this (i), as applicable, would have been accurate at all times during the five years and six months prior to the date hereof except as and if Guarantor has specifically notified Lender in writing prior to Guarantor's execution of this Guaranty.

(ii)    Guarantor (if Guarantor is not a natural person) and any Subsidiary are validly existing and in good standing under the laws of their state of organization or formation, and are duly qualified, in good standing and authorized to do business in each jurisdiction where failure to do so would reasonably be expected to have a material adverse impact on the assets, condition or prospects of Guarantor.

(iii)    The execution, delivery and performance of this Guaranty and all Related Documents: are within Guarantor's powers and have been authorized by all necessary action required by law and (unless Guarantor is a natural person) Guarantor's Constituent Documents; have received any and all necessary governmental approval; and do not and will not contravene or conflict with any provision of law, any Constituent Document or any agreement affecting Guarantor or its property. This Guaranty and all Related Documents are enforceable against Guarantor and/or the applicable Related Parties in accord with their terms, except to the extent, if any, that such enforceability may be limited by equitable principles, whether applied in a court of law or equity, or by bankruptcy, insolvency and other laws affecting creditors' rights generally.

(iv)    There has been no material adverse change in the business, condition, properties, assets, operations or prospects of Guarantor since the date of the latest financial statements or other documentation provided by or on behalf of Guarantor to Lender.

(v)    Guarantor has filed or caused to be filed all foreign, federal, state, and local tax returns that are required to be filed, and has paid or has caused to be paid all of its taxes, including any taxes shown on such returns or on any assessment received by it, to the extent that such taxes have become due.

(vi)    The execution, delivery and performance of this Guaranty and all Related Documents are in Guarantor's best interest in its current and future operations and will materially benefit Guarantor. Guarantor has received adequate, fair and valuable consideration, and at least reasonably equivalent value, to enter into and

perform this Guaranty and all Related Documents. Guarantor's assets at fair valuation exceed the sum of Guarantor's debts. Guarantor is able to pay its debts as they become due. Guarantor does not have unreasonably small capital with which to conduct its business.

8.  **GUARANTOR COVENANTS.** Guarantor agrees that so long as this Guaranty remains in effect, it will:

(a)  NOTIFY LENDER IN WRITING AT LEAST SIXTY (60) DAYS IN ADVANCE OF: (i) ANY CHANGE WHATSOEVER IN THE NAME OF GUARANTOR; (ii) ANY CHANGE WHATSOEVER IN THE STATE OR JURISDICTION IN WHICH GUARANTOR IS ORGANIZED OR FORMED OR, IF GUARANTOR IS A NATURAL PERSON, IN WHICH GUARANTOR'S PRINCIPAL RESIDENCE IS LOCATED; (iii) ANY NEW NAMES UNDER WHICH GUARANTOR INTENDS TO DO BUSINESS; OR (iv) ANY NEW ADDRESSES AT OR FROM WHICH GUARANTOR INTENDS TO DO BUSINESS. IF GUARANTOR IS A REGISTERED ORGANIZATION, SUCH AS A CORPORATION, LIMITED LIABILITY COMPANY, OR LIMITED PARTNERSHIP, GUARANTOR AGREES TO NOTIFY LENDER IMMEDIATELY IF GUARANTOR'S STATE OR JURISDICTION OF ORGANIZATION DISSOLVES, SUSPENDS OR TERMINATES GUARANTOR'S EXISTENCE OR PRIVILEGES, OR NOTIFIES GUARANTOR THAT IT IS NOT IN COMPLIANCE WITH ANY REQUIREMENTS OF SUCH STATE OR OTHER JURISDICTION. IF GUARANTOR IS A NATURAL PERSON THE FOREGOING PORTION OF THIS (a) DOES NOT LIMIT GUARANTOR'S AGREEMENTS IN SUBSECTION (a)(i)(C) OF THE SECTION ENTITLED "REPRESENTATIONS AND WARRANTIES."

(b)  Furnish (or cause to be furnished) to Lender:

(i)  the information and documentation required under Section 8(b) of the Loan Agreement for the Guarantor.

(ii)  Within thirty (30) days after the end of each calendar quarter, information concerning commercial real estate indebtedness of the Guarantor or any Affiliates scheduled to mature over the next twelve (12) calendar months including, without limitation, amount, maturity, lender, and a progress update on whether such debt will be extended, modified or otherwise refinanced along with other information reasonably requested by the Lender in connection therewith.

(iii)  From time to time such other information, financial or otherwise, concerning Guarantor or any Related Party as Lender may reasonably request.

(c)  Furnish (or cause to be furnished) to Lender:

(i)  Immediately upon the institution of, or any adverse determination in, any litigation, arbitration or governmental proceeding which is material to Guarantor or any Subsidiary on a consolidated basis, written notice describing the same and the steps being taken by Guarantor or any Subsidiary in respect thereof.

(ii)  From time to time such other information, financial or otherwise, concerning Guarantor or any Related Party as Lender may reasonably request, including fully-completed personal financial statements of any Related Party who

is a natural person on Lender's then-current form on and as of such dates as Lender may reasonably request.

(d)     If Guarantor is not a natural person:  (a) preserve and maintain its existence, rights, franchises, licenses and privileges; and (b) not liquidate, dissolve, merge, or consolidate with or into any other entity, or sell, lease, transfer or otherwise dispose of all or a substantial part of its assets other than in the ordinary course of business as now conducted.

(e)     Guarantor, on a combined basis with all other Guarantors, shall maintain Liquid Assets of at least $15,000,000 at all times, subject to reduction on a dollar-for-dollar basis with the monthly principal amount paid by the Borrower on the Note.  In addition, the foregoing covenant shall no longer be measured once the Borrower has reduced the outstanding principal balance on the Note to $10,000,000.

9.     **SECURITY INTEREST; SETOFF.**  To secure the payment and performance of Guarantor's obligations hereunder, Guarantor grants to Lender a security interest in all property of Guarantor now or at any time hereafter in the possession of Lender for any purpose.  Lender shall have the rights and remedies of a secured party under the UCC in respect to such property, including the right to sell or otherwise dispose of any or all of such property.  Lender may apply or set off any deposit or other indebtedness at any time credited by or due from Lender to Guarantor against any liability of Guarantor under this Guaranty when any amount is payable hereunder by Guarantor.

10.     **LENDER MAY ALSO BE FIDUCIARY.**  Guarantor hereby irrevocably waives, releases and forever relinquishes any claim or right of any nature whatsoever based upon the fact that a trustee or other fiduciary of any Guarantor or Related Party is or may be Lender itself or a Lender Affiliate, and irrevocably consents to any such circumstance.  The rights and powers of Lender shall not in any way be restricted by reason of any such present or future circumstance.

11.     **ARM'S LENGTH TRANSACTIONS.**  Guarantor acknowledges and agrees that:

(a)     The transactions contemplated by the Related Documents are arm's length commercial transactions among Guarantor, Lender and any other parties thereto.

(b)     In connection with such transactions, Lender is acting solely as a principal and not as an agent or a fiduciary of Guarantor or any Related Party.

(c)     With respect to any advances of Liabilities or the process leading thereto (whether or not Lender or any Lender Affiliate has advised or is currently advising Guarantor or any Related Party on other matters), Lender has not assumed a fiduciary responsibility in favor of Guarantor or any Related Party or any other obligation of Guarantor or any Related Party.

(d)     Guarantor and the Related Parties have consulted with their own legal and financial advisors to the extent they deem appropriate in connection with the transactions contemplated by the Related Documents.

12.     **NOTICES.**  Except as and if otherwise provided herein, all notices, requests and demands to or upon the respective parties pursuant hereto shall be in writing and shall be deemed to have been given or made five business days after a record has been deposited in the mail, postage prepaid, or one business day after a record has been deposited with a recognized overnight courier, charges prepaid or to be billed to the

sender, or on the day of delivery if delivered manually with receipt acknowledged, in each case addressed or delivered:

    (a)    if to Lender to **The Northern Trust Company, Attention: Credit Administration Team, IL-CD-BB-11, 50 South LaSalle, Chicago, IL 60603,** with a copy to Winthrop & Weinstine, P.A., 225 South Sixth Street, Suite 3500, Minneapolis, Minnesota 55402, Attn: Jonathan W.J. Armour; and

    (b)    if to Guarantor to its address indicated in the preamble hereto,

or to such other address as may be hereafter designated in writing by the respective parties hereto by a notice in accord with this Section.

13.    **MISCELLANEOUS**.  Except as and if otherwise specifically agreed in any Related Document, and only as to such Related Document, and to the extent, if any, that the UCC or other law provides for the application of the law of a different state, this Guaranty and the Related Documents shall be:  (i) governed by and construed in accordance with the internal law of the State of Illinois; and (ii) deemed to have been executed in the State of Illinois.  This Guaranty shall bind Guarantor, its(his)(her) heirs, trustees (including successor and replacement trustees), executors, personal representatives, successors and assigns, except that Guarantor may not transfer or assign any rights or obligations hereunder without the prior written consent of Lender.  Without limiting Guarantor's obligations under any other provision hereof, Guarantor agrees to pay upon demand all expenses (including reasonable attorneys' fees, legal costs and expenses, and time charges of attorneys who may be employees of Lender, in each case whether in or out of court, in original or appellate proceedings or in bankruptcy) incurred or paid by Lender in connection with the enforcement or preservation of its rights hereunder or under any Related Document.  This Guaranty may be executed in two or more counterparts, and (if there is more than one party) by each party on separate counterparts, each of which shall be deemed an original but which together shall constitute one and the same instrument.  **Delivery of an executed counterpart of a signature page of this Guaranty, whether with or without the remainder hereof, by facsimile or in electronic (e.g., "pdf" or "tif") format shall be effective as delivery of a manually executed counterpart hereof.**  Time is of the essence in the performance of all obligations under this Guaranty.  This Guaranty is, and is intended to take effect as, an instrument under seal.  Whenever possible, each provision of this Guaranty shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Guaranty shall be prohibited by or invalid under such law, such provision shall be ineffective only to the extent and duration of such prohibition or invalidity without invalidating the remainder of such provision, the applicability of such provision in any other instance, or the remaining provisions of this Guaranty.  To the maximum extent permitted by applicable law, Lender is hereby authorized by Guarantor without notice to Guarantor to fill in any blank spaces and dates herein or in any Related Document to conform to the terms of the transaction and/or understanding evidenced hereby.  **THIS GUARANTY AND THE RELATED DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AS TO THE SUBJECT MATTER HEREOF AND THEREOF, AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

14.    **NO PUNITIVE DAMAGES. NO PARTY HERETO MAY SEEK OR RECOVER PUNITIVE DAMAGES IN ANY PROCEEDING BROUGHT UNDER OR IN CONNECTION WITH THIS GUARANTY OR ANY RELATED DOCUMENT.  THIS PROVISION IS A MATERIAL INDUCEMENT TO LENDER TO EXTEND CREDIT SUPPORTED BY THIS GUARANTY.**

15.     **AUTHORIZATION TO RECORD PHONE CALLS.  FOR ITSELF AS WELL AS ANY RELATED PARTY AND ANY AGENT, DIRECTOR, EMPLOYEE, MANAGER, MEMBER, OFFICER, OR PARTNER OF GUARANTOR, AS APPLICABLE, GUARANTOR IRREVOCABLY CONSENTS TO LENDER'S RECORDING OF ANY TELEPHONE CONVERSATION PERTAINING TO THIS GUARANTY.**

16.     **ANTI-TERRORISM LAW.**

**(a)     Lender hereby notifies Guarantor and any Related Party that, pursuant to the requirements of the USA Patriot Act, Lender may be required to obtain, verify and record information that identifies Guarantor and any Related Party, which information may include the name and address of Guarantor and any Related Party and other information that will allow Lender to identify Guarantor and any Related Party in accord with the USA Patriot Act.  Guarantor hereby agrees to take any action necessary to enable Lender to comply with the requirements of the USA Patriot Act.**

(b)     Guarantor covenants, represents and warrants as follows:

(i)     Neither Guarantor nor any Related Party is or, to the best of Guarantor's knowledge, will be in violation of any Anti-Terrorism Law.

(ii)     Neither Guarantor nor any Related Party is or, to the best of Guarantor's knowledge, will be a Prohibited Person.

(iii)     Neither Guarantor nor any Related Party:  (A) conducts any business or engages in any transaction or dealing with any Prohibited Person, including making or receiving any contribution of funds, goods or services to or for the benefit of any Prohibited Person; (B) deals in, or otherwise engages in any transaction relating to, any property or interests in property blocked pursuant to Executive Order No. 13224; or (C) engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law.

(iv)     Neither Guarantor nor any Related Party will engage in any of the activities described in (iii) of this subsection (b) in the future.

(v)     Guarantor and each Related Party will ensure that the proceeds of the Liabilities are not used to violate any foreign asset control regulations of the U.S. Office of Foreign Assets Control ("OFAC") or of any enabling statute or any Executive Order relating thereto.

(vi)     Guarantor will deliver to Lender any certification or other evidence requested from time to time by Lender in its sole reasonable discretion, confirming Guarantor's and any Related Party's compliance with this Section.

(vii)     Guarantor has implemented procedures, and will consistently apply those procedures while this Guaranty is in effect, to ensure that the representations and warranties in this Section remain true and correct while this Guaranty is in effect.

Guaranty 2016-4/27/16
©The Northern Trust Company 2016

17.     **SAVINGS CLAUSE.**     Notwithstanding any provision herein contained to the contrary, Guarantor's liability under this Guaranty shall be limited to an amount not to exceed as of any date of determination the amount which could be claimed by Lender from Guarantor under this Guaranty without rendering such claim voidable or avoidable under Section 548 of the Bankruptcy Code (Title 11, U.S.C.) or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law (for purposes of this Section, the "Avoidance Provisions") after taking into account, among other things, Guarantor's right of contribution and indemnification from each other guarantor, if any. To the end set forth above in this Section, but only to the extent that the obligations of Guarantor hereunder (for purposes of this Section, the "Guarantee Obligations") would otherwise be subject to avoidance under the Avoidance Provisions, if Guarantor is not deemed to have received valuable consideration, fair value, fair consideration or reasonably equivalent value for the Guarantee Obligations, or if the Guarantee Obligations would render Guarantor insolvent, leave Guarantor with unreasonably small capital to conduct its business, or cause Guarantor to have incurred debts (or to have intended to have incurred debts) beyond its ability to pay such debts as they mature, in each case as of the time any of the Guarantee Obligations is deemed to have been incurred for the purposes of the Avoidance Provisions, then the maximum Guarantee Obligations shall be reduced to that amount which, after giving effect thereto, would not cause the Guarantee Obligations as so reduced to be subject to avoidance under the Avoidance Provisions.

18.     **JURISDICTION AND VENUE.  Except as and if otherwise specifically agreed in any Related Document, and only as to suits, actions or other proceedings pertaining to such Related Document, Guarantor and (by its acceptance hereof as evidenced by its extension of any Liabilities) Lender:**

> **(a)     agree irrevocably that all suits, actions or other proceedings with respect to, arising out of or in connection with this Guaranty or any Related Document shall be subject to litigation in courts having situs within or jurisdiction over Cook County, State of Illinois;**

> **(b)     consent and submit to the jurisdiction of any such court; and**

> **(c)     waive any right to transfer or change the venue of any suit, action or other proceeding brought in accordance with this Section, or to claim that any such proceeding has been brought in an inconvenient forum.**

19.     **WAIVER OF JURY TRIAL.  TO THE FULLEST EXTENT PERMITTED BY LAW, GUARANTOR AND (BY ITS ACCEPTANCE HEREOF AS EVIDENCED BY ITS EXTENSION OF ANY LIABILITIES) LENDER VOLUNTARILY, KNOWINGLY, IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY RIGHT THEY OR ANY OF THEM MAY HAVE TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) BETWEEN OR AMONG GUARANTOR AND LENDER ARISING OUT OF OR IN ANY WAY RELATED TO THIS GUARANTY, ANY RELATED DOCUMENT, OR ANY RELATIONSHIP BETWEEN LENDER AND GUARANTOR.**

31934806v3
15341.18

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

Guaranty 2016-4/27/16
©The Northern Trust Company 2016

Northern Trust/FFC
Guaranty – Harshad Dharod

To the extent applicable under any state law, Guarantor executed and Lender accepted this Guaranty as of the date stated at the top of the first page, intending to create an instrument executed under seal.

**GUARANTOR:**

_____
**HARSHAD DHAROD**, a natural person

| A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document. |
| --- |

State of California
County of _____ Orange _____ )

On August 5th ____, 2025, before me, Blanca Nunez, Notary Public
(insert name and title of the officer)
personally appeared Harshad Dharod, a natural person, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

I certify that under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

BLANCA NUNEZ
Notary Public · California
Orange County
Commission # 2401651
My Comm. Expires Apr 21, 2026

Signature _____ (Seal)

**NOTICE TO COSIGNER**

You are being asked to guarantee this debt. Think carefully before you do. If Borrower doesn't pay the debt, you will have to. Be sure you can afford to pay if you have to and that you want to accept this responsibility.

You may have to pay up to the full amount of the debt if Borrower does not pay. You may also have to pay late fees or collection costs, which increases this amount.

The bank can collect this debt from you without first trying to collect from Borrower. The bank can use the same collection methods against you that can be used against Borrower, such as suing you, garnishing your wages, etc. If this debt is ever in default, that fact may become a part of your credit record.

This notice is not the contract that makes you liable for the debt.

Guaranty 2016-4/27/16
©The Northern Trust Company 2016

<div align="right">Northern Trust/FFC<br>Guaranty – Harshad Dharod</div>

**EXHIBIT A**
(Form of Burndown Request)

*[NOTE:  MUST PRINT ON GUARANTOR LETTERHEAD]*

**DATE**


The Northern Trust Company
IL-CD-BB-11
50 South LaSalle, Chicago, IL 60603
Attention: Credit Administration Team

RE:  Guaranty of $20,000,000 Term Loan ("Loan")

Pursuant to the terms of that certain Guaranty dated as of September 5, 2025 (the "Guaranty"), executed by the undersigned in favor of The Northern Trust Company, an Illinois banking corporation (the "Lender"), the undersigned hereby requests the Lender to reduce liability under the Guaranty as set forth in paragraph 2(b) of the Guaranty.  The Guarantor hereby certifies and the Lender acknowledges that (i) no Event of Default and no Unmatured Event of Default has occurred in the twelve (12) months prior to the date of this Burndown Request, (ii) the outstanding principal balance of the Note has been paid down to $10,000,000, and (iii) the Lease-Adjusted Leverage Ratio has been less than 4.50 to 1.00 for four (4) consecutive calendar quarters.  All capitalized terms used herein, which are not defined herein, shall have the meanings given to them in the Guaranty.

<div align="center"><b>GUARANTOR:</b></div>


*EXHIBIT – DO NOT SIGN* _____
**HARSHAD DHAROD**, a natural person


**ACKNOWLEDGED BY:**

**THE NORTHERN TRUST COMPANY**, an
Illinois banking corporation


By: *EXHIBIT – DO NOT SIGN* _____
    Tim Rohde
    Its: Senior Vice President

<div align="center">A-1</div>